**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Civil Action No.    05-11395-RCL

PATRICIA BERGEVINE,
         Plaintiff,

v.

PEASE & CURREN, INC, PEASE & CURREN
MATERIALS, INC., FRANCIS H. CURREN, JR.,
ROBERT H. PEASE, JR., FRANCIS H. CURREN,
III A/K/A KIP CURREN AND MEREDITH A.
CURREN.
         Defendants.

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO
PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE AS TO DAMAGES
AND FOR SANCTIONS DUE TO SPOLIATION**

---

**INTRODUCTION**

NOW COMES the Plaintiff Patricia Bergevine (the "Plaintiff") and hereby moves this

Honorable Court to preclude the Defendants Pease & Curren, Inc., Pease & Curren Materials,

Inc., Francis H. Curren, Jr., Robert H. Pease, Jr., Francis H. Curren, III a/k/a Kip Curren and

Meredith Curren (the "Defendants") from introducing evidence relating to damages as a result of

the intentional destruction of computer files, ledger cards, assay tickets and other relevant

documents, all of which are central to this litigation, and which the Defendants have admitted to

incinerating or deleting prior to, and since the commencement of, this litigation.  In support

hereof, the Plaintiff states as follows:

# PROCEDURAL HISTORY

On or about July 1, 2005, Plaintiff filed suit against the Defendants Pease & Curren, Inc.,

Pease & Curren Materials, Inc., Francis H. Curren, Jr., Robert H. Pease, Jr., Francis H. Curren,

III a/k/a Kip Curren and Meredith Curren (the "Defendants") for breach of contract, fraud,

violations of the Racketeer Influence and Corrupt Organization Act (RICO), 18 U.S.C. §§

1962(a) and 1962 (c), negligent infliction of emotional distress[1] and intentional infliction of

emotional distress as a result of Defendants' fraudulent conduct and business practices. The

Defendants answered Plaintiff's Complaint (the "Defendants' Answer") on August 9, 2005,

denying Plaintiff's allegations.

On March 10, 2006, the Plaintiff served the Defendants with, among other things,

Plaintiff's Request for Production of Documents Propounded Upon the Defendants Francis H.

Curren, Jr., Francis H. Curren, III a/k/a Kip Curren, Robert H. Pease, Jr., Meredith Curren, Pease

& Curren, Inc. and Pease & Curren Materials, Inc. Thereafter, on or about April 25, 2006, the

Defendants filed a Motion for a Protective Order to Defer Depositions and Answers to

Interrogatories for Six Months. Plaintiff opposed same on May 1, 2006 and filed a Cross-Motion

to Compel the Defendants to Participate in Discovery and for Sanctions. On May 24, 2006, the

Court (Lindsay, J.) denied the Defendants' Motion for a Protective Order and granted Plaintiff's

Cross-Motion (the "May 24, 2006 Order"). Thereafter, via e-mail, telephone and letter, Plaintiff

sought responses to Plaintiff's Request for Production of Documents, as well as answers to

Plaintiff's First Set of Interrogatories and firm dates for the depositions of the Defendants. On

---

[1] The Parties intend to file a Stipulation of Dismissal as to Plaintiff's Counts for Negligent and Intentional Infliction of Emotional Distress.

June 15, 2006, Plaintiff received Defendants' Responses to Plaintiff's Request for Production of

Documents.

On June 29, 2006, Meredith Curren appeared for her deposition and on July 25, 2006,

Francis H. Curren, III appeared for his deposition. During the deposition of the Defendant

Francis H. Curren, counsel for the Plaintiff inquired as to the location of certain requested

documents and was informed that the documents had been incinerated, discarded or deleted[2]. A

---

[2] MR. ACETO: Earlier we were talking about the ledger cards. When's the last time you threw out or destroyed ledger cards?
MR. ARONSON: Objection.
WITNESS: We dispose of the ledger cards on an annual basis every three years.....
MR. ACETO: So in what month would that be that it's done, in April, then?
WITNESS: I'm not sure, April, May. Spring cleaning.
MR. ACETO: You will throw out anything that is more than three years old?
WITNESS: As far as customer things. The ledger cards, one of the administrative assistants will monitor them and go through them, and she will pull ledger cards that have no -- jobs haven't come in in two years and then she will make a note to the salesperson ....
MR. ACETO: So you say the administrative assistants find the ones that are either two years old or --
WITNESS: With no shipments, right, pulls them.
MR. ACETO: I'm asking you what the procedure is for throwing them away, as you just said?
WITNESS: Incineration.
MR. ACETO.: Okay. And what are the time limitations as to when you throw them away?
WITNESS: Well, if we haven't had a shipment in two years, then we've declared them not a customer.
MR. ACETO: But you just said you will try to win them back.
WITNESS: Yeah, I said that.
MR. ACETO: But you don't keep the ledger card to try to win them back?
WITNESS: No, no, it goes in the computer, the salesmen's computer.....
MR. ACETO: What about the -- do you have a distinct memory in the spring of this year throwing away, as you said, ledger cards in the spring of this year?
WITNESS: Yeah, yeah.
MR. ACETO: Okay. How many ledger cards were thrown away in the spring of this year?
WITNESS: I know this doesn't register on the computer.
MR. ACETO: So you're indicating about --
WITNESS: I'm going to say 50, I'm going to guess.
MR. ARONSON: Don't guess. If you can give an estimate, do that.
WITNESS: Can I estimate 50?
MR. ARONSON: You can estimate whatever you think the figure is, but don't guess.
WITNESS: I really don't know.......
MR. ACETO: What about the assay tickets, do you save the assay tickets?
WITNESS: Yes.
MR. ACETO: For how long do you save the assay tickets?
WITNESS: Six months.
MR. ACETO: Have you thrown any assay tickets away since this lawsuit started?
WITNESS: Yeah.
MR. ACETO: When did you last throw away assay tickets?

3

true and correct copy of the Deposition Transcript of Francis H. Curren, III (the "Curren

Transcript") is attached hereto as *Exhibit A*.

---

WITNESS:  A month or two ago.

MR. ACETO:  Did you have any discussions with Miss Curren that these might be of some use in the litigation?

WITNESS:  Miss Curren?

MR. ACETO:  Yeah, your sister over there, sis you have discussion with her of how they may be of value in the litigation.

WITNESS:  No.....

MR. ACETO:  Did you tell any of the employees not to throw them away because of the pending litigation?

WITNESS:  The assay tickets -- I incinerate them myself....

MR. ACETO:  When was the last time you incinerated them?

WITNESS:  About a month and a half ago......

MR. ACETO:  Any assay tickets left over from when Miss Bergevine worked there?

WITNESS:  No.

MR. ACETO:  When would those have been incinerated?

WITNESS:  When she worked there.

MR. ACETO:  Contemporaneously with when she worked there?

WITNESS:  Yeah.

MR. ACETO:  Or within six months, I guess you're saying; you say you throw them out six months later?

WITNESS:  It's possible that when she left in June that the assay tickets went out at the end of the year or thereabouts.  Could be a month either side.  Maybe at the end of the year.  If Jay was throwing them out, he might have been a little busy and not thrown them out until February......

MR. ACETO:  What about the current tracking system, have you taken any steps since Miss Curren's deposition to get a copy of the tracking system pertaining to Miss Bergevine's clients.

WITNESS:  Have I?  No.

MR. ACETO:  Do you know if anyone in the company has attempted to do that?

WITNESS:  There's no documents.

MR. ACETO:  There's no documents?

WITNESS:  There's no documents.

MR. ACETO: There's no documents relating to Miss Bergevine's employment?

WITNESS:  No.

MR. ACETO:  Why is that?

WITNESS:  Because we don't keep documents that we don't need for more than two or three years....

MR. ACETO:  But you have a computer system, so why can't you access the documents in the computer system and print them?  The tracking system is in a computer; correct?

WITNESS:  The tracking system is in the computer.

MR. ACETO:  Yeah, so has anyone in the company made an effort to print out those documents related to Miss Bergevine's customers?

WITNESS:  No.

MR. ACETO:  Do they exist?

WITNESS:  No.

MR. ACETO:  Why don't they exist?

WITNESS:  Because I don't keep them around.

MR. ACETO:  So are you testifying that somebody at the company deleted the tracking system relating to Miss Bergevine's customers?

WITNESS:  I certainly hope so.

MR. ACETO:  Why is that?

WITNESS:  Because we got this computer system with 8000 customers in it, and maybe 3000 of them are real customers, and I am constantly trying to get people to get all the stuff out of the computer......

4

During Francis H. Curren, III's deposition, counsel for the Plaintiff requested the following documents (all of which were previously requested in Plaintiff's Requests for Production of Documents and in the Schedule A's attached to the Defendants' deposition notices) from counsel for the Defendants: i) copies from the "tracking" system (electronic or paper); ii) copies of settlement reports (electronic or paper); iii) client account documents (electronic); iv) ledger cards; v) assay tickets; vi) correspondence with clients; vii) call logs for dental customers; viii) tax documents and financial records from 1996 to present; ix) personnel files for the Plaintiff and an employee named Bethany Warburton; x) copies of complaints allegedly made against the Plaintiff; and xi) contact and availability information for the Defendant Robert H. Pease, Jr. Both Defendants' Counsel and the Defendant Meredith Curren indicated that the majority of the documents requested had either been incinerated or deleted from their computers.

## FACTUAL BACKGROUND

As alleged in Plaintiff's Complaint, the Plaintiff served as an independent contractor for the Defendants from August, 1996 through December, 2001, and as an employee of the Defendant Pease & Curren, Inc. from December, 2001 through July, 2002. *See* Plaintiff's Complaint, dated July 1, 2005 ("Complaint"). In or around June, 2002, the Plaintiff and another colleague discovered discrepancies between two (2) databases at the Defendants' offices, indicating the apparent systematic defrauding of the Defendants' customers and employees. *See* Complaint. In or around July, 2002, the Plaintiff gave her notice to the Defendants and reported her suspicions and findings to the Federal Bureau of Investigation and, upon the advice of the FBI, to the Rhode Island State Police ("RISP").

5

On information and belief, the RISP took on the investigation of the Defendants, and in or around the first week of February, 2003, the RISP raided the offices of the Defendants pursuant to a search warrant. On further information and belief, the Defendants were aware that the RISP took a "mirror" copy of the databases in question and that the RISP would continue to investigate the allegations.

During the deposition of Francis H. Curren, III, Mr. Curren stated that there is a "tracking system" which contains information on lots or jobs assayed for their precious metal content. The "tracking system" is the database which the Plaintiff's colleague discovered. *See* Complaint. The information in the "tracking" database was also recorded from the assay tickets. *See Exhibit A,* p. 98. Thereafter, the information from the assay tickets, or the "tracking system" would be modified (fraudulently, as alleged by the Plaintiff), and transferred to the ledger cards, by either Mr. Curren or another Defendant Mr. Pease. The "new" information from the ledger card would then be entered into a second computer database from which the settlement reports were generated. *See Exhibit A,* p. 98-99. In order to determine how much each amount of metal was modified and reduced, a comparison of the assay ticket or "tracking system" to the ledger cards or settlement reports is necessary. *See* Complaint. Mr. Curren also stated that he had a list of "charges" which he backed out of the numbers on the assay tickets in order to obtain the numbers on the ledger cards, but the list of charges has been thrown away. *See Exhibit A,* p. 81-88.

6

**LEGAL ARGUMENT**

I.    **The Defendants should be precluded from offering any evidence relating to damages because they incinerated, destroyed, and deleted relevant documents and files after receiving notice of the investigation, and because they knowingly and willfully incinerated, destroyed, and deleted relevant documents and files after litigation commenced.**

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Perez v. Hyundai Motor Company*, 440 F.Supp.2d 57, 61 (D. P. R. 2006) *citing Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). "Litigants have the responsibility of ensuring that relevant evidence is protected from loss or destruction." *Perez, supra*, 440 F. Supp.2d. at 61. "A litigant has a duty to preserve relevant evidence." *Id. citing Perez-Velasco v. Suzuki Motor Co. Ltd.*, 266 F.Supp.2d 266 (D.P.R. 2003). "This obligation predates the filing of the complaint and arises once litigation is reasonably anticipated." *Perez, supra*, 440 F. Supp.2d. at 61. "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. *Perez-Velasco, supra*, 266 F.Supp.2d at 268 *citing Silvestri, supra*, 271 F.3d at 591.

"Applicable case law in the First Circuit has clearly established that 'bad faith or comparable bad motive' is not required for the court to exclude evidence in situations involving spoliation." *Perez, supra*, 440 F. Supp.2d. at 61 *citing Trull v. Volkswagen of America, Inc.*, 187 F.3d 88, 95 (1st Cir. 1999). "Even absent bad faith, if evidence is destroyed through carelessness and the other side is prejudiced, a court is entitled to consider imposing sanctions." *Stanton v.*

*Northside Marina at Seaside Harbor, Inc.*, 2005 WL 2035586 *citing Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997).

The *Stanton* court did not sanction a party who threw out a relevant lease agreement because "the absence of the lease [did] not prejudice [the other party]" where other documents established the relationship between the parties. *Stanton, supra,* 2005 WL 2035586 at *2. However, in the *Sacramona* matter, evidence relating to a wheel involved in an accident was excluded because the plaintiff's expert cleaned the interior surface of the wheel, thereby causing prejudice to the defendants in attempting to rebut plaintiff's theory of tort claims. *Sacramona, supra,* 106 F.3d at 444.

In this matter, prejudice clearly results from the Defendants' destruction, incineration and deletion of documents and files. The assay tickets, ledger cards, "tracking system", and settlement reports are essential to Plaintiff's claims, particularly with regard to damages. Although Plaintiff possesses a small portion of the documents, the vast majority of the relevant documents are, or were, in the possession of the Defendants, and have now been permanently deleted or destroyed.

The Defendants have admitted that they never made any effort to preserve evidence which they were aware may be necessary in litigation. In fact, the Defendants have admitted that they destroyed relevant evidence even after receiving Plaintiff's Request for Production of Documents[3]. In February, 2003, the Defendants' offices were raided by the Rhode Island State

---

[3] MR. ACETO: What about the assay tickets, do you save the assay tickets?
WITNESS: Yes.
MR. ACETO: For how long do you save the assay tickets?
WITNESS: Six months.
MR. ACETO: Have you thrown any assay tickets away since this lawsuit started?
WITNESS: Yeah.
MR. ACETO: When did you last throw away assay tickets?

Police and several documents and computers were seized.  From that point on, the Defendants

were on notice that the relevant documents - including assay tickets, ledger cards, settlement

reports and tracking system entries - should be preserved in anticipation of litigation.  However,

even if the Defendants claim ignorance of the likelihood of litigation at that point in time, they

still willfully destroyed relevant documents as recently as a few months ago[4].

---

WITNESS:  A month or two ago.
MR. ACETO:  Did you have any discussions with Miss Curren that these might be of some use in the litigation?
WITNESS:  Miss Curren?
MR. ACETO:  Yeah, your sister over there, sis you have discussion with her of how they may be of value in the litigation.
WITNESS:  No.....
MR. ACETO:  Did you tell any of the employees not to throw them away because of the pending litigation?
WITNESS:  The assay tickets -- I incinerate them myself....
MR. ACETO:  When was the last time you incinerated them?
WITNESS:  About a month and a half ago......
MR. ACETO:  Any assay tickets left over from when Miss Bergevine worked there?
WITNESS:  No.
MR. ACETO:  When would those have been incinerated?
WITNESS:  When she worked there.
MR. ACETO:  Contemporaneously with when she worked there?
WITNESS:  Yeah.
MR. ACETO:  Or within six months, I guess you're saying; you say you throw them out six months later?
WITNESS:  It's possible that when she left in June that the assay tickets went out at the end of the year or thereabouts.  Could be a month either side.  Maybe at the end of the year.  If Jay was throwing them out, he might have been a little busy and not thrown them out until February......

[4] MR. ACETO:  What about the current tracking system, have you taken any steps since Miss Curren's deposition to get a copy of the tracking system pertaining to Miss Bergevine's clients.
WITNESS:  Have I?  No.
MR. ACETO:  Do you know if anyone in the company has attempted to do that?
WITNESS:  There's no documents.
MR. ACETO:  There's no documents?
WITNESS:  There's no documents.
MR. ACETO:  There's no documents relating to Miss Bergevine's employment?
WITNESS:  No.
MR. ACETO:  Why is that?
WITNESS:  Because we don't keep documents that we don't need for more than two or three years....
MR. ACETO:  But you have a computer system, so why can't you access the documents in the computer system and print them?  The tracking system is in a computer; correct?
WITNESS:  The tracking system is in the computer.
MR. ACETO:  Yeah, so has anyone in the company made an effort to print out those documents related to Miss Bergevine's customers?
WITNESS:  No.
MR. ACETO:  Do they exist?
WITNESS:  No.

II.    **The Court should preclude the Defendants from offering any evidence to refute Plaintiff's claim of damages.**

Destruction of relevant evidence - willful or not - warrants the imposition of sanctions "to avoid unfair prejudice to the opposing party". *Perez, supra*, 440 F. Supp.2d. at 61. "[T]he district court has inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to prevent the non-offending side from suffering unfair prejudice". *Id. citing Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 28 (1st Cir. 1998). "Sanctions for spoliation range from dismissal of the action, exclusion of evidence or testimony or instructing the jury on a negative inference to spoliation whereby jury may infer that party that destroyed evidence did so out of realization that it was unfavorable." *Perez, supra*, 440 F. Supp.2d. at 61 *citing Driggin v. Am. Sec. Alarm Co.*, 141 F.Supp.2d 113, 121 (D.Me.2000).

The Defendants in this matter destroyed all of the documents which would actually establish and quantify Plaintiff's damages. The documents were destroyed after the Defendants were on notice of potential litigation and have even been destroyed as recently as a few months ago. Based on the foregoing, the Court should preclude the Defendants from offering any evidence refuting the Plaintiff's claimed damages.

---

MR. ACETO: Why don't they exist?
WITNESS: Because I don't keep them around.
MR. ACETO: So are you testifying that somebody at the company deleted the tracking system relating to Miss Bergevine's customers?
WITNESS: I certainly hope so.
MR. ACETO: Why is that?
WITNESS: Because we got this computer system with 8000 customers in it, and maybe 3000 of them are real customers, and I am constantly trying to get people to get all the stuff out of the computer......

## CONCLUSION

By incinerating documents and deleting computer files, the Defendants destroyed any evidence as to the Plaintiff's actual damages, thereby unfairly prejudicing the Plaintiff from being able to present evidence as to same.

**WHEREFORE**, the Plaintiffs respectfully request that this Honorable Court sanction the Defendants by precluding them from offering any evidence refuting Plaintiff's claimed damages.

Respectfully submitted,
PATRICIA BERGEVINE,
By her attorneys,


/s/ Gregory J. Aceto
Gregory J. Aceto, Esq.
 BBO No. 558556
Erin J. Brennan, Esq.
 BBO No. 660097
Johnson & Aceto, LLP
67 Batterymarch Street, Suite 400
Boston, MA 02110
(617) 728-0888

**Certificate of Service**

I hereby certify that on October 4, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in the matter via e-mail.  I further certify that copies will be sent via U.S. Mail to all counsel in the matter who are not registered with the CM/ECF system.

/s/ Gregory J. Aceto
Gregory J. Aceto, Esq.
Johnson & Aceto, LLP
67 Batterymarch Street, Suite 400
Boston, MA 02110
Telephone: (617) 728-0888
Facsimile: (617) 338-1923
Email: aceto@johnsonaceto.com

Attorney for Plaintiff Patricia Bergevine

1

```
1              Pages: 1-223
2              Exhibits: 1-21
3
4      UNITED STATES DISTRICT COURT
5      DISTRICT OF MASSACHUSETTS
6          C.A.#: 05 11395 RCL
7
8   PATRICIA BERGEVINE,
9          Plaintiff
10  VS.
11  PEASE & CURREN, INC., PEASE & CURREN
12  MATERIALS, INC., FRANCIS H. CURREN, JR.,
13  ROBERT H. PEASE, JR., FRANCIS H. CURREN,
14  III, A/K/A KIP CURREN AND MEREDITH A.
15  CURREN,
16          Defendants
17
18
         DEPOSITION OF FRANCIS H. CURREN,
19  III, a witness called by and on behalf
    of the Plaintiff, pursuant to the
20  provisions of the Federal Rules of Civil
    Procedure, before Joan Applegate,
21  Certified Shorthand Reporter and Notary
    Public in and for the Commonwealth of
22  Massachusetts, at the offices of Johnson
    & Aceto, 67 Batterymarch Street, Boston,
23  Massachusetts, on Tuesday, July 25, 2006
    commencing at 10:00 a.m.
24
```

2

```
1   APPEARANCES:
2
3   Gregory J. Aceto, Esq.
4   Erin J. Brennan, Esq.
5   Johnson & Aceto, P.C.
6   67 Batterymarch Street
7   Boston MA 02110
8   On behalf of the Plaintiff;
9
10  Joseph H. Aronson, Esq.
11  The McCormack Firm, LLC
12  One International Place
13  Boston MA 02110
14  On behalf of the Defendants;
15
16  Bruce W. Gladstone, Esq.
17  Cameron & Mittleman LLP
18  56 Exchange Terrace
19  Providence RI 02903
20  On behalf of the Defendants.
21
22  ALSO PRESENT:
23  Patricia Bergevine
24  Meredith A. Curren
```

3

```
1             I N D E X
2   DEPONENT
3    Francis H. Curren, III
4   EXAMINATION                    PAGE
5   (By Mr. Aceto)          9
6
7        E X H I B I T S
8   NO.      DESCRIPTION       PAGE
9   1   The Pease & Curren Inc.      122
10      brochure regarding dental
11      industry refining
12  2   The Patricia Bergevine      122
13      compensation documents
14  3   The document containing the   122
15      Pease & Curren Inc. Terms and
16      conditions
17  4   The letter to Marleen Thomason 122
18      from Robert H. Pease, Jr.,
19      dated 5/14/02
20  5   The letter to Tom Ganzenmuller 122
21      from Robert H. Pease, Jr.,
22      dated 3/6/02
23
24          (CONTINUED)
```

4

```
1        E X H I B I T S
2   NO.      DESCRIPTION       PAGE
3   6   The Pease & Curren Inc.      122
4       Website information
5   7   The letter to Detective John   122
6       Lemont from Kevin J. Bristow
7       dated 3/18/03
8   8   The Pease & Curren Inc. Lot    122
9       information for HE-221
10  9   The document entitled "Assay   122
11      Inquiry by Customer Name" for
12      Innodent
13  10   The document containing copies 122
14      of the Pease & Curren Inc.
15      Telephone log for Precious
16      Metal Refining Services
17  11   The document containing the    122
18      Pease & Curren Inc. Customer
19      settlement history for various
20      customers
21  12   The document entitled "Assay   122
22      Inquiry by Customer Name" for
23      Pease & Curren
24          (CONTINUED)
```

5

```
1          E X H I B I T S
2   NO.      DESCRIPTION          PAGE
3   13  The document entitled        122
4       Defendants' Responses to
5       Plaintiff's Requests For The
6       Production of Documents"
7   14A The document containing the   122
8       Pease & Curren Inc. Settlement
9       report for Jean Matrisciano,
10      Lot No. B0470, dated 2/14/02
11  14B The document entitled "Assay  122
12      Inquiry by Customer Name" for
13      Jean Matrisciano
14  15A The document containing the   122
15      Pease & Curren Inc. Settlement
16      report for Shaw Laboratories,
17      Lot No. B0410, dated 2/7/02
18  15B The document entitled "Assay  122
19      Inquiry by Customer Name" for
20      Shaw Laboratories
21  16A The document containing the   122
22      Pease & Curren Inc. Settlement
23      report for Darrell Overton,
24      Lot No. B1079, dated 4/24/02
```

7

```
1          E X H I B I T S
2   NO.      DESCRIPTION          PAGE
3   18D The document containing the   122
4       Pease & Curren Inc. Settlement
5       report for CDS Dental Studio,
6       Lot No. B1291, dated 5/16/02
7   18E The document entitled "Assay  122
8       Inquiry by Customer Name" for
9       CDS Dental Studio
10  18F Page 2 from the document      122
11      entitled "Assay Inquiry by
12      Customer Name" for CDS Dental
13      Studio
14  19  Deposition Notice            15
15  20  Pease & Curren 2004 Outside  125
16      Rep and Dental Rep Sales
17      Commission Plans
18  21  Printed document entitled    157
19      Dental Industry Refining
20
21
22
23
24
```

6

```
1          E X H I B I T S
2   NO.      DESCRIPTION          PAGE
3   16B The document entitled "Assay  122
4       Inquiry by Customer Name" for
5       Darrell Overton
6   17A The document containing the   122
7       Pease & Curren Inc. Settlement
8       report for Fort Wayne Dental Lab,
9       Lot No. S9232, dated 6/17/02
10  17B The document entitled "Assay  122
11      Inquiry by Customer Name" for
12      Fort Wayne Dental Lab
13  18A The document containing the   122
14      Pease & Curren Inc. Settlement
15      report for CDS Dental Studio,
16      Lot No. S9135, dated 5/16/02
17  18B The document containing the   122
18      Pease & Curren Inc. Settlement
19      report for CDS Dental Studio,
20      Lot No. S8679, dated 2/4/02
21  18C The document containing the   122
22      Pease & Curren Inc. Settlement
23      report for CDS Dental Studio,
24      Lot No. B0341, dated 2/4/02
```

8

```
1          S T I P U L A T I O N S
2       It is hereby stipulated and
3   agreed by and between counsel for the
4   respective parties that the sealing,
5   filing, and certification of the
6   deposition are waived.
7       It is further stipulated and
8   agreed by counsel that all objections,
9   except as to the form of the question,
10  are reserved until the time of trial.
11  Motions to strike likewise are reserved
12  until the time of trial.
13      The witness exercises his right
14  to read the transcript and sign the
15  original signature page under the pains
16  and penalties of perjury.  If the
17  transcript is not signed within 30 days
18  of receipt thereof, it is deemed
19  accurate.
20      FRANCIS H. CURREN, III, having
21  duly affirmed that his testimony would
22  be the truth, the whole truth, and
23  nothing but the truth, testified as
24  follows in answer to direct
```

9

1  interrogatories:
2  BY MR. ACETO:
3  Q.  Mr. Curren, can you state your full
4      name, please?
5  A.  Francis Henry Curren, III.
6  Q.  Where do you currently reside, sir?
7  A.  Middletown, Rhode Island.
8  Q.  How long have you lived there?
9  A.  25 years.
10 Q.  Who do you live there with, sir?
11 A.  My wife, two kids.
12 Q.  How old are your kids?
13 A.  My son is 21, daughter is 18.
14 Q.  Can you briefly describe for me, sir,
15     your educational background?
16 A.  BA, Boston College '74; MFA, Columbia
17     University, New York City, 1976; OPM,
18     Harvard Business School, 1990.
19 Q.  I'm sorry, what was that last one you
20     got from Harvard?
21 A.  OPM.
22 Q.  What's an OPM?
23 A.  Executive education program for company
24     owners.

10

1  Q.  What year did you attend that program?
2  A.  1990.  Three-year program.
3  Q.  Full-time or part-time basis?
4  A.  It's full-time for six weeks.  You live
5      in the dorms.  You do it for three
6      years.
7  Q.  Any other educational background that
8      you haven't described for us already?
9  A.  Yeah, I went to Saint Paul's.
10 Q.  Saint Paul's High School?
11 A.  No, grade school.
12 Q.  Well, I'm talking about college and
13     forward.  Anything after college, post
14     college?
15 A.  Columbia University.
16 Q.  What did degree did you obtain at
17     Columbia University?
18 A.  Like I said, an MFA.
19 Q.  Any other educational training or
20     programs you've taken, Mr. Curren,
21     related to the job that you're involved
22     in today?
23 A.  No.
24 Q.  Any metallurgy classes?

11

1  A.  No.
2  Q.  Any kinds of training or programs that
3      facilitated your ability to understand
4      the processes that you engage in at
5      Pease & Curren?
6  A.  No.
7  Q.  What is your title today at Pease &
8      Curren, sir?
9  A.  Vice-president.
10 Q.  Vice-president, is that what you just
11     said?
12 A.  Vice-president.
13 Q.  And how long have you been
14     vice-president?
15 A.  20 years.
16 Q.  And before that, what was your title?
17 A.  Operations manager.
18 Q.  What are your responsibilities as
19     vice-president, sir?
20 A.  I oversee the sales force.
21 Q.  Anything else?
22 A.  I sell the lower grade material to the
23     outside refiners.
24 Q.  What other responsibilities do you have

12

1      at Pease & Curren, sir?
2  A.  Well, I own the place, so I'm interested
3      in the operations.
4  Q.  Anything else?
5  A.  That's it.
6  Q.  You say you own the place.  What
7      percentage do you own of the business?
8  A.  50 percent.
9  Q.  Who owns the other 50 percent?
10 A.  My sister.
11 Q.  Your sister that is here today?
12     (Witness nodding his head
13     affirmatively.)
14 Q.  You have to answer orally.
15 A.  My sister.
16 Q.  Your sister that's here today, sir?
17 A.  My sister that is here today, yes.
18 Q.  You said you sell lower grade materials
19     to outside refiners.  What does that
20     mean, sir?
21 A.  That means material that does not fit
22     through our refining process I sell.
23 Q.  Sell to whom?
24 A.  Various smelters and refiners.

SHEA COURT REPORTING SERVICES
BOSTON MA - (617) 227-3097

3 (Pages 9 to 12)

13

1   Q.   Such as?
2   A.   Rand Refinery in South Africa; Umicore,
3        Hoboken and Belgium; Johnson Matthey,
4        London, Johnson Matthey, West Depford,
5        New Jersey; Heraeus, Germany; Heraeus,
6        New Jersey; Mercury Refining, New
7        Jersey; Sipi Metals, Chicago; Sabin
8        Metals, Rochester, New York.
9   Q.   Any other refineries that you sell to?
10  A.   Yeah.
11  Q.   How many more?
12  A.   Five or six.
13  Q.   Any that you recall off the top of your
14       head?
15  A.   Those are the -- I have stated the main
16       people that we do business with.
17  Q.   When you say "low grade materials,"
18       Mr. Curren, are you referring also to
19       the dental materials that you recovered?
20  A.   All dental.
21  Q.   What other materials besides dental
22       materials are considered low grade by
23       you?
24  A.   If it's silver below 80 percent.

14

1   Q.   I think what I'm asking you, Mr. Curren,
2        any other field such as the dental
3        field, any other field that are low
4        grade materials that are shipped to
5        outside refiners?
6   A.   Yes.
7   Q.   What are those other fields?
8   A.   Material that is contaminated with
9        platinum or palladium.
10  Q.   Anything else?
11  A.   Material with characteristics that make
12       it below 30 percent gold. Incinerated
13       material, refractory material, crushable
14       material, material contaminated with
15       iron, steel, molybdenum.
16  Q.   Any other materials that you recover at
17       Pease & Curren that you consider to be
18       low grade materials that are refined by
19       an outside refinery?
20  A.   I didn't get that one.
21       MR. ARONSON:  I think he asked
22       you if there were any other materials.
23  A.   Yeah, there's others.
24  Q.   Anything else of significance?

15

1   A.   Sludge, zinc traps for jewelers,
2        ceramic.
3        MR. ACETO:  Let's go off the
4   record for a second.
5        (Whereupon there is a brief
6   discussion off the record.)
7        MR. ACETO:  Can we mark this 19?
8        (Exhibit 19, Deposition Notice,
9   so marked.)
10  Q.   Mr. Curren, I'm going to show you what
11       has been marked as Exhibit No. 19 to
12       your deposition, sir.
13       MR. ACETO:  As I just said when
14   we were off the record, the deposition
15   exhibits that were marked at your
16   sister's deposition are going to remain
17   the same number for ease of reference,
18   so we are going to start and mark this
19   as Exhibit 19.
20  Q.   Can you take a moment and look at what
21       has been marked as Exhibit 19, sir?
22       (Witness looking over document.)
23  Q.   Have you had sufficient time to review
24       Exhibit 19, Mr. Curren?

16

1   A.   Correct.
2   Q.   Have you seen it prior to today?
3   A.   No.
4   Q.   You have never seen this Notice of
5        Deposition prior to today?
6   A.   No.
7   Q.   Did you bring any of the documents that
8        are referenced in the Schedule A?
9        MR. ARONSON:  I can jump in here
10   and say we have produced in our document
11   production documents responsive to this
12   request.
13       MR. ACETO:  Okay.  As part of
14   the documents request?
15       MR. ARONSON:  Yes.
16       MR. ACETO:  And he has no other
17   documents in his personal possession?
18       MR. ARONSON:  To my knowledge,
19   all the documents that were requested
20   and not objected to were produced.
21       MR. ACETO:  Including the ones
22   listed in the Schedule A?
23       MR. ARONSON:  That's my
24   understanding.

17

1    Q.  Mr. Curren, who's senior to you at
2        Pease & Curren?
3    A.  Nobody.
4    Q.  You said you're vice-president.  Who's
5        president of the company?
6    A.  Meredith.
7    Q.  Is she considered a senior officer to
8        you?
9    A.  No.
10   Q.  You're both equal?
11   A.  Equal.
12   Q.  And when you make decisions, the two of
13       you make them together jointly?
14   A.  Sometimes.
15   Q.  Anybody else involved in the decision-
16       making at Pease & Curren?
17   A.  Yeah, a lot of people.
18   Q.  Who are they?
19   A.  The managers, the workers, salesmen,
20       inside salespeople, administrative
21       assistants, maintenance guys, lab
22       people, lab manager.
23   Q.  When you make decisions about the
24       company, you involve all these people

18

1        that you just testified about,
2        Mr. Curren?
3    A.  Absolutely.
4    Q.  Do you have a company-wide meeting every
5        time there's a decision to be made?
6    A.  No.
7            MR. ARONSON:  Objection.
8    Q.  I think you understand the question,
9        sir.  The highest levels of the company,
10       who makes the decisions at Pease &
11       Curren?
12   A.  At the highest levels?
13   Q.  Of Pease & Curren, yes.
14   A.  Myself and my sister.
15   Q.  Anybody else meet with you when the
16       two of you meet to make decisions about
17       running the company?
18   A.  Yes.
19   Q.  Who's that?
20           MR. ARONSON:  I'm going to
21       object.  That's a very broad question.
22       You can answer it, but there are a lot
23       of decisions that might require others
24       and some that may not.  If you can be

19

1        more specific with your question.
2            THE WITNESS:  That's what I'm
3        getting to.
4            MR. ARONSON:  Go ahead and
5        answer it, if you can.
6            THE WITNESS:  What was the
7        question?
8            (Whereupon the previous question
9        was read back.)
10   A.  John Michener.
11   Q.  Who's John Michener?
12           THE WITNESS:  Should I answer
13       the first question or should I answer
14       this question?
15           MR. ARONSON:  Answer this
16       question.  Have you finished your
17       answer?
18           THE WITNESS:  No.
19           MR. ACETO:  I thought you were
20       done.
21   Q.  Who else meets with you, Mr. Curren?
22   A.  Other people.
23           MR. ARONSON:  If you can
24       identify all of them, certainly --

20

1            THE WITNESS:  Should I identify
2        all the people?
3            MR. ARONSON:  Yes, that is what
4        he asked you.
5    A.  Stephen Doyle.
6    Q.  Okay.  What was the first guy, James
7        Michener?
8    A.  No, that's a famous author.  John
9        Michener.
10   Q.  John Michener.  Who else?
11   A.  Stephen Doyle.
12   Q.  Anybody else?
13   A.  John Lees.
14   Q.  Who else, sir?
15   A.  Karen DelPonti.
16   Q.  Anybody else?
17   A.  I would say under most circumstances
18       those people would cover the list of
19       people that we would have at high level
20       meetings, such as you asked.
21   Q.  And John Michener, what is his title at
22       the company?
23   A.  Consultant.
24   Q.  Is he an employee of the company?

21

1   A.  No.
2   Q.  What is his background in?
3   A.  Business and law.
4   Q.  He's an attorney?
5   A.  He is.
6   Q.  What is the name of his law firm?
7   A.  John Michener.
8   Q.  And Stephen Doyle, what is his title,
9       sir?
10  A.  Consultant.
11  Q.  What is his background in?
12  A.  Sales management and general management.
13  Q.  And he's not an employee, either; is
14      that correct?
15  A.  He's a consultant.
16  Q.  He's not an employee?
17  A.  He's not an employee of Pease & Curren.
18  Q.  John Lees, sir, what is his relationship
19      to the company?
20  A.  He's a consultant.
21  Q.  What is the name of his company?
22  A.  I can't remember the name of his
23      company.
24  Q.  What about Stephen Doyle, what is the

22

1       name of his company?
2   A.  Stephen Doyle.
3   Q.  Where is he located?
4   A.  Martha's Vineyard.
5   Q.  Where is John Michener located?
6   A.  Fort Worth, Texas.
7   Q.  And John Lees, where is he located, sir?
8   A.  Boston, Massachusetts.
9   Q.  What's the area that Mr. Lees consults
10      with Pease & Curren in?
11  A.  General management and sales management.
12  Q.  And Karen DelPonti?
13  A.  Providence, Rhode Island.
14  Q.  And she's a consultant, as well?
15  A.  She is.
16  Q.  What's the name of her company?
17  A.  Cameron & Mittleman.
18  Q.  What's the area that she consults with
19      you in?
20  A.  Financial planning.
21  Q.  Financial planning for the company or
22      for you individually?
23  A.  Both.
24  Q.  Prior to working at Pease & Curren,

23

1       Mr. Curren, can you describe for me
2       your employment background?
3   A.  Yeah, I worked at Simon & Schuster in
4       New York City.
5   Q.  What were the years of that employment?
6   A.  1977 to 1979.
7   Q.  And what did you do there?
8   A.  I worked for paperback pocket books at
9       Viacom.  I purchased book rights for
10      movies.
11  Q.  This is when you got right out of
12      college?
13  A.  Graduate school.
14  Q.  What did you do after 1979?
15  A.  Went to work at Pease & Curren.
16  Q.  What was your title when you started at
17      Pease & Curren?
18  A.  Worker.
19  Q.  Who were the owners of the company when
20      you started in 1979?
21  A.  My father; Mr. Pease.
22  Q.  What was Mr. Pease's full name, sir?
23  A.  Robert Pease.
24  Q.  Is that the same Robert Pease that you

24

1       were partners with in the last few
2       years, or is that his son?
3   A.  That is his father.
4   Q.  Right.  So the partner that you recently
5       had was the son of Robert Pease that you
6       just identified; is that right?
7   A.  Correct.
8   Q.  When did your father sell his interest
9       in the company?
10  A.  In the '90s.
11  Q.  What about Mr. Pease, when did he sell
12      his interest?
13  A.  Same time.
14  Q.  At the same exact time both them sold
15      their interest?
16  A.  Yeah.
17  Q.  The two of them sold their interest to
18      the three of you, you, Miss Curren, and
19      Mr. Pease?
20  A.  Yes.
21  Q.  What interest at the time of the sale
22      did each of the three of you have in the
23      company, what percentage interest?
24  A.  Zero.

SHEA COURT REPORTING SERVICES
BOSTON MA - (617) 227-3097

25

1  Q.  Why was that?
2  A.  Because my father and Mr. Pease owned
3      the company.
4  Q.  Well, immediately after the sale to you,
5      what percentage interest did each of you
6      own in the company?
7  A.  Jay Pease owned 50 percent, Meredith
8      Curren owned 25 percent, and I owned
9      25 percent.
10 Q.  How many employees did the company have
11     when you purchased the company back in
12     the '90s?
13 A.  Approximately 35.
14 Q.  How many employees does it have today?
15 A.  Approximately 35.
16 Q.  What were the sales -- excuse me, strike
17     that.  What was the gross revenues for
18     the company back in the 1990s?
19 A.  It varied.
20 Q.  Can you give me an estimate?
21     MR. ARONSON:  What year are we
22     talking about?
23 Q.  At the time that you bought the company,
24     sir.

26

1  A.  No.  I don't know.
2  Q.  You have no idea what the revenue
3      figures were back at the time you bought
4      the company?
5      THE WITNESS:  Should I guess?
6      MR. ARONSON:  I don't want you
7      to guess.
8  A.  I can't guess.
9      MR. ARONSON:  Don't speculate,
10     don't guess.
11 Q.  What are the gross revenue figures
12     today, sir?
13 A.  For last year?
14 Q.  Yeah.
15 A.  $35 million.
16 Q.  Has that figure gone up or down since
17     2000?
18 A.  Up.
19 Q.  Can you describe for me, sir, your
20     compensation package at Pease & Curren
21     for 2005?
22     MR. ARONSON:  I am going to
23     object and instruct him not to answer to
24     the extent that you're asking for

27

1      specific salary amounts and things of
2      that nature, but he can describe the
3      structure of his compensation, but I'm
4      not going to let him disclose
5      information concerning the details of
6      his own salary.
7      MR. ACETO:  And the reason for
8      what is why?
9      MR. ARONSON:  That is
10     confidential information.  That has no
11     relevance to this case, and I believe
12     you're doing this the same way you asked
13     Miss Curren about that information, in
14     order to harass the witnesses.
15     MR. ACETO:  Okay.  And I don't
16     agree with that, and I am going to file
17     a motion to compel those answers.
18     You're still instructing him not
19     to answer?
20     MR. ARONSON:  You heard my
21     instruction, didn't you, sir?
22     MR. ACETO:  There's no need to
23     get flip, Mr. Aronson, I'm just making
24     sure that you're still instructing him

28

1      not to answer the question.
2      MR. ARONSON:  You do have a flip
3      approach yourself, Mr. Aceto, and you
4      repeated yourself three times.  I gave
5      you my objection.  I told you why I was
6      objecting, which you're not even
7      entitled to that, so you heard that, and
8      you haven't persuaded me differently, so
9      he will not answer the question, and you
10     can do what you would like after.
11     MR. ACETO:  Mr. Aronson, you're
12     incorrect.  I have a right to know why
13     you're instructing him not to answer.  I
14     don't need to know why you're objecting.
15     When you go one step further and told
16     him not to answer on a completely
17     baseless faction, I have a right to
18     inquire about it.
19     I am confirming you're telling
20     him not to answer that question or what
21     his salary is?
22     MR. ARONSON:  You heard my
23     instruction, sir.  I don't want to waste
24     time with your speeches on the record

29

1     that I'm going to have to pay for later.
2     Let's move on with the deposition.
3     We're going to be here a long time, and
4     so let's try to do it expeditiously,
5     please.
6  Q.  Mr. Curren, state your full compensation
7     package, please.
8        MR. ARONSON:  With my
9     instruction, you may answer.
10  A.  No.
11  Q.  No what?
12  A.  No, I'm not answering the question.
13  Q.  You're not going to answer any of the
14     question?
15  A.  No.
16  Q.  You're not even going to describe what
17     your compensation package is?
18        MR. ARONSON:  You can describe
19     the structure of what it is, if it's
20     based on -- the breakup of the
21     compensation package.  I don't want you
22     to give figures, but give him an idea of
23     how you get compensated.
24  A.  Sure.  I get a weekly check.  Then at

30

1     the end of the year, I talk to John
2     Michener, and he basically goes over the
3     tax implications of what the balance
4     sheet looks like and the company looks
5     like, and he says, "I think it would be
6     a good idea for you guys to do the
7     following," and we take his advice, and
8     it could include putting money into the
9     company.
10  Q.  And what other advice does he give you
11     in regards to -- I assume you're talking
12     about money that is left over at the end
13     of the year, how to distribute it.
14        MR. ARONSON:  Let me object
15     here.  If these are communications that
16     you're receiving from Mr. Michener as an
17     attorney regarding legal issues, I'm
18     going to instruct you not to answer
19     that.
20        THE WITNESS:  Okay.
21  Q.  And Mr. Curren, is it your understanding
22     that he is acting as an attorney when
23     he's advising you how to distribute
24     money?

31

1  A.  Yes.
2  Q.  And you have hired him as an attorney
3     for the company?
4  A.  I have.
5  Q.  Do you have a fee agreement with him?
6  A.  I do.
7  Q.  Will you be willing to produce a copy of
8     that for me?
9        MR. ARONSON:  He's not going to
10     make decisions what they produce.  If
11     you want to make a request, we will deal
12     with it appropriately.
13  Q.  And there's an executed fee agreement
14     between you and Mr. Michener; is that
15     right, between your company and
16     Mr. Michener?
17  A.  No, that's not right.
18  Q.  There is no written fee agreement
19     between the two of you?
20  A.  No.
21  Q.  How did you meet Mr. Michener?
22  A.  I went to Harvard with him.
23  Q.  And what program did you attend at
24     Harvard with him?

32

1  A.  OPM.
2  Q.  How do you pay him for his services?
3  A.  Check.
4  Q.  Does he bill you on an hourly basis?
5        MR. ARONSON:  You may answer.
6  A.  Daily.
7  Q.  On a daily basis.  So he bills you a
8     flat rate per day?
9  A.  Correct.
10  Q.  And does it entail your meeting with him
11     here or in Texas?
12  A.  Yes.
13  Q.  Does he come here or do you go there?
14  A.  Back and forth.
15  Q.  What else is involved in your
16     compensation package besides this,
17     Mr. Curren?
18  A.  Nothing.
19  Q.  You don't have your health insurance
20     paid for by the company?
21  A.  I do.
22  Q.  You don't have a car provided for you by
23     the company?
24  A.  I do.

33

1  Q.  You don't have -- what other benefits,
2      Mr. Curren, do you get paid for by the
3      company?
4  A.  A car, health insurance.
5  Q.  Anything else?
6  A.  I don't think so.
7  Q.  Are you familiar with a company called
8      Pease & Curren Materials, Inc.?
9  A.  I am.
10 Q.  Is that company still in existence
11     today, sir?
12 A.  No.
13 Q.  Were you an employee of the company?
14 A.  No.
15 Q.  Can you describe for me what the purpose
16     of that company was?
17 A.  It commonly would be called a materials
18     company, which would also commonly be
19     called a holding company.
20 Q.  And it was a holding company for whom,
21     sir?
22 A.  Metals.
23 Q.  And who were the owners of the company?
24 A.  Robert Pease and my father.

34

1  Q.  When was the company created?
2  A.  In the '90s.
3  Q.  After your purchase of Pease & Curren?
4  A.  Correct.
5  Q.  Why is the company no longer in
6      existence today?
7  A.  It's not necessary.
8  Q.  Why isn't it necessary?
9  A.  It has no assets.
10 Q.  Describe for me how this company -- why
11     this company came into existence after
12     you purchased Pease & Curren.
13 A.  It was a vehicle to hold metals.
14 Q.  To hold what metals, sir?
15 A.  Gold, silver, platinum, palladium and
16     copper.
17 Q.  And who owned those metals before
18     Pease & Curren Materials, Inc. was
19     created?
20 A.  Robert Pease and my father.
21 Q.  Owned it individually?
22 A.  They were the owners.
23 Q.  Individually?
24     MR. ARONSON:  Objection.

35

1  A.  I don't get "individually."
2  Q.  The two of them owned it individually,
3      not Pease & Curren, sir?
4  A.  They were the individual owners of Pease
5      & Curren, who owned the metal.  I think
6      that's what -- is that where you're
7      going?
8  Q.  The company owned the materials, the
9      metals; is that your testimony?  Pease &
10     Curren, Inc. owned the metals?
11     MR. ARONSON:  Objection.  I
12 think you're confusing what he's
13 answered, but go ahead and answer again.
14 He's asking you whether Pease & Curren
15 owned the metals.
16     MR. ACETO:  Mr. Aronson, just
17 state your objection, that's it.  Your
18 editorializing isn't helping any.
19     MR. ARONSON:  I would like him
20 to answer the question so he understands
21 it.  I don't want you taking advantage
22 of the witness, Mr. Aceto.  You asked
23 the question and you twisted the words.
24     MR. ACETO:  I think the record

36

1  will show what he just said.
2      MR. ARONSON:  The record will
3  show it.  I want to make sure he
4  understands the question and has an
5  opportunity to answer it.  I would like
6  you to let him answer it and give a
7  full answer.  You're cutting him off,
8  you're trying to mislead him, and I
9  don't think that's right, Mr. Aceto.
10     MR. ACETO:  Mr. Aronson, I am
11 not cutting him off, and at any point
12 have I cut off his testimony, and at no
13 point am I misconstruing his words.
14     He just said Mr. Pease and your
15 father owned the company, and the
16 company owned the metals; is that
17 correct?
18     THE WITNESS:  Correct.
19     MR. ACETO:  Thank you.  Is there
20 anything else you would like to say,
21 Mr. Aronson?
22     MR. ARONSON:  I would like you
23 to try to be fair with your questions,
24 sir, not mislead the witness, and not

37

1    cut him off.
2        MR. ACETO:  Thank you.  Anything
3    else you need to say, Mr. Aronson?
4        MR. ARONSON:  That's all I have
5    to say.  Why don't you ask your next
6    question.
7        MR. ACETO:  Thank you,
8    Mr. Aronson.
9  Q.  So how were the metals transferred from
10     Pease & Curren, Inc., the ownership,
11     from Pease & Curren, Inc. to Pease &
12     Curren Materials, sir?
13 A.  Paperwork.
14 Q.  Was there any transfer of money?
15 A.  No.
16 Q.  So when Pease & Curren, Inc. -- how did
17     Pease & Curren, Inc. pay for the metals
18     that were owned by Pease & Curren
19     Materials, Inc. once they were
20     transferred to Materials?
21 A.  They didn't.
22 Q.  So what happened to the metals that were
23     owned by Materials -- I will call Pease
24     & Curren Materials, Materials, what

38

1    happened to them?
2  A.  They remained at Pease & Curren
3    Materials, and if and when we needed
4    that metal, we -- meaning the new
5    ownership of Pease & Curren, which was
6    at this point myself, my sister who is
7    sitting here, and Mr. Pease -- would be
8    in a situation that we could borrow the
9    metal to use the metal for our process,
10     and we had to pay a lease fee to Pease &
11     Curren Materials for this privilege.
12 Q.  Of using their materials?
13 A.  Yeah.
14 Q.  And for what purpose did you use Pease &
15     Curren Materials metals?
16 A.  To process material that was moving
17     through the Pease & Curren plant.
18 Q.  Why would you need those metals to
19     process?  I don't understand what you're
20     saying, Mr. Curren.
21 A.  It's a difficult concept.  If you're
22     interested in hearing about it and
23     learning about it, I can explain it to
24     you in as much detail as you would like.

39

1  Q.  Sure.  Why don't you try and explain it
2    to me, Mr. Curren.
3  A.  Okay.  Materials come to Pease & Curren.
4    We cannot process the materials, we have
5    to ship them to somebody else.  We are
6    not a refiner of a large part of the
7    materials that come into Pease & Curren;
8    however, we have to pay our customers
9    before the material is refined, so one
10     way to do that would be to go to a bank,
11     get a loan, pay interest.  If you set up
12     a materials company, materials company
13     you can lease instead of a loan at a
14     lower rate.  That's the motivation for
15     it.  The reality of the situation is the
16     amounts of metals ebb and flow, so
17     sometimes you may need this material,
18     sometimes you may not need this
19     material.  It has to be accounted for.
20     It has to be kept someplace.  In this
21     case, Pease & Curren Materials was an
22     ideal vehicle to keep this metal when we
23     didn't need it and to lease it from when
24     we did need it.

40

1  Q.  What would be the circumstances why you
2    would need metals?
3  A.  It's a volume-related situation.
4  Q.  Meaning what, sir?
5  A.  A company ships in a couple thousand
6    ounces of gold.  We have to pay before
7    we get paid, pay the company, lease the
8    gold so we can etch the gold, so we can
9    match our buys and sells.
10 Q.  So when you sell -- so that after you
11     have leased material -- metals from
12     Materials -- let's call the company
13     Pease & Curren Materials, can we agree
14     to call them PCM, just to make it clear?
15 A.  Whatever you want.
16 Q.  When you lease the metals from PCM, you
17     pay money back to PCM to lease that
18     material; correct?
19 A.  That's correct, yes.
20 Q.  Then you take those metals and you
21     package them together to send to a
22     refiner; is that correct?
23 A.  No, no.
24 Q.  You don't?

41

1    A.  No, no, no, no, no, no, no.
2    Q.  But at some point PCM has been depleted
3        of all metals that were owned by it at
4        one point; is that right?
5    A.  I'm not sure that ever happened, but it
6        could have happened.  It could be
7        totally depleted, yeah.  That's
8        possible.
9    Q.  In fact, isn't that why the company was
10       dissolved?
11   A.  It was dissolved because it was no
12       longer necessary as a vehicle.  But no,
13       that's not why it was dissolved.
14   Q.  You said that earlier.  Why wasn't it
15       necessary as a vehicle anymore to
16       Pease & Curren?
17   A.  Because we purchased the metals.
18   Q.  Over time you had purchased all the
19       metals from PCM?
20   A.  We purchased -- now I can't tell you
21       whether we purchased Pease & Curren
22       Materials and dissolved it or whether we
23       purchased the metals and then dissolved
24       it; I cannot remember that distinction.

42

1    Q.  Okay.
2    A.  It's a transfer, recorded transfer that
3        happened that I can investigate for you,
4        but I can't remember right now how
5        exactly we did it.
6    Q.  Okay.  When did you first get into the
7        dental industry, sir?
8    A.  1996.
9    Q.  And were you involved in the
10       dental industry refining prior to
11       Miss Bergevine joining?
12   A.  Not on a strategic basis.
13   Q.  What do you mean by that, "not on a
14       strategic basis"?
15   A.  We had some dental customers who would
16       ship in periodically.
17   Q.  But you weren't marketing the dental
18       industry?
19   A.  That is what I said, not on a strategic
20       basis.
21   Q.  Whose decision was it to hire
22       Miss Bergevine at the company?
23   A.  Beth -- excuse me, Meredith, myself.
24   Q.  And how did you first learn of

43

1        Miss Bergevine?
2    A.  Meredith.
3    Q.  And do you recall who approached
4        Miss Bergevine about a job offer?
5    A.  No.
6    Q.  Do you recall whether she came to you
7        first?
8    A.  No, we came to her.
9    Q.  Where was she working at the time that
10       you approached her?
11   A.  I think nowhere.
12   Q.  She was unemployed?
13   A.  That's what I think.
14   Q.  Do you recall what her compensation
15       package was when you hired her?
16   A.  No.
17   Q.  Do you recall whether at some point her
18       compensation became based on the amounts
19       of metals recovered by her customers?
20       MR. ARONSON:  Objection.  Go
21       ahead.
22   A.  Trish wanted to work at home.  She had a
23       baby named Victoria.  She was a mother.
24       And Trish had dental experience, so

44

1    therefore she was valuable to us because
2    we wanted to go into this industry.  It
3    was a good fit.  We came up with a sort
4    of weekly pay or an hourly pay, I don't
5    remember, and then we came up with a
6    commission plan based on the number of
7    jobs that she produced.  She was adamant
8    that she wanted to be an independent
9    contractor and not tie herself up solely
10   with Pease & Curren because she was
11   interested in some other companies
12   besides Pease & Curren and working as a
13   dental distributor selling dental
14   products to dental labs, so she
15   presented herself as someone who would
16   be selling various dental products to
17   dental labs, and along with that a
18   refining line, so we would be another
19   line of work for her along with her
20   product lines.  And she had represented
21   to me that she had made arrangements
22   with two distributors to solicit
23   business from dental laboratories, and
24   that the refining line would be a good

45

```
 1    line to have in addition to the -- I
 2    don't know -- product lines that she
 3    wanted to have.
 4  Q.  What were the product lines that she
 5    wanted to have, sir?
 6  A.  I'm not -- I don't remember exactly, but
 7    the types of things that you would use
 8    in a dental lab.  Some consumables, some
 9    hardware.  In other words, they have
10    catalogs, and some items they use every
11    week kind of come out of the items, and
12    then some specialty items.  A lot of
13    items if you were setting up a new
14    dental lab, for instance.
15  Q.  I don't mean to cut you off.  This is
16    really not relevant to what we're
17    talking about, so let me just ask you,
18    when did she present this to you?
19        MR. ARONSON:  Did you finish
20    your answer?
21        THE WITNESS:  No, I didn't
22    finish my answer.
23  Q.  What else did you want to say,
24    Mr. Curren?
```

46

```
 1  A.  She -- her goal in the beginning was to
 2    have the freedom to be with Victoria and
 3    also the freedom not to be a full-time
 4    employee at Pease & Curren and represent
 5    these other people and some sort of
 6    autonomy, and also her goal was to work
 7    out of her house a lot using the
 8    telephone, and because she had
 9    experience, we accommodated this,
10    although we don't usually accommodate
11    people working out of their houses or
12    people just coming to the office one day
13    a week or half a day because in my
14    experience they don't learn some of the
15    things they need to learn.  They don't
16    gain the experience.  However, because
17    she was strong in the dental industry
18    and she had represented that she had had
19    existing customers, I thought, "Let's
20    give it a try and see how it goes."
21  Q.  So she told you all this that she wanted
22    to do prior to you hiring her?
23  A.  Yes.
24  Q.  And you understood that she was working
```

47

```
 1    for a while at selling other product
 2    lines?
 3  A.  Yes.
 4  Q.  And you understood that she was going to
 5    work out of her house?
 6  A.  Yes.
 7  Q.  And you agreed to hire her as an
 8    independent contractor?
 9  A.  We did.
10  Q.  Throughout the full time of her
11    employment?
12  A.  Up until the last six months.
13  Q.  And why did that change in the last six
14    months?
15  A.  Trish had a real desire for money, more
16    money, and she wanted to move up like
17    the jewelry salespeople and make more
18    money.  Also, her independent
19    contracting stuff turned out to be
20    somewhat mythical, had never developed
21    -- her other dental pursuits with these
22    other companies did not develop.
23  Q.  How do you know that?
24  A.  Because I spoke to her about it.  So
```

48

```
 1    because they didn't develop the way she
 2    had hoped they'd develop, she became
 3    drawn more and more into the refining,
 4    into Pease & Curren, so her efforts were
 5    more and more dedicated to our company.
 6    At a certain point you say you're an
 7    outside contractor, but you're not
 8    really an outside contractor.  You're
 9    not working for any other dental labs.
10    You have been here for several years.
11    We're the only ones paying you.  The
12    Board of Labor is going to come walking
13    in the door and we're going to say, "Oh,
14    here's the outside contractor, Trish,"
15    and then they're going to say, "She's
16    not an outside contractor.  She's
17    working for you exclusively.  She's an
18    employee."  This was very difficult to
19    explain to Trish, but I explained it to
20    her.
21        So, also we got -- I stopped
22    being the sales manager.  We hired a new
23    sales manager.  So she wanted to make
24    more money.  She wanted to play with the
```

49

1  big boys, so we changed and made her a
2  full-time employee and put her on a new
3  compensation system which the jewelry
4  salesmen were on.  And we said, "Trish,
5  you have a great upside of potential.
6  Rather than sitting around getting 50 or
7  75 bucks a job, we will put you on just
8  like the salespeople; however, we don't
9  want these transactional customers.
10  We are going after long-term, repeat,
11  large customers, so therefore instead of
12  a five-ounce threshold for commission,
13  we are going to put the threshold up" --
14  for jewelry salespeople it was 250
15  ounces; that we deemed to be
16  unreasonable for Trish, so we put it at
17  25 ounces.
18      So now Trish had to deal with
19  repeat customers, larger customers,
20  service customers, and not spend her
21  time with transactional customers.
22  This, I felt, would be very good for
23  Trish, increase her income.  It would be
24  better for the sales manager, make her a

50

1  better part of the team, make her less
2  isolated.  She was very isolated working
3  out of her home.
4  Q.  When did this transfer occur?
5  A.  I believe January 1, 2000.
6  Q.  All this happened at the same time she
7  became an employee as opposed to a
8  contractor, and she became integrated in
9  the rest of the sales force; is that
10  right?
11  A.  "All this" meaning what?
12  Q.  All this happened at the same time?
13  A.  No, no, no, no.  It took about a year.
14  You can't just take somebody and chuck
15  them into this.  You have to prepare
16  somebody for change, for the step up the
17  ladder, for the -- you were aiming at
18  success.  Success -- you don't just
19  declare success, you have to make
20  success and prepare for success and
21  train for success.
22  Q.  So when did this process start,
23  Mr. Curren?
24  A.  I would say 2001.

51

1  Q.  It started in 2001?
2  A.  Yeah.  It took about a year.
3  Q.  What happened from January 1, 2000 to
4  2001 when it started, what was going on?
5  A.  What was going on is Trish was learning
6  how to handle repeat customers, larger
7  customers.  She was getting training.
8  Q.  Anything else?
9  A.  Yeah.  She was becoming more integrated
10  into the sales force and more integrated
11  into the company.
12  Q.  What about Bethany Warburton, was she
13  transferred to an employee status as
14  well?
15  A.  No.
16  Q.  She stayed as an independent contractor?
17  A.  No.
18  Q.  It had to be one or the other; didn't
19  it?
20  A.  No.
21  Q.  What was her status with the company?
22  A.  Employee.
23  Q.  She was always an employee?
24  A.  From the day she started.

52

1  Q.  Okay.  Did she also go through this
2  process to be merged into the sales
3  force?
4  A.  Yes.
5  Q.  She did that when, at the beginning of
6  her employment or at the same time that
7  Trish was going through it?
8  A.  The same time.
9  Q.  In your opinion, how did that process go
10  of merging them into the sales -- the
11  two of them into the sales force?
12  A.  It's kind of like taking a hurricane --
13  that would be Trish -- and then just
14  putting the hurricane on top of a
15  30-foot sailboat in the middle of the
16  Gulf Stream.  Trish was totally
17  resistant to teamwork and having another
18  employee -- totally resistant to
19  splitting her territory up.  She thought
20  that we were taking something away from
21  her.  I had to explain to her, "Can't
22  cover the whole world.  This is a good
23  thing.  Less territory, less
24  transactional customers, more big

53

1    customers, more profitable customers.
2    Partner. You're not here, your partner
3    helps you out. You trust your partner.
4    You're a team, dental team. You go to
5    shows together. You work together. You
6    bounce ideas off each other. Two and
7    two makes three."
8        She resisted it, kicking and screaming.
9  Q. Who was her partner in this process?
10 A.  Bethany Warburton.
11 Q. What do you mean "two plus two makes
12    three"?
13 A.  Well, one plus one makes three. I don't
14    know how it works. It's asymmetry. If
15    you have teamwork, you get more out of a
16    team than you do out of individual
17    players. That's a sales dynamic.
18 Q.  I know what you're saying now, sir.
19    So what did do you mean by "a
20    transactional customer"? You mean a
21    one-time customer?
22 A.  A customer with no loyalty to Pease &
23    Curren. We have customers who their
24    only criteria for shipping to Pease &

54

1    Curren is they didn't like the return at
2    the last refiner. And some of these
3    guys we can convert, some of them --
4    they didn't like the return at this
5    refinery, that refinery. They don't
6    like the return at our refinery. They
7    won't like the one at the next. Some of
8    them go the whole circle and come back,
9    and you can convert them into loyal
10    customers or repeat customers. Some of
11    these transactionally customers have no
12    loyalty to you, are not worth putting
13    sales marketing dollars and effort into.
14 Q.  You said that Bethany was going to have
15    larger customers. Who was going to
16    provide those customers to her? Was
17    that coming from the company, or did she
18    have to go out and locate them?
19        MR. ARONSON: Objection. Go
20    ahead and answer. I am objecting for
21    the record. You can answer it if you
22    understand it.
23        THE WITNESS: Okay.
24 A.  We know how many dental labs there are

55

1    in the United States. We know how many
2    crown and bridge laboratories there are
3    in the United States, and then we also
4    know the manpower involved in these
5    dental laboratories. And from
6    experience we know that a one or two-man
7    lab, crown and bridge, produces a lot
8    less scrap than a 30 or 40 or 100-person
9    laboratory, so we have lists -- a list,
10    and we broke it down into a manageable
11    size.
12        One thing you don't want to do,
13    especially with a new salesperson, is
14    give them too many people to call on.
15    They're wandering around. You target.
16    "Let's target these 16 for the next
17    eight weeks, see how we do, and then
18    gauge where we are with them, what sort
19    of progress have we made, what sort of
20    interest do they have in our service."
21    These things have to be taught to
22    people, new dental representatives, and
23    there are concepts that we can sit here
24    and talk about, but in order to really

56

1    get somebody to understand these
2    concepts, they really have to listen,
3    and if they do, they can be extremely
4    successful.
5  Q.  So the answer is that you were going to
6    provide her the names of the companies
7    to go and call on, as you called them?
8  A.  Many of them, and she would, of course,
9    get referrals, and she would, of course,
10    have her list, and she would -- yeah,
11    yeah. So it's really a combination,
12    really.
13 Q.  You said earlier about new people that
14    are new in the industry. Of course,
15    she's not new. At this point she was
16    working for you for five years; correct?
17 A.  You're talking about Bethany.
18 Q.  No, I was talking about Trish.
19 A.  No. You asked me about Bethany.
20 Q.  Okay, all this was about Bethany before.
21 A.  That's what you just asked me, that's
22    what I just answered.
23 Q.  Okay, now in terms of Trish now, how did
24    Trish do in the transfer process?

57

1  A.  Trish does not like change.  I had Trish
2      in my office once -- you're not going to
3      believe this --
4  Q.  Let me ask you one question.  You said
5      before, you said about the hurricane
6      that landed on the boat, is that about
7      Trish or Bethany you were referring to
8      in that answer?
9          MR. ARONSON:  Let him finish his
10     answer, then you can ask the next
11     question.  This is a repeated pattern.
12 A.  I had Trish in my office once, and we
13     were discussing moving into the
14     commission schedule that the jewelry
15     people had, and Trish got so upset that
16     she stood up, left the room, left the
17     company, went outside, stormed around in
18     the street in front of the plant for
19     about 20 minutes, came back in, sat
20     down, and she told me that she quit
21     smoking for six months, and because I
22     was going to change her commission
23     structure, it was my fault, she had
24     resumed smoking.

58

1          MS. BERGEVINE:  That's a fat
2      lie.  That is such a lie.
3          MR. ARONSON:  All right, we're
4      not going to be able to go on here if
5      Miss Bergevine is going to be making
6      comments.
7          MS. BERGEVINE:  It's difficult.
8      I will be out here for a minute.
9          MR. ARONSON:  Why don't we take
10     a break now.
11         MR. ACETO:  I want him to finish
12     his answer.  I don't want to interrupt
13     anything he said.
14 Q.  Go ahead, Mr. Curren.
15         MR. ARONSON:  As long as
16     Miss Bergevine is not interrupting and
17     making comments.
18         MR. ACETO:  Miss Bergevine made
19     one comment and she walked out of the
20     room.
21         MR. ARONSON:  You know your
22     client should not be making comments
23     during the deposition, and I would ask
24     that you please try to prevail upon her

59

1      not to make comments or not have her
2      present.
3  A.  A precise answer is we have a talented
4      player who is adverse to change and
5      adverse to teamwork.  We have a lone
6      player, very good working alone.  To
7      integrate onto the team had to -- a lot
8      of nurturing, a lot of time, a lot of
9      patience, mentoring, and we got there.
10 Q.  And when did you get there?
11 A.  Bethany --
12 Q.  No, I'm talking about Trish.
13 A.  Do you want me to continue answering
14     questions?
15 Q.  It's my deposition, Mr. Curren, so go
16     ahead and answer my question, sir.
17         MR. ARONSON:  Are we going to
18     take a break?
19         MR. ACETO:  We are going to take
20     a break in a minute, yes.
21 A.  Bethany won her over.
22 Q.  Bethany won who over?
23 A.  Trish.  Bethany was such a great
24     spirited team player.  She played

60

1      soccer.  She was really fun.  She was
2      really talented.  She could take this
3      hurricane and calm it down, and she won
4      her over, and it made my job a lot
5      easier, and it made the harmony in the
6      company a lot better.  So I give Bethany
7      a lot of credit for dealing with what
8      she had to deal with when she walked in
9      the door and I said, "Here's your new
10     partner."  She overlooked some things
11     that somebody else may not overlook and
12     did a heck of a job.
13         MR. ACETO:  Why don't we take a
14     break here for a minute.
15         (Whereupon there is a brief
16     recess.)
17         MR. ACETO:  Back on the record.
18 Q.  So Mr. Curren, I'm not sure that you
19     answered the question that I asked you
20     before about what was Miss Bergevine's
21     compensation structure in 1996.  Do you
22     recall any elements of it?
23 A.  Yeah.  It was an hourly pay --
24 Q.  Right.

61

1    A.  -- for a certain amount of hours per
2        week.
3    Q.  What else?
4    A.  Compensation based on performance, her
5        jobs produced.
6    Q.  So it was based on a percentage of the
7        metals recovered from the lots; is that
8        right?
9            MR. ARONSON:  Objection.
10   A.  I'm not sure at that time if it was.
11   Q.  Okay.  And at some point did it become
12       based on a percentage of the metals
13       recovered from lots that she had
14       delivered to Pease & Curren from
15       customers?
16           MR. ARONSON:  Objection.
17   A.  Never a percentage.
18   Q.  Okay.
19   A.  Never a percentage.
20   Q.  Well, what is your memory of what it
21       was, then?
22   A.  Well, there's a relationship, a
23       relationship, but you wouldn't call it a
24       percentage.

62

1    Q.  What was that relationship?
2    A.  Well, if you had a certain amount of
3        ounces come in, you received a certain
4        amount of money, but it's not -- I
5        wouldn't call it a percentage.  It's a
6        payment based on ounces that were
7        settled to the customer.
8    Q.  Did that payment vary depending on which
9        precious metal it was that was
10       recovered?
11           MR. ARONSON:  Objection.
12   A.  I don't think so.
13   Q.  Did the amount that she was paid
14       increase based on the increased levels
15       of ounces that were recovered?
16           MR. ARONSON:  Objection.
17   A.  Yes.
18   Q.  Do you remember at all what that pay
19       structure was?
20   A.  I don't remember the pay structure
21       exactly.  If you want me to look at some
22       of the production, I could do that, but
23       if you want me to guess, I can't really
24       guess.  I have a lot of salespeople, and

63

1        I don't want to guess, but I want to be
2        as helpful as I can.
3    Q.  Okay.  So what production would I show
4        you that would help you remember what
5        she was paid for compensation?
6    A.  Well, Trish and I were very careful to
7        document what our arrangement was, and
8        as Trish worked at the company, she
9        became more valuable, and she was
10       compensated better, and each time we did
11       that, it was documented.
12   Q.  Documented in what way, sir?
13   A.  On a piece of paper, in writing.
14   Q.  And do you have those documents today?
15   A.  I don't have them, no.
16   Q.  Does the company have them?
17   A.  No.
18   Q.  No?
19   A.  No.  I saw the documents at my sister's
20       deposition, some of them.
21   Q.  So the company does have those documents
22       and they were produced?
23   A.  No, you produced them.  You showed them
24       to me, like you're going to do now.

64

1    Q.  I show you the exhibits from
2        Miss Curren's deposition, Mr. Curren.
3        Why don't you tell me which documents
4        in there would help you figure out what
5        Miss Bergevine's compensation structure
6        was.
7            (Witness looking over exhibits.)
8            MR. ACETO:  I think I would like
9        Mr. Curren to look -- I appreciate your
10       assistance, Mr. Aronson, but I think he
11       can look through them himself.
12           MR. ARONSON:  They're already
13       marked as exhibits.  We can have him do
14       that.  I was going to put a -- he's not
15       as familiar with the numbers, and he's
16       going to go through them.  You could
17       have done it yourself if you knew what
18       the exhibits were.
19   A.  All right.  February 12, 19 --
20   Q.  Hold it, Mr. Curren.  You're looking at
21       Exhibit No. 2; is that correct?
22   A.  I don't know.
23   Q.  Is that Exhibit No. 2 that you are
24       looking at?

65

1   A.   It says M. Curren 2, KR 6/29/06.
2   Q.   That 2 means Exhibit No. 2, sir, so
3        you're looking at Exhibit 2 to
4        Meredith Curren's deposition?
5   A.   I will take your word for it.
6   Q.   And page 3, which is Bates stamped 0084;
7        is that right?
8   A.   Yup.
9   Q.   Okay.  And that's a document that you
10       say reflected Miss Bergevine's
11       compensation structure; is that right?
12  A.   This document is very helpful to answer
13       your question.
14  Q.   But why is that?
15  A.   It says, "It is" --
16  Q.   You don't need to read it out loud, sir,
17       just read it to yourself.
18            MR. ARONSON:  Why don't you take
19       a look at all the documents in that
20       exhibit, Mr. Curren, before you answer.
21            (Witness looking through
22       documents.)
23  Q.   Have you had sufficient time to review
24       Exhibit No. 2, Mr. Curren?

66

1            THE WITNESS:  Do you want me to
2        thumb through all this stuff, too?
3            MR. ARONSON:  No.  I think he
4        wanted you to look at Exhibit 2.  It's a
5        multi-page document that he has given
6        you.  I want to make sure that you have
7        looked through it all.
8            (Witness looking through
9        document.)
10  Q.   Mr. Curren, are these the documents that
11       you were referring to earlier in your
12       testimony, Exhibit No. 2?
13            MR. ARONSON:  Objection.
14  A.   These documents lay out the compensation
15       structure between Pease & Curren and
16       Trish Bergevine for several years.
17  Q.   And these were the documents that you
18       were referring to that you needed to
19       look at earlier; is that right?
20  A.   That's correct, yes.
21  Q.   Are there any other documents that are
22       not in there that you would like to
23       review relating to Miss Bergevine's
24       compensation?

67

1   A.   Yeah.
2   Q.   Like what?
3   A.   I just -- my recollection is there's
4        some other documents.
5   Q.   In the possession of Pease & Curren?
6   A.   No.
7   Q.   What documents do you recall today that
8        are not part of Exhibit No. 2?
9   A.   I just think that -- we have '97, '99.
10       I just think there would be some
11       documents for 2000 and 2001.
12  Q.   There is a document for '96; correct?
13       That's page 4.
14  A.   Yeah.
15  Q.   So it's your understanding that there's
16       a document that was similar to these
17       that was executed each year reflecting
18       Miss Bergevine's compensation?
19  A.   No.
20  Q.   Isn't that what you just testified a
21       second ago?
22  A.   No.
23  Q.   What are these other documents that you
24       think exist?

68

1   A.   Similar to these documents where Trish
2        received essentially raises or territory
3        changes.  I'm just -- my recollection is
4        there was more territory changes or
5        raises than what we have here.  That's
6        my recollection.
7   Q.   Fair enough.  And I'm asking you in
8        2000 and 2001, you think there should
9        have been some kind of documentation as
10       to how her compensation was effected?
11  A.   I think so, yes.
12  Q.   How many documents, two or three or
13       more?
14  A.   Two or three.
15  Q.   So it's your understanding that each
16       time her compensation structure changed
17       in some way, there was written
18       documentation between Pease & Curren and
19       Miss Bergevine?
20  A.   Yes.
21  Q.   If you could turn, Mr. Curren, to the
22       last page of Exhibit No. 2 -- this
23       document -- do you recall creating this
24       document in 1999?

69

1   A.   All the documents that were executed
2        were signed by both of us, so I would
3        say this -- there was at one time
4        existing this document executed, signed
5        by both of us, even though this is --
6        you know, it's a document, but the
7        policy was that I sign them, Trish signs
8        them, so we didn't have any -- it was
9        clear to everybody that -- you know, it
10       wasn't a document floating around. It
11       was, you know, an example of what I
12       would like to have happen or this is a
13       good idea or something like that.
14  Q.   So my question to you is is that
15       the compensation structure for
16       Miss Bergevine as of 1999, as of
17       January 1st?
18  A.   I can assume it is, but I can't say
19       without seeing something with my
20       signature on it.
21  Q.   So do you question the validity of that
22       document?
23  A.   No.
24  Q.   It's on Pease & Curren's stationery;

70

1        right?
2   A.   I do not question the validity of the
3        document, no. I don't think anybody
4        made this up or anything. I think it's
5        something that either I made up or
6        somebody -- the sales manager made up
7        or, somebody made up and said, "Maybe
8        this is what we want to do with Trish,"
9        and then we probably did that with
10       Trish. But if you showed me another
11       document that I signed and it was a
12       little bit different, I would say,
13       "Well, that's the one that we agreed
14       on."
15  Q.   Okay. And are there any other documents
16       that you're aware of that Pease & Curren
17       has relating to Miss Bergevine's
18       commission structure that are not
19       attached as Exhibit 2?
20  A.   Pease & Curren has?
21  Q.   Yes.
22  A.   No, I don't have any documents.
23  Q.   Have you yourself looked at her
24       personnel file to see what's in there?

71

1   A.   No.
2   Q.   Who would have done that in response to
3        document requests in this litigation?
4   A.   Heather Blanchard.
5   Q.   So turning to Bates-stamped document
6        0136, sir, which is the last page
7        of Exhibit 2, sir, was it your
8        understanding in 1999 that
9        Miss Bergevine would get $75 for each
10       job which contained five ounces of gold,
11       palladium, or a combination of the two?
12  A.   I think we have to back up and talk
13       about Trish's situation. This is
14       recoverable metal. We're talking about
15       recoverable metal that was on a
16       settlement sheet. That's what the
17       standard used to pay all salespeople
18       are, recoverable metal.
19  Q.   Okay, I understand where you're going.
20  A.   I'm not finished.
21  Q.   Try my question.
22  A.   I'm not finished.
23  Q.   Yeah, but you have to answer my
24       question. These are things that I will

72

1        get into later with you, Mr. Curren.
2        I'm asking you this question. Was this
3        your understanding that she would get
4        $75 for each job which contained five
5        ounces of gold? It just requires a yes
6        or a no answer.
7   A.   Once again, I think we should back up
8        and understand that we're talking about
9        recoverable metal and on the settlement
10       sheet. Those are the parameters that
11       the commission structure is based on.
12       In that context, I will answer your
13       question yes.
14  Q.   Okay. So where in this document does it
15       say that on recoverable metals specified
16       in the settlement report? Where does it
17       say it on here, Mr. Curren?
18  A.   Well, it doesn't say it on there.
19  Q.   So, let's go to paragraph 2, Mr. Curren,
20       of Bates stamp 0136. In addition to the
21       $75 a job, on a job of five ounces of
22       gold, palladium, or a combination of the
23       two, Miss Bergevine was going to get
24       five dollars per ounce; correct, for

73

1   each ounce of gold and palladium; is
2   that right?
3   A.  Recovered.
4   Q.  Right.  Well, that's what you say,
5   recoverable as specified on the
6   settlement report; right?  That's what
7   you want to add?
8        MR. ARONSON:  Objection.
9   A.  That's the terms.  We have to talk
10  within parameters that work with this
11  document, with this company, and I am
12  quite willing to help you out as long as
13  we understand what we are talking about.
14  I'm going to answer the question yes,
15  that's her payment.
16  Q.  So it would be your understanding that
17  this doesn't refer to what's specified
18  in the tracking system for recoverable
19  ounces in a particular job?
20  A.  This has nothing to do with the tracking
21  system.
22  Q.  And you made that clear to
23  Miss Bergevine when you exchanged
24  this --

74

1        MR. ARONSON:  Objection.  Go
2   ahead.
3   A.  Absolutely, crystal clear.
4   Q.  You told her there was a tracking system
5   and that there was a settlement report,
6   and that these numbers and her
7   compensation would be based on these
8   settlement reports?
9        MR. ARONSON:  Objection.  Go
10  ahead and answer, if you can.
11  A.  Absolutely, crystal clear.
12  Q.  So you explained to her that there was a
13  tracking system?
14  A.  Yes.
15  Q.  When was it that you first explained to
16  Miss Bergevine that there was a tracking
17  system?
18  A.  The day she started work and we made our
19  deal.
20  Q.  What exactly did you say to her in
21  reference to the tracking system?
22  A.  I said, "Trish, you have to understand
23  the way the commission structure works.
24  It's a little bit complicated, but you

75

1   need to understand."  If you have a
2   salesperson who doesn't understand a
3   commission structure, you might as well
4   not have a commission structure, it's
5   totally ineffective.  You have to have
6   people motivated by the commission
7   structure, and they really have to
8   understand it, and it has to drive their
9   activity.
10       So, I explained the process and
11  how the material comes in, and I
12  explained, "We have charges that we
13  deduct from the material, and then we
14  have a settlement report.  And the
15  settlement report is going to rule when
16  it comes to commissions.  And, you know,
17  I know it's going to be disappointing to
18  you sometimes if you think that it was
19  4.9 ounces and if we didn't -- of
20  palladium, and if we didn't take out our
21  90 percent, then it would have been
22  five."  And she was a great advocate of
23  that, and that is what later on she
24  would -- one of her things that she

76

1   wanted to talk about a lot.  But I
2   explained to her at the beginning --
3   this is an anticipatable problem with
4   salespeople.  If only we didn't have
5   charges, my job would have been
6   palatable.  Very disappointing, and it
7   needs to be explained upfront, and if --
8   it needs to be explained crystal clear
9   upfront because it's going to happen,
10  it's going to come up with salespeople
11  and their commissions.
12  Q.  Back to my question Mr. Curren.
13  A.  No, I'm not finished.
14       MR. ARONSON:  Let him finish his
15  answer.
16  Q.  This isn't an answer responsive to my
17  question, Mr. Curren, so I'm asking you
18  again, what did you specifically say to
19  her about the tracking system?
20       MR. ARONSON:  He's going to
21  finish the answer to the question.
22  A.  That's exactly what I was --
23  Q.  Tell me what you said about the tracking
24  system.  What did you tell her about the

77

1    tracking system? You haven't mentioned
2    those words, "tracking system," in any
3    way in what you just answered. I am
4    asking what did you specifically say to
5    her about the tracking system?
6  A.  I said, "The tracking system is not
7    going to rule in commissions. The
8    settlement system, the settlements are
9    going to rule. There's going to be
10   differences. It's going to be
11   disappointing sometimes when you go out
12   there and work your butt off and it
13   doesn't make the five ounces, or you add
14   up the month's pay and you think maybe I
15   should have made more if I didn't deduct
16   the charges," but it's the same for all
17   the salespeople at Pease & Curren.
18   Everybody understands that that's where
19   we set up the commission structure, on
20   the settlement, not the tracking, and
21   every salesman needs to know that. I
22   anticipated the problems, and I
23   anticipated that, and you have to
24   explain it to them. You can't just have

78

1    salesmen coming in going, "Oh, well,
2    look at this assay over here," and then,
3    "Where's my commission?" I mean,
4    they're salespeople. "Where's my" --
5    that's what they do. "We're paying on
6    recoverable metals, and that's going to
7    be reflected in the settlement, and
8    that's what you're going to get," and --
9  Q.  And that's what you told Miss Bergevine
10   when you first hired her?
11 A.  Absolutely, that and more. Yeah.
12 Q.  So as a procedure, as a standard in the
13   -- strike that. As a practice and a
14   procedure in the office, you advise
15   every salesperson of what you just said;
16   is that right?
17 A.  You have to.
18 Q.  And you tell them to disregard the
19   tracking system, that the commissions
20   will not be paid on that?
21 A.  Absolutely. No, we're not -- no.
22   Absolutely, that's correct. "You're not
23   getting paid on" -- "Nobody, nobody is
24   getting paid off" --

79

1  Q.  And every salesperson is advised that
2    this tracking system is solely for
3    internal purposes?
4  A.  Absolutely.
5  Q.  And everybody is told that the
6    settlement report is what you're going
7    to get your commissions off of?
8  A.  Absolutely.
9  Q.  And the charges that you referenced
10   before -- you keep mentioning "the
11   charges," what do you mean by "the
12   charges"?
13 A.  Well, we deduct the charges.
14 Q.  What are those charges?
15 A.  Well, they're a percentage and they're a
16   dollar amount.
17 Q.  For what?
18 A.  For refining.
19 Q.  Can you be more specific as to what the
20   charges are?
21 A.  They vary for different lots.
22 Q.  Okay. A typical lot, is it based on
23   weight?
24 A.  Based on weight, based on incoming

80

1    weight, based on metal content. We
2    have a whole group of charges for a
3    whole group of different types of
4    products.
5  Q.  And where are those charges listed in
6    writing that you do?
7        MR. ARONSON: Objection. Go
8    ahead.
9  A.  You mean where were they listed in 2002
10   or --
11 Q.  Let me rephrase it. I will go a
12   different way, Mr. Curren. Who's in
13   charge of making up, imposing these
14   charges now?
15       MR. ARONSON: Objection.
16 A.  Who's posing the charges?
17 Q.  I said imposing, Mr. Curren.
18       MR. ARONSON: Do you
19   understand --
20 A.  Imposing?
21 Q.  Yes. Do you have trouble with that
22   word?
23       MR. ARONSON: Objection. Answer
24   it, if you can, and if you don't

81

1    understand it --
2    A.   I don't understand it.
3    Q.   Who decides what the charges are for
4         each lot, Mr. Curren?
5    A.   I do.
6    Q.   That's today.  Who did it in 2000 and
7         2001?
8    A.   Jay.
9    Q.   And when did that responsibility change
10        to you?
11   A.   When Jay left.
12   Q.   Which was when, again, 2002?
13   A.   I think it was 2004 or 2005.
14   Q.   And do you have a standard procedure
15        that you implement in determining the
16        charges for each lot?
17   A.   A standard procedure?  We have weight-
18        based -- we have rates based on the
19        material makeup and weight and content.
20   Q.   And are those rates written down
21        somewhere in your office?
22   A.   Back in 2002?
23   Q.   No, today.
24   A.   Today, yeah, they're written down.

82

1    Q.   Where are they written down?
2    A.   They're written down on my desk.
3    Q.   On a piece of paper, on your desk
4         blotter, where?
5    A.   On my desk.
6    Q.   Literally on your desk, on the top of
7         your desk?
8    A.   Yeah.
9    Q.   Not on a piece of paper?
10   A.   No, no, no.  They're on a piece of paper
11        on my desk.
12   Q.   Okay, well, that's what I'm asking you
13        about.  And how big is this piece?  Is
14        it one piece of paper?
15   A.   Just like this.
16   Q.   One piece of paper?
17   A.   It's three or four.
18   Q.   Three or four pages?
19   A.   Yeah.
20   Q.   Have you produced that in this
21        litigation?
22   A.   I have no idea.
23   Q.   What does it look like?  Is it
24        handwritten or is it typed?

83

1    A.   It's typed.
2    Q.   Who typed it up?
3    A.   Somebody.  One of the administrative
4         assistants.
5    Q.   But not you?
6    A.   No.
7    Q.   Where did that information come from
8         that was typed up by one of the
9         administrative assistants?
10   A.   You're talking in 2002?
11   Q.   I'm talking about the document that is
12        on your desk today back at your office
13        that you're relying on to determine the
14        charges for each one of these jobs.
15   A.   I raised prices January?  February, I
16        think?  February 1st I raised the
17        charges, and I said to somebody at a
18        sales meeting, "We're raising the
19        charges.  Here they are.  We are raising
20        our charges."  Wrote them down on the
21        desk.
22   Q.   Now you were raising the charges.  Were
23        you also raising the rates that you were
24        paying for the precious metals that were

84

1         recovered?
2              MR. ARONSON:  Objection.
3    A.   Raising the rates?
4    Q.   Yeah.
5    A.   No.
6    Q.   How do you determine what the rates are
7         to pay for the precious metals, is that
8         based on the market rate?
9    A.   No.
10   Q.   What is it based on?
11   A.   It's based on what we can recover from a
12        specific item profitably.
13   Q.   And so how do you determine how to
14        compensate a customer who delivers a job
15        to you?
16   A.   With a lot of thought and very
17        carefully.
18   Q.   Say you recover five ounces of gold, at
19        what rate do you reimburse the client?
20             MR. ARONSON:  Objection.
21   Q.   Do you understand the question, sir?
22   A.   It's a hypothetical question.  We have
23        charges.  It depends upon what the
24        material is.  Do you want to pretend

85

1    it's --
2    Q.  I'm asking before you get to the
3    charges, don't you determine what the
4    rate -- how much ounces of a precious
5    metal is in the lot times the rate, and
6    then you do the charges?
7        MR. ARONSON:  Objection.
8    Q.  Isn't that how you calculate it?
9    A.  It's not as simple as that.  You have --
10    incoming weight is one charge.  You have
11    to understand, really do have to
12    understand, that people don't send pure
13    gold to Pease & Curren or pure silver --
14    people send scrap.  Think of us as a
15    glorified junkyard.  We have piles of
16    stuff that comes in, it's
17    unrecognizable, and if you want to
18    have bigger piles of stuff coming in
19    unrecognizable and without precious
20    metals, then you can have very low
21    charges.  So in order to alleviate that,
22    you have to have an incoming charge
23    that's fairly substantial to give the
24    customer an incentive not to send drums

86

1    of garbage or, you know, stuff that is
2    too low grade to process or something,
3    so that's one component.  And then you
4    have another component, after you
5    incinerate the material -- some stuff
6    doesn't burn down at all, so you have
7    2000 pounds of something -- let's -- you
8    asked me a hypothetical question, I will
9    give you a partially hypothetical
10    answer -- sludge, and it burns down from
11    2000 pounds to 1900 pounds, and you have
12    1900 pounds of material that's going to
13    get sent out to Heraeus or Umicore or
14    someplace, and they're going to charge
15    you by the incoming weight, so you have
16    to charge by the incoming weight and the
17    afterburn.  You may have another
18    customer, who's maybe a better customer,
19    who would send in 2000 pounds.  The
20    material may burn down to 100 pounds.
21    You would charge him less on the after-
22    burn possibly if his gold content was
23    higher; that would be a more profitable
24    testament in many cases.

87

1    Q.  So will you produce a copy of these
2    rate charges that you have on your desk,
3    Mr. Curren?
4        MR. ARONSON:  Any requests
5    should be made to counsel.
6    Q.  Have you produced a copy of that to
7    counsel?
8    A.  I don't know.  I don't know.  I just
9    don't know.
10        MR. ACETO:  Well, I'm asking
11    you, then, formally, on the record, to
12    produce a copy of that to counsel and
13    have it sent to me; that is obviously
14    part of the case.
15    Q.  What did you do with the old rate
16    charges after you said you -- I think
17    you said you did a new one.  Was it
18    February 1, 2006 that you did a new rate
19    charge; is that right?
20    A.  You know, I just did another one last
21    week.
22    Q.  What did you do -- that was my question.
23    What have you done with the old ones
24    that you replaced them with the new one?

88

1    A.  I throw them in the wastebasket.
2    Q.  Okay, so --
3    A.  In the refinery, there's a couple of
4    different sets of different charges
5    floating around.  It's the last thing
6    you want.
7    Q.  And why did the rate charges change from
8    February to last week?
9    A.  We have an area called gold-filled,
10    which is very strong -- historically a
11    very strong area for Pease & Curren.
12    Women, for 20, 30 years, have been
13    wearing gold-filled earrings and jewelry
14    and costume jewelry.  It's a big, big
15    product that a lot of jewelers have, and
16    when it comes in, it comes in in fairly
17    large amounts of bulk, and it becomes
18    something that historically would go
19    through the refining process at Pease &
20    Curren as opposed to being sent out to
21    one of these outside refiners.
22    Q.  Right.
23    A.  So we had set up this quite intricate
24    and expensive system where --

89

1  Q.  Does this relate to the rate changes?
2  A.  Yes.
3  Q.  Okay, go ahead.
4  A.  You asked me about the rate change last
5      week, and I am going to explain it to
6      you.
7  Q.  All right.
8  A.  But you need to -- so anyway, it's
9      called the copper bullion circuit, and
10      the copper bullion circuit is -- you
11      would take the gold-filled material --
12      which is jewelry -- and you melt it into
13      what is called an anode.  Then you have
14      a copper cathode, and we would take the
15      anode and the copper cathode, and we
16      would hang them, suspend them in a vat
17      of acid, and then we would introduce
18      heat and electricity.  Now from high
19      school chemistry, you might remember the
20      electrometer series -- you might not
21      -- but if you set it up correctly, you
22      understand the electrometer series, you
23      can make the gold fall out of the copper
24      into a slime, and then you take the

90

1      slime out of the bottom, you put it in a
2      vessel, glass-lined vessel, and you
3      precipitate the metal.  Now to be cost
4      effective, you have to have a certain
5      amount of feed, and unfortunately gold-
6      filled jewelry has gone out of style,
7      but our customers -- some of them are
8      still using it, chain guys, gold-filled
9      chain and a few guys, so now all of a
10      sudden, I turn around and I have a gold-
11      fill coming in, but I don't have enough
12      gold-fill to work at this size anymore,
13      so I say to myself, "Okay, maybe I can
14      sell some of it to one of these other
15      refiners."  So I went out and I got
16      quotes from all the other refiners, and
17      the quotes weren't very good at all, so
18      I said, "Okay, I got to raise my prices
19      here.  I got to go from twenty-five
20      cents an ounce on the incoming to
21      seventy-five cents, and then I have to
22      go from accountability of 97 down to
23      90," so I raise --
24  Q.  This is only for the gold-filled

91

1      jewelry; correct, or is it for all gold?
2  A.  No, this is just for the gold-filled.  I
3      am trying to give you an example of how
4      pricing changes -- you know, pricing
5      changes to meet the market conditions,
6      because you could very easily overlook
7      this and keep receiving this gold-fill,
8      again at an unprofitable price.  Now
9      it's sitting over here, and gold goes
10      from 650 down to 599, and then you
11      really don't have enough to run the
12      sells, and then you can't really -- when
13      you go to try to sell it to somebody,
14      nobody wants to buy it.
15  Q.  So when you changed the rates last week,
16      you didn't change every rate, you
17      changed only the rates relating to the
18      gold-filled jewelry or gold-fill metals
19      that you received?
20  A.  Don't worry.  There was plenty of
21      complaining from the salespeople.  There
22      was plenty of complaining.  Any time you
23      change the rates, it's like a major
24      theatrical get-together because you

92

1      always raise them, and then the sales
2      guys are, "What about my customer?  He
3      can't go from twenty-five to
4      seventy-five."  It's a major event.
5  Q.  Why are the salespeople concerned about
6      it, because it's going to affect their
7      clients or it's going to affect their
8      commissions?
9  A.  Both, both.  Plus they have to go tell
10      the guy, "Guess what, prices are up."
11  Q.  Mr. Curren, can you describe for me the
12      process from the time that the tracking
13      system data is entered into the computer
14      system until the time a settlement
15      report is sent out, what happens between
16      those two steps?
17  A.  I don't use the tracking system.
18  Q.  You don't even look at the tracking
19      system?
20  A.  I have never entered one thing into the
21      tracking system, nor have I taken one
22      thing out of the tracking system.
23  Q.  In all the years you worked at Pease &
24      Curren?

93

1   A.  Well, the tracking system is fairly new.
2       I am not a computer guy, so I am not a
3       tracking system guy. I've been -- my
4       sister has diligently shown me how to
5       get to the tracking system, except on
6       occasions I have to navigate my way to
7       it.
8   Q.  You're saying the tracking system is
9       fairly new. When was it implemented at
10      the company?
11  A.  I don't know. I think -- maybe -- I
12      don't know. A few years ago. I'm not
13      sure exactly.
14  Q.  Prior to 2002?
15  A.  Yes, I think it was prior to 2002, yeah.
16  Q.  Prior to Miss Bergevine's employment?
17  A.  Yes.
18  Q.  Describe for me, sir, if you're not
19      involved in the tracking system, what's
20      the process from the time that the assay
21      ticket is completed -- and I mean all
22      the data is entered on the assay ticket
23      -- until the time that settlement report
24      is sent out to the client, can you

95

1       the customer, with the realization that
2       it's not going to get homogeneous
3       because you have such divergent melting
4       temperatures between gold and platinum
5       group metals, and you have them combined
6       together. So you have to think of the
7       platinum not so much as the precious
8       metal or valuable item, but you have to
9       think of it as a contaminant, so it
10      contaminates the gold. Now when I look
11      at a dental lot, or for that matter any
12      lot, I have kind of a rule which I tell
13      the salespeople, "If it ends in i-u-m,
14      it's difficult -- it's a periodic table.
15      You got platinum, palladium -- but if
16      it's selenium, titanium, chromium --
17      it's not a perfect rule, but it works
18      for our refinery -- if it has i-u-m in
19      it, at the end of it, as opposed to
20      zinc, as opposed to nickel, then you
21      know you're not going to get the perfect
22      homogeneous mix because of the melting
23      temperatures and because of our
24      capabilities in the marketplace. So,

94

1       describe to me that process?
2   A.  Oh, yeah. Do you want to limit it to
3       dental --
4   Q.  Yeah, why don't we limit it to dental.
5   A.  -- or go all over the spectrum.
6   Q.  Let's limit it to dental and to the
7       2001, 2002 time frame, if you have
8       personal knowledge of that. Let me
9       ask you, do you have personal knowledge
10      as to how the procedure went back then?
11  A.  Yeah.
12  Q.  Okay, please.
13  A.  All right. The dental jobs are the most
14      difficult jobs to get homogeneous. In
15      fact, there are people who will tell you
16      it's impossible to get them homogeneous.
17      At Pease & Curren we can't get them
18      homogeneous. So, you have too many
19      different elements and deleterious
20      substances in them to get them
21      homogeneous. So, we're buying it from
22      the customer. We're doing our best to
23      get a sample that relates to the amount
24      of precious metal in it so we can pay

96

1       the material comes in a bullion and it
2       may have teeth in it, it may have zinc,
3       in it, it may have titanium, whatever it
4       has in it, so if you can pull some of it
5       out to start with, you're much better
6       off. Just less contaminants. Try to
7       segregate the precious metals a little
8       bit. Then you take it, melt it. If it
9       has iron in it, you add copper to it.
10      Now theoretically you could have it
11      become more homogeneous by adding more
12      copper to it because copper brings down
13      the melting temperature of the platinum
14      and the palladium, and it helps it mix
15      better. But if you have iron in it, it
16      makes it more difficult to get a good
17      homogeneous sample. The problem with
18      that is you can assay a sample that is
19      not homogeneous from here to kingdom
20      come, and you're not going to get very
21      accurate numbers. You're going to get a
22      pretty good estimate, sufficient to pay
23      our customers and keep them happy. It's
24      a lot of chemistry and a lot of science,

97

1    but it's not NASA and it's not Bell:
2    Labs, so --
3  Q.  Let's go back to my question, what's the
4    process from the time that the assay
5    ticket is completed till the time you
6    sent out the settlement report, what's
7    the process involved at Pease & Curren?
8  A.  Okay, so --
9  Q.  Because all that stuff you were just
10    describing --
11  A.  That's sampling, that's sampling.
12    You're not interested in sampling?
13  Q.  All the stuff you were describing before
14    is stuff that was done before the assay
15    ticket is completed; correct?  Getting
16    the homogeneous sample and adding
17    copper, that's all done before the assay
18    ticket is completed?
19  A.  In many occasions, but not always.
20  Q.  So what I'm asking you, what is the
21    standard procedure from the time the
22    assay ticket is completed until the time
23    you sent out the settlement report,
24    what's the procedure in the office?

98

1  A.  Just on the ticket?
2  Q.  The ticket is completed now.
3  A.  It's completed.
4  Q.  And you're sending out a settlement
5    report to the client.
6  A.  It's completed?
7  Q.  Yes.
8  A.  Okay.
9  Q.  What's the procedure in the office to
10    determine --
11  A.  Do you want me to talk about somebody
12    entering it into the tracking system?
13  Q.  You just told me you're not involved in
14    the tracking system.
15  A.  Well, I'm not.
16  Q.  So that is why I am asking about the
17    assay ticket instead.
18  A.  So you're asking what I do?
19  Q.  What you do today.
20  A.  What I do.
21  Q.  What Mr. Pease did before.  That's why I
22    was asking if you had personal knowledge
23    in 2001, 2002.  I'm asking you about
24    that procedure.

99

1  A.  Why don't you ask the question again so
2    it's clear for the record.
3  Q.  I'm asking the procedure you implement
4    today that was implemented by Mr. Pease
5    back in 2001, 2002 to get those final
6    numbers in the settlement report from
7    the assay ticket.
8  A.  Okay.  I get the assay ticket.  I get a
9    ledger card.  I get the paperwork,
10    incoming paperwork.  I take the assay
11    ticket.  I read it.  I randomly recheck
12    the calculations.  I place a number on
13    the ledger card.  I give it to Marianne.
14    She writes up the settlement report,
15    prints out a check -- unless the
16    customer doesn't want a check, they want
17    gold back or they want the metal held or
18    whatever.
19  Q.  Right.
20  A.  There's all sorts of options.
21  Q.  But that's the procedure that you just
22    described to me?
23  A.  Yeah.
24  Q.  So the ledger card -- what is a ledger

100

1    card?
2  A.  It's bigger than this.
3  Q.  By "this," you mean an eight-and-a-half
4    by 11 piece of paper?
5  A.  Yeah, it's more of a permanent record.
6  Q.  Is this ledger card what was used when
7    Mr. Pease was doing this procedure?
8  A.  Oh, yeah.
9  Q.  And do you save the ledger cards?
10  A.  Well, we save some of the ledger cards,
11    and we discard some of the ledger cards.
12  Q.  Which ones do you save?
13  A.  The customers that are non-
14    transactional.
15  Q.  The repeat customers, you save those
16    ledger cards?
17  A.  We've determined if somebody hasn't
18    shipped to us in two years, then they're
19    not really a customer.  So you can keep
20    the ledger card if you want, but it's
21    not doing you any good.
22  Q.  What's the purpose of keeping a ledger
23    card for a repeat customer?
24  A.  It's sort of a duplicate of the computer

101

1   system.  I like it, some of the
2   salespeople like it.  Grab it really
3   quick.  You can talk to a customer on
4   the phone really quick.  You can -- I
5   mean, it has its uses.  Some people
6   prefer the computer.  I'm not a computer
7   guy.  I'm like, "Go get that ledger
8   card," and I say to the guy, "Remember
9   the stuff you sent us eight months ago?
10  Why don't we -- when are we getting that
11  again?"  It's a sales tool.  It's a
12  record of behavior that you can use to
13  sell, to market.  It's a quick place to
14  find a phone number.  In other words, is
15  the guy on the other end of the phone
16  the guy you really want to talk or is he
17  just the accountant, that type of thing,
18  so it's got a lot of purposes.  I like
19  it.
20 Q.  So when you say you grab a ledger card,
21  you're grabbing a form ledger card to
22  fill out?
23 A.  Whatever.  It's cardboard, kind of, and
24  it's bigger, so it can withstand getting

102

1   passed around the office and getting
2   pulled out.
3  Q.  But it's a preprinted form that you
4   complete for each job?
5  A.  Yeah.
6  Q.  And you said that you take the incoming
7   paperwork.  What's the incoming
8   paperwork?
9  A.  Well, you might have a different couple
10  types.  One piece of incoming paperwork
11  would be like -- let's say a guy sent
12  you a letter.  "I am sending you my
13  dental scrap.  It weighs five pounds.
14  I'm from Wisconsin.  I met Trish or
15  Rochelle.  She was very nice.  I'm
16  sending scrap.  I have been collecting
17  it for three years."  There's
18  information on it -- and another type is
19  when it comes in the door, we -- it gets
20  categorized, and the manager will take
21  it and he'll write notes down.  He'll
22  say, "Okay, this drum came in.  It had a
23  seal on it.  It didn't have a seal on
24  it.  The drum came in, it was rusty.

103

1   This drum came in, it was full of water.
2   This came in plastic bags.  This came --
3   this has a lot of ceramic."  Just
4   description-type of thing.  So you're --
5   in other words, I would love to be able
6   to look at every job, you know, before
7   it goes in to be melted.  I would love
8   to look at every job after it's melted,
9   and you find out after a while you can't
10  do everything, so you record what
11  happened on paperwork.  I call it
12  incoming paperwork.  So it's a
13  combination of things we produce and
14  things the customers produce.
15 Q.  Where are the ledger cards maintained in
16  the offices at Pease & Curren?
17 A.  In the office.
18 Q.  Can you be more specific?
19 A.  I can draw you a picture if you want.
20 Q.  Whose filing cabinet are they kept in?
21 A.  It's a common file.  Everybody has
22  access to it.
23 Q.  Is it by your office?
24 A.  No, it's around the corner.  It's

104

1   underneath the blackboard where we keep
2   the metal prices that we put up every
3   day.
4  Q.  And who has access to the ledger cards?
5  A.  Anybody who works in the office.
6  Q.  Anyone who works in the sales office or
7   anyone in the office?
8  A.  Anyone in the office and any manager
9   from the plant and -- that's about it.
10 Q.  And how far back do the ledger cards go?
11  How many years do you keep them?
12 A.  Usually two or three.
13 Q.  You said you randomly recheck the
14  calculations on the assay ticket.
15  How do you do that?
16 A.  With an adding machine.
17 Q.  And what specific calculations are you
18  verifying are accurate?
19 A.  I'm verifying the metal contents or the
20  weights to make sure they make sense.
21 Q.  Meaning you add up all the weights of
22  all the metal contents, add them
23  together?
24 A.  Not usually.  Usually it's more back to

105

1    what you're talking about before, a
2    percentage.
3  Q.   So the next step you say is you place a
4    number of a ledger card?
5  A.   Yeah.
6  Q.   So my question to you is how do you
7    calculate that number that goes on the
8    ledger card?
9  A.   Well, I calculate it by looking at the
10   assay and deciding what the estimated
11   precious recoverable metal is. I got
12   to get paid for it. I'm selling it, I
13   got to get paid for it, so I look at
14   that. And then I look at what it's
15   worth or what the metal content is.
16  Q.   Are there any guidelines you go by in
17   determining the number that you place on
18   the ledger card?
19  A.   Well, we have our charges -- I certainly
20   want to get those -- and then we have
21   our metal content that may or may not be
22   homogeneous, and we have tests that
23   we've run on the thing, and if you --
24   you know what it's kind of like? It's

106

1    kind of like navigating a boat before we
2    had GPS. You learn how to -- where the
3    boat is, where the metal is, what's
4    going to happen to the metal when you
5    combine it with something else, or if
6    it's going through our refinery. We
7    say -- we talk about dental. Dental
8    it's always going somewhere else.
9  Q.   Right.
10  A.   So, say what's recoverable, that's the
11   big question; right?
12  Q.   Right?
13  A.   What's recoverable? That is what
14   Gregory wants to know, what's
15   recoverable. So then we go back to what
16   is platinum? Is that a valuable metal
17   or is that a contaminant? Well, if you
18   have 100 ounces of gold and you have one
19   ounce of platinum or two ounces of
20   platinum, I'm sure that some people
21   would say, "I want to get paid for that
22   two ounces of platinum," but can you
23   recover that two ounces of platinum or
24   100 ounces of gold? Can you? You

107

1    can't.
2  Q.   Why can't you?
3  A.   Because it would cost way too much money
4    to get to do that. We'd have to set up
5    a whole different type of refinery.
6  Q.   Of course, you're not doing the
7    refining, you sending it out to another
8    refinery?
9  A.   That's true.
10  Q.   And they have the same problem?
11  A.   They have the same problem. If you want
12   to go down this road, I can go down this
13   road with you really far and really
14   explain some things to you about
15   chemistry and recoverability.
16  Q.   But you don't have a background in that
17   area; correct?
18  A.   Yeah, I got a huge background, been
19   working in a refinery for 30 years.
20  Q.   You don't have any technical training in
21   that area?
22  A.   I taught myself everything I need to
23   know. It's kind of like running a farm
24   or a bar.

108

1  Q.   So are there any -- going back to this
2    issue of the numbers that you placed on
3    the ledger card, is there a set
4    procedure in the office as to how you
5    calculate the numbers, or is it just
6    based on your experience in the
7    industry?
8  A.   It's based on experience in the
9    industry. We don't have a standard --
10   you can't have a standard. These things
11   are all different. Believe me, I wish
12   we had a standard. I wish we -- that,
13   you know, the things that came in, that
14   you could get a homogeneous mix. I wish
15   the things that came in were a lot
16   easier to assay. I mean, it's -- you
17   have to -- this is the card you have
18   been dealt, this is the refinery you
19   have, these are the restrictions you're
20   working under, financially and
21   chemically, so you work under them.
22  Q.   You have a lab that does the testing,
23   and then there's a metallurgist that is
24   in charge of that lab; is that correct?

109

1   A.  Yes.
2   Q.  What's the metallurgist's name today?
3   A.  Kim Michalik.
4   Q.  Is that a woman?
5   A.  That's a woman.
6   Q.  Dr. Michalik?
7   A.  No, Kim, K-i-m, Kimberly.
8   Q.  But her last name is Michalik, is that
9       what you said?
10  A.  Yeah.
11  Q.  And why isn't Dr. Michalik involved in
12      calculating the numbers that you placed
13      on the ledger card?
14  A.  She is.
15  Q.  She is involved in it?
16  A.  Absolutely.
17  Q.  What is her involvement in determining
18      the numbers that go on the ledger card?
19  A.  Her involvement is like when I come
20      running out of the office and go find
21      her and say, "What the heck is with this
22      assay?  This is impossible.  Did you see
23      this stuff when it came in?  What color
24      was it?  Does this have iron in it?  Who

110

1       did this assay?  Why didn't they do a
2       three-gram sample?  Do we need a
3       grammometric on this?  Is this an AA?"
4       Yeah, I'm chasing her around.
5   Q.  But you're asking for clarification on
6       the assay ticket.  I'm asking if she's
7       involved in actually determining the
8       numbers that go on the ledger card.
9           MR. ARONSON:  Objection.
10  A.  On the ledger card?
11  Q.  Yeah.
12  A.  No.
13  Q.  Do you do that yourself?
14  A.  Yeah.  I'm responsible for it.  She's
15      responsible for getting me the
16      information I need.
17  Q.  How about back when Mr. Pease was doing
18      it, was he -- when he was completing the
19      ledger cards, was anybody assisting him
20      in completing the ledger cards?
21  A.  You mean physically writing on the
22      ledger cards?
23  Q.  Yes, yes.
24  A.  No.

111

1   Q.  I mean, calculating the numbers that are
2       physically written on the ledger card,
3       does anybody assist --
4   A.  The numbers are calculated when you get
5       it.
6   Q.  Where are they calculated?
7   A.  In the office.
8   Q.  By whom?
9   A.  One of the administrative assistants.
10  Q.  They calculate the numbers that go on
11      the ledger cards, the administrative
12      assistants?
13  A.  They calculate the numbers that go on
14      the assay tickets.
15  Q.  Right, I understand that.  I'm not
16      talking about the assay tickets, I'm
17      talking about the numbers that go on the
18      ledger cards.
19  A.  No, that's traditionally been the
20      owner's job at Pease & Curren.
21  Q.  That's what I'm asking you about, no one
22      else writes the number on the ledger
23      cards, only you, and before you it was
24      Mr. Pease.

112

1   A.  Yes.
2   Q.  So I'm asking the calculations that
3       you use to derive those numbers that
4       you place on the ledger cards, does
5       Dr. Michalik assist you in deriving
6       those numbers?
7   A.  Yes.
8   Q.  How does she assist you in doing that?
9   A.  By giving me information.
10  Q.  But does she actually do the
11      calculations with you?
12  A.  Yeah.  If it's a difficult thing, yes.
13      Yeah.  I mean, if we have -- back to the
14      i-u-m thing, if we have a job with --
15      contaminated with chromium or we have a
16      job that we've melted and we've
17      precipitated the metals out, you can't
18      -- I can't -- as I said, I can't do
19      everything.
20  Q.  Let me ask you hypothetically: you have
21      gone to Dr. Michalik and said, "I have
22      100 ounces of gold and two ounces of
23      platinum" -- I think you said -- and she
24      tells you, "You're not going to be able

113

1    to recover the platinum, don't include
2    that on the ledger."  Is that the kind
3    of discussion that you have with
4    Dr. Michalik?
5    A.  No.  I don't have to have that
6    discussion because we have minimum
7    recoverable amounts that we make known
8    to our customers, and then we tell them
9    it's a trace amount of platinum.  We're
10   not going to tell them it wasn't there,
11   we're just telling them we're not God,
12   we can't pay for it.  If I can get my
13   customer to not put the platinum in with
14   the gold, I can pay him.  A lot of times
15   we have been very successful by saying
16   to like a dental lab, I'd say, "Well,
17   you had three ounces of platinum alloy
18   you sent in, just keep it separate.
19   Don't think of it as value, I am
20   thinking of it as contamination.  Just
21   keep it separate.  Send it to me
22   separate.  I won't even charge you for
23   it," maybe I will say to him.  "Just
24   keep it separate.  To you it's value,

114

1    to me it's a contaminant.  Send it in.
2    We will pay you for it."  Everybody is
3    happy if you can get to that point, but
4    if they take it and throw it into a
5    drum -- we're not miracle workers, we
6    are refiners.
7    Q.  What's the minimum amount of platinum
8    that needs to be present in a job lot to
9    pay the customer?
10   A.  Point 6 percent.
11   Q.  Point 6 percent of the overall weight of
12   the lot?
13   A.  No, the assay.
14   Q.  Point 6 percent of all of the precious
15   metals, is that what you're saying?
16   A.  No, .6 percent of all metals.
17   Q.  Of all precious metals?
18   A.  No, metals.
19   Q.  All metals in general?
20   A.  Chromium, copper.
21   Q.  If it's more than -- if the presence of
22   platinum is more than .6 percent in a
23   particular assay of all the metals in
24   that lot, then you will pay on the

115

1    platinum?
2    A.  You know, there's different things going
3    on here.  If this -- if it's
4    recoverable, yes.  If it's contaminated
5    with chromium or selenium, I have to
6    say, "Boys, this doesn't fit into the
7    refining schedule.  You have got this
8    contaminant in here.  It's not
9    recoverable to us.  We can't pay.  I'm
10   very sorry."
11   Q.  Forget about the contaminant.  I'm only
12   asking about the minimums.  You said
13   before -- you brought this up about the
14   minimums, that the platinum might not be
15   above the minimums, so I want to make
16   sure I understand what you're saying
17   now.  So if it's more than .6 percent of
18   all the metals in a particular lot after
19   you have assayed it, then you will pay
20   on the platinum; is that right?
21        MR. ARONSON:  Objection.
22   Q.  Isn't that what you just said?
23   A.  Well --
24   Q.  Assuming there's no contaminants.

116

1    A.  No, that is not what I just said.
2    Q.  I am trying to understand, so please
3    explain it to me again.
4    A.  Well, if it's below that --
5    Q.  -- you don't pay.
6    A.  Not always.  If it's recoverable, we
7    will.
8    Q.  But you brought that issue up that it
9    would be below the minimum.  I am trying
10   to understand what the minimum is.  The
11   minimum is .6 percent on platinum; is
12   that right?
13   A.  Yes.
14   Q.  And if there's a presence of platinum of
15   more than .6 percent in an assay of all
16   the precious metals, then you would pay?
17        MR. ARONSON:  Objection.
18   A.  If I could.
19   Q.  Meaning what by that, when you say, "if
20   I could"?
21   A.  If I could recover it.
22   Q.  How do you know at that stage whether
23   you can recover it or not?  At the stage
24   when you're writing the ledger card up,

117

1    how do you know whether it's
2    recoverable?
3    A.   Well, in order to do that you'd have to
4         go look at the material in the plant and
5         say, "Oh, this is iron. I can't recover
6         that." You go, "Oh, this is copper. No
7         problem, we can get that back."
8    Q.   And you involve Dr. Michalik in that?
9              MR. ARONSON: Objection.
10   A.   Yeah.
11             MR. ARONSON: I think you have
12        been referring to her as a doctor. I
13        don't think that's correct. Go ahead
14        and answer.
15   Q.   Is she a doctor?
16   A.   No, she's a mother.
17   Q.   But she heads the lab?
18   A.   She's a chemist.
19   Q.   I apologize, I thought she was a doctor.
20        Do you have any Ph.Ds in the area of
21        metallurgy or some area like that that
22        works in your lab?
23   A.   No.
24   Q.   Did you at any time have anyone with a

118

1    Ph.D?
2    A.   Yeah.
3    Q.   Who was that?
4    A.   Mishra, M-i-s-h-r-a.
5    Q.   When did Mishra leave, Dr. Mishra leave?
6    A.   Several years ago.
7    Q.   And have you ever replaced him with
8         another doctor?
9    A.   No.
10   Q.   Why was that?
11   A.   I found a chemist who was fabulous,
12        Kimberly Michalik. She didn't have her
13        Ph.D, so what. She's wonderful. I
14        don't want too many doctors running
15        around.
16   Q.   Are you familiar with the interaction
17        between Mr. Pease and Dr. Mishra when
18        they were doing -- when Pease was doing
19        the ledger cards?
20   A.   Yeah, yeah.
21   Q.   How much involvement did Dr. Mishra have
22        in the completion of the ledger cards?
23   A.   Not much or zero. I would say zero.
24   Q.   Zero?

119

1    A.   Yeah.
2    Q.   Did he even know about the existence of
3         the ledger cards?
4    A.   Oh, yeah, he knew.
5    Q.   Did he know about the existence of the
6         tracking system?
7    A.   Yes.
8    Q.   How do you know that he knew about the
9         tracking system?
10   A.   Well, we had a computer consultant in
11        there who practically moved in to build
12        the thing. It was kind of like having a
13        construction crew come in here and put
14        in a new room. It was obvious.
15   Q.   I'm not asking about the computer
16        system, I'm asking about the tracking
17        system. Do you have knowledge that he
18        was aware of the tracking system?
19             MR. ARONSON: Objection.
20   A.   You know, if he came in here and said,
21        "I wasn't aware of the tracking system,"
22        I would say, "Oh, you weren't aware of
23        the tracking system?" I'm going to
24        answer your question yes, that he was

120

1    aware of it, but if he came in here and
2    said, "I wasn't aware of the tracking
3    system," I would say, "Oh, you weren't?"
4    It was that long ago. Everybody is
5    aware of the tracking system. It's not
6    such a major -- the tracking system is
7    not a major item at Pease & Curren. It
8    categorizes metal. You can categorize
9    metal without using it, you can use the
10   assay. You can use different methods of
11   doing it. Some people love it, some
12   people don't like it that much.
13   Q.   So the procedure that you were
14        describing before as to how you derived
15        the numbers for the ledger cards, is
16        that pretty much the same procedure that
17        Mr. Pease implemented, to your
18        knowledge?
19   A.   Yeah, he was -- yeah. He was -- did it
20        for a long time and did it pretty well.
21   Q.   Was there a transition period where
22        Mr. Pease was advising you as to how to
23        complete the ledger cards?
24   A.   No.

121

1  Q.  So he just one day stopped when he left
2      the company completing the ledger cards,
3      and you took over the next day?
4  A.  Greg, let's go back through history, and
5      I will tell you a really interesting
6      piece of history.  It will only take a
7      few minutes.  Back in the '80s I went
8      out to California, bought a refinery,
9      and ran it for ten years, so we had
10     assays coming out our ears, material
11     coming out our ears.  It was a refinery,
12     I ran it for ten years.  I opened it,
13     set it up, closed it down when we didn't
14     need it anymore.
15 Q.  Ran it for Pease & Curren?
16 A.  Yeah, so we didn't need a transition.
17 Q.  I didn't mean to offend your
18     intelligence in this area, I'm just
19     asking you if he trained you in
20     completing the ledger cards in some way.
21 A.  No, we train each other.  It's kind of a
22     teamwork thing.
23 Q.  So it's fair to say that you were
24     involved in the ledger cards even when

122

1      Mr. Pease was there, then?
2  A.  It was not my job, that was his job, and
3      he really liked his job so -- he really
4      did, he liked his job.
5  Q.  But he must have been on vacation --
6  A.  If he was on vacation, I did it for him.
7  Q.  So there were times that you filled in
8      for him?
9  A.  Yeah, if he was on vacation, but it was
10     his job.  It was kind of like his desk,
11     his computer, his pen, his personal
12     little area.
13     MR. ACETO:  Do you want to take
14 a break?  Why don't we break here for
15 lunch.
16     (Whereupon there is a lunch
17 recess commencing at 12:45 p.m.)
18     (Exhibits 1-18 from Meredith
19 Curren's Deposition remarked.)
20     AFTERNOON SESSION
21     RECOMMENCING AT 1:45 P.M.
22     DIRECT EXAMINATION CONTINUED
23     MR. ARONSON:  Mr. Aceto, I
24 wanted to mention that we had produced

123

1      here today a document from Pease &
2      Curren that we recently located entitled
3      2004 Outside Rep and Dental Rep Sales
4      Commission Plans.  It's dated February
5      17, 2004, and it is my understanding
6      that this applied in an earlier version
7      to Miss Bergevine, and therefore we are
8      producing it as part of our Response to
9      the Request for Production of Documents;
10     however, this is a confidential
11     document, and it's a document that is
12     used by Pease & Curren internally, and
13     it's critical that this not be disclosed
14     to anyone outside the company for
15     matters unrelated to this case, for
16     instance, to competitors or other people
17     like that, and there is a concern by my
18     client that we -- that it's agreed that
19     Miss Curren and you will not disclose
20     this to any competitors of Pease &
21     Curren at any point in time.
22     MR. ACETO:  Miss Bergevine, you
23 mean?
24     MR. ARONSON:  I stand corrected,

124

1      Miss Bergevine will not disclose this to
2      any competitors.  Obviously you need it
3      and can use it for purposes of this
4      case, but we want to have your agreement
5      that it will not be disclosed by either
6      you or your client to competitors or
7      other people in the refinery business
8      who are not involved in this case.
9      MR. ACETO:  Why don't you write
10 up a confidentiality agreement, and we
11 will put it in place for all the
12 discovery going forward.
13     MR. ARONSON:  Okay.
14     MR. ACETO:  Just a standard
15 confidentiality agreement, that not
16 aside we will not disclose any of the
17 documents, and we will just sign it,
18 both sides will sign it.
19     MR. ARONSON:  Fine.  Are you
20 agreeable to do that?
21     MR. ACETO:  To sign the
22 confidentiality agreement?
23     MR. ARONSON:  Yes.
24     MR. ACETO:  Sure.  If you want

125

1   to keep that and mark it confidential,
2   we can mark the documents that we deem
3   confidential between us --
4        MR. ARONSON:  I'm producing it
5   today for you to look at.  If you want
6   to look at it or question the witness,
7   you're entitled to do that, but I just
8   wanted your assurance that it would
9   remain confidential for purposes of this
10  litigation, and I understand that you
11  have agreed to that.
12       MR. ACETO:  Why don't we mark
13  this as the next exhibit, please.
14       (Exhibit 20, Pease & Curren
15  2004 Outside Rep and Dental Rep Sales
16  Commission Plans, so marked.)
17  Q.  Mr. Curren, your counsel has provided me
18      with this document that has now been
19      marked Exhibit 20 to your deposition.
20      Have you seen this document prior to
21      today?
22  A.  Yes.
23  Q.  Can you tell me what it is?
24  A.  It's a sales commission plan.

126

1   Q.  A sales commission plan for the
2       salespeople at Pease & Curren?
3   A.  Well, this one is specific for dental
4       and -- but it's also generic for the
5       whole company, so it's both.  But the
6       general components of it are to keep
7       existing accounts -- if you have
8       existing accounts, there's always
9       accounts that go out to our business
10      or for some reason don't use precious
11      metals, so just to stay even it's a
12      small victory, so we want to encourage
13      the people, to give them a baseline,
14      and then have them -- if they stay at
15      100 percent or even 90 percent, they're
16      doing really, really well because of
17      certain natural attritions.  Some people
18      go above 100 percent; however, you don't
19      want them calling on the same customers
20      all the time, so you have another
21      component, which is new, large accounts,
22      repeat customers.  And then you have the
23      sweeps component, and then you have the
24      new accounts.  You don't want to just

127

1   get them, you want to grow them if you
2   can, and usually by doing that you have
3   to take away from a competitor, so we've
4   come up with this commission plan, and
5   as I said before, if they understand the
6   commission plan, it's really a road map
7   to how to spend their time.
8   Q.  I understood your counsel to say there
9       was a similar plan to this one in effect
10      back in 2001; is that right, that
11      applied to Miss Bergevine?
12  A.  2001, yeah.  This -- yeah.
13  Q.  Where's the 2001 version of this?
14  A.  It wasn't as neat and tidy.  Certain
15      parts are on the computer and certain
16      parts are done by hand.
17  Q.  In the 2001 version?
18  A.  Yeah.
19  Q.  So I got the idea that this was -- you
20      changed 2001 to 2004 and submitted this
21      to the employees.  That's not the case?
22  A.  Well, the reason this is here is because
23      you asked for when Trish became a
24      full-time employee.

128

1   Q.  Right.
2   A.  She went on the program.
3   Q.  This program outlined in Exhibit 20?
4   A.  Yeah.
5   Q.  Okay.
6   A.  But I don't have that one.
7   Q.  Where is that one today?
8   A.  I mean, I just didn't keep it around.
9       She quit, and I didn't keep -- it's --
10      the baseline has changed, the existing
11      accounts have changed.  Certain
12      components have in it changed, so I just
13      brought one.
14  Q.  Where on this document would it show how
15      you calculate her commissions, what
16      page?
17  A.  Well, the --
18  Q.  Assuming this was in effect in 2001,
19      which we all know it wasn't.
20  A.  Well, it was in 2002 when she became a
21      full-time employee.
22  Q.  So where would she calculate her
23      commissions, on what page?
24  A.  She would start here.

129

1  Q.  Page 12?
2  A.  You can start, yeah, with the lot size.
3  Q.  Okay.
4  A.  So we know percentages of lot sizes.
5      And as I told you before, it was 250 for
6      jewelry, but for her we wanted 25
7      because, as you can see, 83 percent of
8      the --
9  Q.  This says 25 ounces, too, doesn't it?
10 A.  That's what I am saying, that's what we
11     did for her.  This is dental.  Dental
12     its still 25 ounces.
13 Q.  For everybody that worked --
14 A.  Threshold, yeah.
15 Q.  -- in dental.  Not just for Patricia?
16 A.  No, no.
17 Q.  Everybody in the dental field, the
18     threshold was 25 ounces?
19 A.  Yeah.  So you see that.  And then you
20     see -- you keep going through here.  You
21     can see 2003.
22 Q.  Again, for the record, you're looking at
23     page 15 of Exhibit 20?
24 A.  Yeah, yeah.  You can see what percentage

130

1      of lots are over 25, how it's gone up.
2      I am trying to get it to go up, so it
3      has some success.  And then --
4  Q.  I don't understand that statement at the
5      top here on page 15, which percentage is
6      over 25 ounces?  22 percent; is that
7      right?
8  A.  Yeah, that's cumulative.  In other
9      words, if you have 25 ounces, and you
10     send in for the year --
11 Q.  For the whole year, it's not just one
12     lot?
13 A.  No.  At the end of the year you add them
14     up, and that's another component.
15 Q.  But it's only -- back in 2003, only
16     22 percent of the accounts at more than
17     25 ounces?
18 A.  And 150 per year.
19 Q.  Oh, I was reading the wrong number.
20 A.  So it's a lot easier to get a lot more
21     metal if you have bigger accounts.  It
22     goes on and on and on.
23         Then you have timed out
24     accounts.  Those accounts, as we said,

131

1      after two years if they haven't shipped,
2      it's not really an account, so you have
3      to focus your time as a salesperson on
4      going back after the big ones, not going
5      back after the little ones.  That's what
6      that is telling you.
7          And then you have on page 21
8      Incremental and Existing Timed Out
9      Volume.  It could be up, it could be
10     down.  New Accounts, and then the Volume
11     from the New Accounts, and then you have
12     a total volume.
13         Then we go into the Sweeps,
14     80 percent of the lots, 26 percent of
15     the lots at ten ounces.
16 Q.  This is page 24 you're looking at?
17 A.  Yeah.  We are trying to get it up.  You
18     see how difficult it is to get it up to
19     25?  You kind of have to show in a
20     bullion -- the same thing.  So 82
21     percent of the sweep lots, 40 percent of
22     the volume at ten ounces.  So it's kind
23     of like the old 80/20 rule, but you have
24     to spell it out.  So then you get your

132

1      line, you get your --
2  Q.  What page are you looking at now,
3      Mr. Curren?
4  A.  33.  So you start at -- you base, then
5      you go below your base to 70 percent.
6      Let's say you lose 30 percent of your
7      business, you don't get any money.  You
8      make your base, you make 10,000.  You
9      grow the accounts with existing timed
10     out in $3000 increments, 3000-ounce
11     increment, you get 20,000.  And then
12     3000-ounce increments, new accounts and
13     accounts that are timed out come back,
14     10,000, so you have different ways to
15     make money.
16 Q.  Who prepared this package, Mr. Curren?
17 A.  Steve Doyle is the architect.
18 Q.  Who put together this Power -- was it a
19     PowerPoint presentation at one point?
20 A.  No.
21 Q.  This package of documents marked as
22     Exhibit 20 was prepared by Steve Doyle?
23 A.  Well, the person who actually did the
24     computer work was John Lees.  Steve

133

1      Doyle is the architect and author.
2   Q.   By architect, you mean the person who
3      created all these drafts?
4   A.   The concepts.  It's one thing to have a
5      concept, the other one is to put it into
6      a computer.  This looks like really
7      something really you do, but every year
8      it gets easier, but you can't buy the
9      stuff off the shelf.
10  Q.   And so, Miss Bergevine, in some form or
11      substance, was given something like this
12      back in 2002?
13  A.   She got this back in 2002.  And it's in
14      the discovery, I saw it yesterday.
15      Pretty much a precise one-page review of
16      what her commissions would be, but this
17      is the back and forth.
18  Q.   So you saw that in discovery from us or
19      from Pease & Curren?
20  A.   We have copies of the discovery.
21  Q.   Right.  I'm asking whether that document
22      came from Miss Bergevine or from Pease &
23      Curren.
24  A.   I don't know whether it came from

134

1      Miss Bergevine or Pease & Curren, but I
2      did see it yesterday.  If you want to
3      pull it out, I can show it to you and
4      explain it to you, or we can do it
5      later, however you want to do it.
6   Q.   We will get to it.  Earlier we were
7      talking about the ledger cards.  When's
8      the last time you threw out or destroyed
9      ledger cards?
10        MR. ARONSON:  Objection.
11  A.   We dispose of the ledger cards on an
12      annual basis every three years.
13  Q.   In January?  I'm sorry, what, every
14      three years?
15  A.   Yeah.
16  Q.   I'm not sure I follow you.  You're
17      saying on an annual basis, then you're
18      saying every three years.  Is it
19      January?
20  A.   Spring, spring cleaning.
21  Q.   So in what month would that be that it's
22      done, in April, then?
23  A.   I'm not sure, April, May.  Spring
24      cleaning.

135

1   Q.   You will throw out anything that is more
2      than three years old?
3   A.   As far as customer things.  The ledger
4      cards, one of the administrative
5      assistants will monitor them and go
6      through them, and she will pull ledger
7      cards that have no -- jobs haven't come
8      in in two years, and then she will make
9      a note to the salesperson if the
10      customer is big enough and say, "I
11      haven't seen anything."  That goes to
12      the sales manager and to the
13      salesperson.  "XYZ Company hasn't
14      shipped in two years.  You better put it
15      on your win back list.  You better" --
16      and then ledger cards -- we don't now
17      use it anymore because we're constantly
18      going through the ledger cards to find
19      ledger cards, and a lot of times we're
20      going through fast because we have
21      customers on the phone or people want
22      information, and it's cumbersome, so we
23      try to keep the ledger cards -- and I'm
24      talking hundreds and hundreds of them,

136

1      but we don't want thousands of them.
2   Q.   So you say that the administrative
3      assistants find the ones that are either
4      two years old or --
5   A.   With no shipments, right, pulls them.
6   Q.   I'm asking you what is the procedure for
7      throwing them away, as you just said?
8   A.   Incineration.
9   Q.   Okay.  And what are the time limitations
10      as to when you throw them away?
11  A.   Well, if we haven't had a shipment in
12      two years, then we've declared them not
13      a customer.
14  Q.   But you just said you will try to win
15      them back.
16  A.   Yeah, I said that.
17  Q.   But you don't keep the ledger card to
18      try to win them back?
19  A.   No, no, it goes in the computer, the
20      salemen's computer.
21  Q.   No shipment in two years --
22  A.   -- you don't need the ledger card.
23  Q.   You tell the sales manager, "Let's win
24      them back"?

137

```
 1   A.  Yeah.
 2   Q.  And you throw the ledger card away?
 3   A.  And it's in the computer, the win back
 4       list.
 5   Q.  And the ledger cards get thrown away?
 6   A.  The ledger cards no longer have any
 7       value whatsoever because it's easier to
 8       write up another ledger card, it takes
 9       five minutes if they do come back.  And
10       plus the information, the contact
11       information for who's making the
12       refining decisions, probably Jake.
13   Q.  Because you haven't contacted them in
14       two years?
15   A.  Well, maybe we have and we haven't
16       gotten anything or maybe we haven't.
17       Sometimes unfortunately, I hate to say
18       it, we haven't contacted them but it's a
19       sales function.
20   Q.  What about the -- do you have a distinct
21       memory in the spring of this year
22       throwing away, as you said, ledger cards
23       in the spring of this year?
24   A.  Yeah, yeah.
```

138

```
 1   Q.  Okay.  How many ledger cards were thrown
 2       away in the spring of this year?
 3           THE WITNESS:  I know this
 4       doesn't register on the computer.
 5   Q.  So you're indicating about --
 6   A.  I'm going to say 50, I'm going to guess.
 7           MR. ARONSON:  Don't guess.  If
 8       you can give an estimate, do that.
 9           THE WITNESS:  Can I estimate 50?
10           MR. ARONSON:  You can estimate
11       whatever you think the figure is, but
12       don't guess.
13           THE WITNESS:  I really don't
14       know.
15   Q.  Who actually does that?  You said you
16       incinerate them?
17   A.  Yeah.
18   Q.  Okay.  Who actually goes and incinerates
19       them?
20   A.  Our plant manager.
21   Q.  The plant manager?
22   A.  Yeah.
23   Q.  What about the assay tickets, do you
24       save the assay tickets?
```

139

```
 1   A.  Yes.
 2   Q.  For how long do you save the assay
 3       tickets?
 4   A.  Six months.
 5   Q.  Have you thrown any assay tickets away
 6       since this lawsuit has started?
 7   A.  Yeah.
 8   Q.  When did you last throw away assay
 9       tickets?
10   A.  A month or two ago.
11   Q.  Did you have any discussions with
12       Miss Curren that these might be of some
13       use in the litigation?
14   A.  Miss Curren?
15   Q.  Yeah, your sister over there, did you
16       have any discussions with her of how
17       they may be of value in the litigation?
18   A.  No.
19   Q.  Did you have any discussions with anyone
20       other than your lawyers whether or not
21       these were of any significance in the
22       litigation?
23   A.  I didn't have discussions with anybody
24       about throwing away the assay tickets.
```

140

```
 1   Q.  Did you tell any of the employees not to
 2       throw them away because of the pending
 3       litigation?
 4   A.  The assay tickets -- I incinerate them
 5       myself.  I don't want to go find a bunch
 6       of assay tickets under a chair in the
 7       plant or the plant manager left them on
 8       his desk for two weeks, you know?
 9       Certain customer stuff -- I'm the
10       customer guy.  I used to be the sales
11       manager.  Certain things I go out in the
12       plant and I do, and that is one of them.
13   Q.  So the plant manager doesn't incinerate
14       the ledger cards -- excuse me, he does
15       incinerate the ledger cards?
16   A.  Yeah.  In this particular case I said,
17       "Bring them."  He had a drum full of
18       material that was going to get
19       incinerated, and he said, "We got ledger
20       cards," and I said, "Put them in the
21       drum."
22   Q.  But you say the assay cards you,
23       yourself --
24   A.  The assay cards I, myself, incinerate.
```

141

1   Q.   How often do you incinerate them?
2   A.   Every six months.
3   Q.   When was the last time you incinerated
4        them?
5   A.   About a month and a half ago.
6   Q.   How many cards were incinerated a month
7        and a half ago?
8   A.   I would say 300 to 600.
9   Q.   Any assay tickets left over from when
10       Miss Bergevine worked there?
11  A.   No.
12  Q.   When would those have been incinerated?
13  A.   When she worked there.
14  Q.   Contemporaneously with when she worked
15       there?
16  A.   Yeah.
17  Q.   Or within six months, I guess you're
18       saying; you say you throw them out six
19       months later?
20  A.   It's possible that when she left in June
21       that the assay tickets went out at the
22       end of the year or thereabouts. Could
23       be a month either side. Maybe at the
24       end of the year. If Jay was throwing

142

1        them out, he might have been a little
2        busy and not thrown them out until
3        February. He may have thrown them out
4        in December. I don't know exactly.
5   Q.   What about when Jay was doing the --
6        writing up the ledger cards, was he in
7        charge of throwing away the assay
8        tickets, or was that still you?
9   A.   No, no. He used to throw them away.
10  Q.   And now that's your responsibility?
11  A.   Yeah.
12  Q.   What about the tracking system, have you
13       taken any steps since Miss Curren's
14       deposition to get a copy of the tracking
15       system pertaining to Miss Bergevine's
16       clients?
17  A.   Have I? No.
18  Q.   Do you know if anyone in the company has
19       attempted to do that?
20  A.   No.
21  Q.   Do you have any intention of attempting
22       to get those documents relating to
23       Miss Bergevine?
24  A.   There's no documents.

143

1   Q.   There's no documents?
2   A.   There's no documents.
3   Q.   There's no documents relating to
4        Miss Bergevine's employment?
5   A.   No.
6   Q.   Why is that?
7   A.   Because we don't keep documents that we
8        don't need for more than two or three
9        years. Basically sales related stuff.
10       She quit, I hire new people. I have her
11       file laying around. I get out her
12       customers, I transition them to the new
13       salespeople. I got new files. I got
14       files on them. I got new commission
15       structure. I got Trish's old commission
16       structure. I got old stuff. It's been
17       around for a while. What am I going to
18       do with this?
19  Q.   But you have a computer system, so why
20       can't you access the documents in the
21       computer system and print them? The
22       tracking system is in a computer;
23       correct?
24  A.   The tracking system is in the computer.

144

1   Q.   Yeah, so has anyone in the company made
2        an effort to print out those documents
3        related to Miss Bergevine's customers?
4   A.   No.
5   Q.   Do they exist?
6   A.   No.
7   Q.   Why don't they exist?
8   A.   Because I don't keep them around.
9   Q.   So are you testifying that somebody at
10       the company deleted the tracking system
11       relating to Miss Bergevine's customers?
12  A.   I certainly hope so.
13  Q.   Why is that?
14  A.   Because we got this computer system with
15       8000 customers in it, and maybe 3000 of
16       them are real customers, and I am
17       constantly trying to get people to get
18       all the stuff out of the computer, and
19       there's kind of a -- for some reason
20       salespeople think that they -- they're
21       eternal optimists. "This guy is coming
22       back. Don't throw his ledger card away.
23       This guy is going to ship in the next
24       month," even though he hasn't shipped in

145

```
 1      for three years.  You're fighting the
 2      eternal optimism of a sales force, and
 3      it has to be disciplined, and somebody
 4      has to drive the ship, and somebody has
 5      to say, "These things are going out.
 6      Work on these things.  This is where the
 7      money is."
 8   Q.  What about the settlement reports, are
 9      the settlement reports saved in the
10      computer system?
11   A.  No.  The settlement -- well, I say
12      that.  I don't know if they are, but I
13      will tell you about the settlement
14      reports, if you want to hear about them.
15   Q.  No, no, I didn't ask you that?
16   A.  No, you asked me a question and I'm
17      going to answer it.
18   Q.  You answer it, you said, "No."  So my
19      next question to you is are there
20      physical copies of the settlement
21      reports preserved at the office?
22   A.  That's a very good question, Gregory.
23      I will now proceed to answer that
24      question.  The settlement documents are
```

146

```
 1      something that the customer is dying to
 2      get ahold of.  They sent this stuff in.
 3      It's worth money.  It's like Christmas.
 4      "When is Santa Claus coming?  I need my
 5      settlement.  I want to pay my taxes.  I
 6      want to go on vacation.  I want to buy
 7      my wife a ring.  I need the money to put
 8      in my business."  They want their
 9      settlements.  The salespeople, they want
10      their settlements.  "Where's my
11      settlement?  I don't want it a day
12      late."  So the settlement -- physical
13      cards go to the salespeople, believe me,
14      and they're looking for them all the
15      time, and they go to the customers.
16      Every day we mail them to the customers.
17   Q.  You're talking about the ledger cards.
18   A.  No, I'm talking about the settlement
19      reports.
20   Q.  I'm talking about the settlement
21      reports.
22   A.  The settlement reports.  They go to the
23      salespeople, they go to the customers.
24   Q.  Right.
```

147

```
 1   A.  Then they go in a file.
 2   Q.  At Pease & Curren?
 3   A.  At Pease & Curren.
 4   Q.  Who maintains that file?
 5   A.  The administrative assistants.
 6   Q.  Who are they that are in charge of this,
 7      all of them are or --
 8   A.  They're all jointly in charge of it, and
 9      they all have access to it.
10   Q.  How about in 2002, who was in charge of
11      the settlement reports at Pease &
12      Curren, maintaining them?
13   A.  The whole crew was in charge of it.
14      It's kind of a trade-off type of thing.
15   Q.  What's the trade-off?
16   A.  Filing.
17   Q.  What are they getting in return?
18   A.  They don't fight to file the way the
19      salesmen fight to get the settlements.
20   Q.  So for how long are those settlement
21      reports preserved?
22   A.  Settlement reports are preserved for
23      three years.
24   Q.  At the end of three years, what happens
```

148

```
 1      to the settlement reports?
 2   A.  Incineration.
 3   Q.  Are any of these settlement reports
 4      relating to Miss Bergevine's clients
 5      available at Pease & Curren?
 6   A.  No.
 7   Q.  Did you have any discussions -- since
 8      this lawsuit has been filed, have you
 9      disposed of any settlement reports from
10      2002 and 2001?
11   A.  No, they're already gone.
12   Q.  They were already gone before the
13      lawsuit started?
14   A.  Yeah, to the best of my knowledge.
15   Q.  The lawsuit was filed in 2005.  The
16      settlement reports would have been from
17      2002, so that wouldn't have been three
18      years.
19   A.  Well, it's possible that some of them
20      were still around.  I'm not sure.
21      There's none around now.
22   Q.  That was my next question.  You're
23      certain that none are around today?
24   A.  I wish they were around.  If I had known
```

149

1    we were going to go through all this --
2    I don't know what to call it.
3  Q.  What you're saying, Mr. Curren, as
4    you're going through this exercise,
5    is you have no way of calculating
6    the amounts of precious metal that
7    Miss Bergevine's clients sent to Pease &
8    Curren from 1996 to 2002?
9  A.  I didn't say that. I can do that.
10  Q.  How would you be able to do that?
11  A.  If you went to Kip Curren, Sam Spade, to
12    go after this problem and solve it? I
13    would bring Trish in and say, "Trish,
14    sit down. Give me your tax returns.
15    You know what you made in those years.
16    I know you know what you made because
17    you recite it in the deposition, so
18    write it all down. Let's back it all
19    up. Let's figure out how many jobs came
20    in. You got 50 for these, you got so
21    much for those. Let's come up with some
22    sort of figure that we can all agree
23    on." It might not be exact, might not
24    be as good as having the settlement

150

1    reports, which I regret we don't have,
2    but I think we can come up with a pretty
3    reasonable number because she got paid.
4    She knows what she got paid. She has
5    tax returns. We know what the
6    commission structures were, and I don't
7    think we are that far out of the ball-
8    park as far as having the information we
9    need to meet your needs in determining
10    what sort of volume she provided Pease &
11    Curren.
12  Q.  Well, assuming what Miss Bergevine says
13    is accurate -- and this is just an
14    assumption -- which is that her
15    commission should have been based on
16    what's in the tracking system as opposed
17    to what is in the settlement reports,
18    how could she possibly calculate that or
19    how could you calculate that without the
20    tracking system documents?
21  A.  Well, you couldn't do it, do any -- I
22    mean, accurately, but you could come up
23    with some sort of -- you could certainly
24    rule out some numbers. You could come

151

1    up with some top end number.
2  Q.  Can you describe for me how that would
3    be done with any degree of accuracy?
4  A.  Well, she got $50 for new jobs and $25
5    for some. We'd sit down and we'd say,
6    "Trish, usually you had so much, you had
7    12 jobs, some months you had 17 jobs,
8    some months you had 20 jobs. Let's do
9    that," and we'd get out -- like the
10    price of palladium spiked, it went up
11    the roof to a thousand bucks. She's got
12    60 jobs for a few months, we all know
13    that. And then palladium came flying --
14    tumbling down on the other side and
15    business fell off. Now she's got six
16    jobs, eight jobs, 12 jobs. You know, we
17    try to recreate it the best you could.
18    That's what I would do.
19  Q.  Mr. Curren, did you create the document
20    that is marked as Exhibit 1 to your
21    deposition?
22  A.  No.
23  Q.  Who created that document?
24  A.  Trish.

152

1  Q.  When did she create it?
2  A.  A couple of years after she started
3    working.
4  Q.  This document was used exclusively for
5    the dental industry; correct?
6  A.  No.
7  Q.  Well, it does say at the top Dental
8    Industry Refining; correct?
9  A.  Yeah.
10  Q.  And you just said that Trish created it?
11  A.  Yeah.
12  Q.  The only thing she worked on was the
13    dental industry; correct?
14  A.  True.
15  Q.  So this document was solely for the
16    dental industry clients; correct?
17  A.  No.
18  Q.  Who else was it used for?
19  A.  Nobody.
20  Q.  It wasn't even used for the dental
21    industry?
22  A.  No.
23        MR. ARONSON: Can we go off the
24    record a minute?

153

```
 1        MR. ACETO:  Sure.
 2        (Whereupon there is a brief
 3     discussion off the record.)
 4  Q.  Let's go to the category of General,
 5     Mr. Curren.  This language here I see is
 6     in that document that was just handed to
 7     me by your counsel, correct, the
 8     language under General?
 9  A.  I don't know.  I would have to look at
10     the document.
11  Q.  So while we are on the record on this,
12     then, are you saying that this document
13     was never used to solicit clients for
14     Pease & Curren in this form in
15     Exhibit 1?
16  A.  That is what I am saying.
17  Q.  Why was it that it was never used?
18  A.  We don't compete on price.  It sets
19     prices on it.
20  Q.  Under the Refining Terms?
21  A.  Yeah.
22  Q.  What is it that you mean you don't
23     compete on prices?
24  A.  What happens, Greg, if you use a
```

154

```
 1     document like this, it blows up in your
 2     face because you say gold, 96, and then
 3     your competitor walks in and they say,
 4     "Oh, Pease & Curren, 96," and the
 5     competitor says, "97, I will pay you
 6     97."  Then you go in someplace else and
 7     you say, "Palladium, platinum, 90
 8     percent," and then the next guy walks in
 9     and goes, "Oh, no, we pay 91 percent,"
10     so it's very counterproductive to use a
11     document like this in marketing, so
12     therefore we don't use it, and I think
13     at the time Trish didn't understand
14     that.  She was trying to inform the
15     customer.  Of course, at that time she
16     was trying to really promote the
17     company.  Trish was a great promoter,
18     that was her strong point was promoting
19     Pease & Curren.  I think she enjoyed
20     doing it, and she was good at it, and
21     she wanted to have some literature to
22     pass out at shows, and she wanted stuff
23     to mail, and she would like do
24     handwritten cards and stuff.  But on
```

155

```
 1     this particular thing I had to explain
 2     to her, "Trish, how are you going to do
 3     this?  It's a little contest with your
 4     competition over percentages, it's not
 5     productive."
 6  Q.  So the customer is going to use this as
 7     a stocking horse, basically, to try to
 8     get a better rate?
 9  A.  No.  Well, that's part of it, and the
10     competition is going to turn the focus
11     on price.  You don't want to turn the
12     focus on price, you want to turn the
13     focus on reputation and payment and
14     integrity and service and, you know --
15     price is --
16  Q.  This document that you say
17     Miss Bergevine created, how far along
18     in the process did it go?  Was it
19     printed by a stationery company?
20  A.  I don't know.
21  Q.  Was it handed out to any clients, as far
22     as you know, or potential clients?
23  A.  She might have handed it out, but I
24     don't think she did.  I think she
```

156

```
 1     understood exactly what I wanted to say.
 2     Does that one have Kevin Dillon at the
 3     bottom?  I think she had a falling out
 4     with Kevin Dillon at some point.  Kevin
 5     Dillon's on here?  Yeah, all right, it's
 6     on both of them.  Yeah, I mean, that's
 7     the story.
 8  Q.  This document that is marked as Exhibit
 9     No. 1 was created in a final format on
10     this stationery that this document is
11     printed on as well; correct?
12  A.  This thing?
13  Q.  Yeah.
14  A.  You know, Greg, I couldn't tell you
15     whether one was printed or 15 were
16     printed.  I couldn't tell you if Trish
17     had some at home and Trish sent them to
18     customers, but I can tell you I told her
19     not to, I can tell you I replaced it,
20     and I can tell you when I got done
21     talking to her, I think she understood
22     pretty much that "We're not competing on
23     price.  That's not going to help you,"
24     so --
```

157

```
 1   Q.  So who prints these out for you guys,
 2       for Pease & Curren; do you do it
 3       in-house?
 4   A.  No.  I mean, a printing company.  We
 5       have a couple of little printing
 6       companies we use around town.
 7   Q.  And would Trish have sent out a
 8       marketing brochure like this without
 9       your approval to a printing company to
10       be printed?
11   A.  Trish, if -- yeah, she might have.  She
12       would send out -- she would write
13       letters and sign her name on them and
14       mail them, and she would do -- create
15       different marketing from her house
16       sometimes that would not be the same,
17       that I would have to say, "Don't do
18       that."
19           MR. ACETO:  Can we mark this as
20       the next exhibit, please?
21           (Exhibit 21, Printed document
22       entitled Dental Industry Refining, so
23       marked.)
24   Q.  On to the General section, Mr. Curren,
```

158

```
 1       the second paragraph says, "You get a
 2       high return if Pease & Curren gives
 3       you a dealing directly with a refiner.
 4       There is no middleman."  That's not
 5       actually an accurate statement, is it?
 6   A.  No, it's very accurate.
 7   Q.  These documents were sent -- this is
 8       used as marketing material in the dental
 9       industry; correct?
10   A.  Yes.
11   Q.  And you testified earlier that you don't
12       do refining for the dental industry;
13       correct?
14   A.  Yes.
15   Q.  So that statement that says you are
16       dealing directly with a refiner, there's
17       no middleman is not true?
18   A.  No, I think you have to understand that
19       we process the material.  We spend a lot
20       of money and time processing material.
21   Q.  What do you mean by that, that you
22       process the material?
23   A.  I know you don't want to go back into
24       this, but --
```

159

```
 1   Q.  Generally.
 2   A.  We sample it, we sample the material at
 3       great expense.  We receive it, we put it
 4       in the computer, we categorize it, we do
 5       tests on it.  You can't say we don't
 6       process this stuff.  We don't refine the
 7       stuff, but we process the material, so
 8       therefore we are not a middleman.
 9   Q.  But you are sending it to a refinery to
10       be refined.
11   A.  We are sending it to a refinery to be
12       refined, yes.
13   Q.  And the next paragraph says, "The
14       company performs three fire assays on
15       each of the lots to insure the highest
16       return on your dental scrap."  Did you
17       make a decision to put that sentence in
18       this brochure?
19   A.  I approved of this.  Trish liked the
20       three fire assays.  We performed three
21       fire assays, and the middleman performs
22       no assays whatsoever.  The middleman is
23       a buyer.  I had a company that I spoke
24       with yesterday called The Jewelers of
```

160

```
 1       Las Vegas.  The Jewelers of Las Vegas --
 2       the owner was very friendly with the
 3       middleman, really nice guy, came around
 4       every month, every two months with a
 5       fistful of cash and pay him $1800 for
 6       his keg full of sweeps and polishings.
 7       He sent the keg to us and we paid him
 8       $9000.  The guy called me up, he was
 9       like, "How can this possibly be?"  I
10       said to the guy, "He's a middleman.
11       He's a buyer.  He's paying you cash.
12       You get your cash in one day.  You want
13       to wait a little bit, you can make more
14       money."  But he's taking it, he's
15       combining it with other things, he's
16       picking up at other places, and then
17       he's sending it into a refinery, so that
18       is what a middleman is.
19   Q.  I'm now focusing you on the third
20       paragraph now.
21   A.  The three fire assays?
22   Q.  Right.  Why was that significant that
23       you wanted to put it into this
24       literature?
```

161

1      MR. ARONSON:  Objection.  Go
2   ahead and answer.
3  A.  We spent a lot of money, Greg, on our
4   laboratory.  We're very proud of our
5   laboratory, and we have a laboratory and
6   the middleman doesn't, and we want to
7   differentiate ourselves.
8  Q.  Don't you want to tell the customer that
9   you're going to give him the most
10  accurate read of what the content of the
11  precious metals are in his lot?
12 A.  What I was saying before you interrupted
13  me is we want to differentiate ourselves
14  from the middleman and buyers and people
15  who do not assay, people who just
16  estimate.  They estimate what's in --
17  because they have no choice, because
18  they have no facilities.  We do have
19  these facilities, and we spent a lot of
20  money on these facilities so that we can
21  perform these tests, and that we can pay
22  people a lot more money because our
23  estimates are much better than somebody
24  else's estimates because we do have this

162

1   laboratory, and we do perform these
2   tests, and that's something that we want
3   our customers to know and as a
4   salesperson Trish wanted her customers
5   to know.
6  Q.  How about the next sentence, Mr. Curren,
7   it says, "Fire assay is the only method
8   accepted by the London Metal Exchange
9   and the New York Mercantile Exchange.
10  What was the reason, the significance
11  that you wanted to include this in this
12  marketing brochure, Exhibit No. 21?
13 A.  Well, a lot of these guys want to be
14  players.
15 Q.  What guys?
16 A.  The gold guys, the dental lab guys.
17  Secretly, underneath their dental lab
18  desk where they're making teeth, and
19  where they're making things for
20  dentists, and where they're making
21  things for dentists' customers, and
22  they're producing this, secretly they
23  want to be gold traders.  They want to
24  be players.  They want to be involved in

163

1   gold.  Gold has an allure to it.  They
2   like their gold.  They like to talk
3   about their gold.  They like to think
4   about their gold going to the London
5   Mercantile Exchange.  They like to
6   sometimes have their gold returned in
7   coins so they can put it in a safe
8   deposit box.  They like to show the
9   coins to their friends when they go to
10  shows.  I mean, people like that.  So we
11  put it in, they like it, they want to be
12  players, let them be players.
13 Q.  Are you also telling the customers,
14  though, that fire assay is an accurate
15  method because it's accepted by the
16  London Metal Exchange and the New York
17  Mercantile Exchange?  Isn't that what
18  you're also telling them?
19 A.  Well, it is accepted.  It's the only one
20  accepted.
21 Q.  I'm not disputing that with you.  I'm
22  asking if one of reasons you put that
23  sentence in Exhibit 21 is to convey to
24  the customer this is an accepted,

164

1   accurate method of estimating, as you
2   just said, estimating the amount of
3   precious metals in a particular scrap?
4  A.  I think it's important to understand
5   that the London Metal Exchange deals in
6   pure bullion, so they randomly inspect
7   pure bullion from bullion dealers, and
8   they use fire assay instead of like a
9   spectrometer or some instruments or
10  something like that; that is what they
11  use.
12 Q.  So back to my question, though,
13  Mr. Curren, isn't the other reason or
14  one of the reasons why you put this
15  statement in here is to tell the
16  customer that this is an accurate method
17  of estimating the amount of precious
18  metals?
19 A.  It is accurate if it's precious metals,
20  pure precious metals.  That is what it
21  says, pure precious metals.  It doesn't
22  say an accurate method for dental scrap
23  received in Pease & Curren.  We're not
24  trying to mislead our people.

165

1  Q.  Are you saying if someone brought you a
2      shipment of pure gold, I guess, that you
3      could do a fire assay and it would
4      accurately tell you the exact amount of
5      that gold?
6  A.  No.
7  Q.  Can you explain to me what you mean by
8      that?
9  A.  I can't.  Let me tell you why.  Accuracy
10     is relative in chemistry.  In chemistry
11     you have to be able to reproduce
12     results.  That's the gold standard of
13     chemistry, that's the test that passes.
14     Reproduce results.  In assaying fine
15     gold, you're going to find you cannot
16     reproduce the results unless you have
17     the same gold from the same source in
18     the same muffle furnace at the same
19     muffle temperature at the same draft at
20     the same time; otherwise, you can't
21     reproduce this, and people think -- and
22     you may think, "Oh, let's do an assay.
23     Oh, the assay is" -- you know, but in
24     reality the assay is a test, and it's an

166

1      excellent test, but when you want to
2      talk about accuracy, that's okay if
3      you're talking about weighing potatoes.
4      Was the scale accurate when we put the
5      potato on?  When we're talking about
6      chemistry, we're talking about
7      reproducing results.  So let's say you
8      came to me and you said, "Kip, here's
9      this bar of gold.  I want you to
10     tell" -- "I own an electronic company,
11     Kip."  Right?
12 Q.  Right.
13 A.  "I'm going to use this gold.  It's going
14     to go into a jet airplane.  Somebody's
15     life is going to depend upon this gold.
16     It has to be pure.  It can't have any
17     chromium in it, it can't have anything
18     that oxidize it.  It's going in a jet
19     airplane.  Somebody could die if we
20     screw this up.  So I've this gold."  So
21     I would take that gold, and then I would
22     take some other gold, and then I would
23     take another piece of that gold, and
24     then I would put it in a muffle furnace

167

1      and I would run it several times and see
2      what the variations are, and then I
3      would take it and I would dissolve it,
4      and I would try to find the impurities
5      and make sure -- because there's always
6      something.  And now I may come back and
7      say, "Well, the impurity is silver, the
8      pair's copper, and guarantee there's no
9      chromium into this."  But each time you
10     go into a muffle furnace and you don't
11     correct the assay, there's always less
12     gold.  When you heat it up, something
13     vaporizes.  It's a fact of life.
14 Q.  Do you have the facilities to do what
15     you just described, using a muffle
16     furnace?
17 A.  I have a muffle furnace.
18 Q.  So you would use an assay test, a fire
19     assay test to do the procedure you just
20     described?
21 A.  If I had to do it, I would -- as I said,
22     I would do several, and I would do
23     side-by-side with a known amount to see
24     what the losses were, and then I would

168

1      dissolve it in acid and then fine out --
2      try to precipitate the impurity to
3      guarantee you, for instance,
4      hypothetically, that there would be no
5      chromium in this that could oxidize the
6      application that you're using.  Gold --
7      you haven't seen gold that is, like,
8      almost pure.  Instead of rolling it out,
9      it's got, like, just a few parts per
10     million -- just a little bit of zinc in
11     it or iridium or platinum.  Instead of
12     rolling out smooth, it rolls out like
13     this.  You look at it, you think it's
14     pure, and it tests pure, and all of a
15     sudden you go to roll it out and it
16     doesn't have the same characteristics
17     that pure gold does, so close with gold
18     doesn't really cut it, you --
19 Q.  So earlier we were talking, Mr. Curren,
20     about the process from the assay ticket
21     to you writing down the numbers on the
22     ledger card to the settlement report
23     being sent to the customer.  Have you
24     ever referred to that whole process as

169

```
 1      the settlement process?
 2   A.  It is a settlement process, yeah.
 3   Q.  Is that how you refer to it in the
 4      company, as the settlement process?
 5   A.  I can refer to it as paying the customer
 6      if I want. I mean --
 7   Q.  My question is do you refer to it as the
 8      settlement process?
 9   A.  No, I don't.
10   Q.  Have you heard people in the office
11      refer to it as the settlement process?
12   A.  Oh, yeah, yeah.
13   Q.  And is that in reference to -- as you
14      put it before -- your job, which is to
15      write down these ledger cards?  Is that
16      your understanding of the settlement
17      process, you're writing down these
18      numbers on a ledger card that ultimately
19      will be transferred to the settlement
20      report?
21   A.  Yes.
22   Q.  And so do you make -- have you heard of
23      the term recoverability adjustment?
24   A.  Yes.
```

170

```
 1   Q.  When someone says that you made
 2      recoverability adjustments, what does
 3      that mean to you?
 4   A.  Well, you have to -- if you're going to
 5      be in the gold business, whether you're
 6      a buyer or refiner, you have to know
 7      what you're going to recover or you have
 8      to have some idea of what you're going
 9      to recover.  You have to have some --
10      have to know how it works.  So you can't
11      recover everything, unfortunately.  Some
12      things you can't recover.
13   Q.  We've talked about that before.  So is
14      that what you're referring to, the
15      things you testified before, in terms of
16      what you consider the recoverability
17      adjustment?  You were talking about
18      platinum, that if there's a low level of
19      platinum, it couldn't be recovered and
20      things of that nature.  Do you recall
21      that?
22   A.  Yeah, I recall that.
23   Q.  Is that what you are referring to now,
24      the recoverability adjustment?
```

171

```
 1   A.  No, no.  There's a lot of factors that
 2      go into determining how you pay a
 3      customer and how you settle for a
 4      customer.
 5   Q.  What are those factors?
 6   A.  Greg, let me finish the answers.
 7   Q.  I'm trying to focus you so we can get
 8      out of here quicker.  Really, if you
 9      answer my questions, we can be out of
10      here a lot quicker.
11         What are those factors that you
12      consider in the recoverability process?
13   A.  See, this is what I don't do when I do
14      it.  I don't rush it.  I take my time,
15      and I really look at it closely;
16      otherwise, you make mistakes.
17         Let's say I have an assay
18      ticket, and let's say I have an amount
19      of silver.  Now I say, "There's the
20      amount of silver.  Is that silver real?"
21      And then I say -- I look at the ticket
22      and I say, "Oh, when we took the button,
23      before we melted the button, we added
24      silver to the button," because otherwise
```

172

```
 1      the ratios weren't right and the button
 2      won't pop, so we have to add silver to
 3      it.  So that silver, that's our silver,
 4      that's not the customer's silver.  We
 5      can't pay him for that.
 6   Q.  How do you know that there wasn't some
 7      presence of silver in there before you
 8      added the silver?
 9   A.  Well, you look at the ticket.
10   Q.  But you're saying to disregard the
11      ticket because you added silver.
12   A.  Well, we know how much silver we added,
13      so we have to deduct it.  We don't
14      always assay for silver.  Sometimes we
15      deduct for silver to pay.
16   Q.  So you keep track of the amount of
17      silver that you add to a specific lot,
18      and you will back it out when you get
19      the assay information?
20   A.  Yeah.
21   Q.  Okay.
22   A.  Very important.
23   Q.  Go ahead.
24   A.  And the dental lots -- which I know
```

173

1    you're very interested in -- specific to
2    dental lots is lead retention.  If you
3    have lead retention -- and the lead
4    shows up as silver when you do the
5    deductions.  The lead also shows up as
6    platinum and palladium, and in certain
7    cases gold.  You can't pay for lead.
8  Q.   And you say it's specific to the dental
9        industry.  Why is that?
10 A.   Because as we talked about at the
11       beginning, the contamination issue of
12       platinum and palladium, and also the
13       melting points of platinum and
14       palladium.  Just so you can understand,
15       this is a common occurrence at Pease &
16       Curren.  We have a jeweler, and he sends
17       us a platinum ring.  He says, "Here's my
18       platinum ring," and we take the platinum
19       ring, and we look at it.  It's not
20       platinum, it's white gold.  There's no
21       platinum in it at all.  It's zinc, but
22       the jeweler doesn't know that.  I mean,
23       some jewelers do, but some don't.
24 Q.   Right.

174

1  A.   So if you take a platinum ring, we bring
2        it into the lab and we fire up a torch
3        to, like, 1700 degrees F.  We stick it
4        under there, the thing turns yellow and
5        it stays in one piece, and we know it's
6        platinum.  We take the other one in
7        there, put it under a torch and it melts
8        like butter, we know it's not.  So the
9        characteristics of the dental scrap make
10       it very difficult to get a homogeneous
11       mix, so you assume you're not going to
12       get a homogeneous mix, and that has to
13       be considered in your settlement.
14 Q.   Did you say earlier that actual lead
15       will come up as silver in assay; is that
16       what you're saying?
17 A.   Yes.
18 Q.   Is that called lead retention, or is
19       that a different process?
20 A.   That's lead retention.
21 Q.   Is lead retention part of your analysis
22       when you do the settlement process?
23 A.   It has to be.
24 Q.   And why is that?

175

1  A.   Otherwise we're paying for silver that
2        doesn't exist, or we're paying for
3        platinum or palladium prices when we
4        only should be paying silver prices.
5  Q.   I thought you said lead retention is
6        different than lead registering as
7        silver in a fire assay, or is that the
8        same thing?
9  A.   The same thing.
10 Q.   The same thing.  And deleterious metals,
11       do you know what that means?
12 A.   Yeah.
13 Q.   Is that part of your settlement process?
14 A.   Yes.
15 Q.   What is that, sir?
16 A.   Well, let's say -- we'll go back to the
17       i-u-ms again, okay?  Iridium.  If you
18       had material with iridium in it -- our
19       process can't tell between iridium and
20       platinum and palladium, so you have to
21       back out the iridium or ruthenium or
22       chromium.
23 Q.   Are those considered precious metals
24       that you're listing?

176

1  A.   Well, iridium and ruthenium are,
2        chromium is not, but chromium can show
3        up as gold.
4  Q.   How do you know to back those out,
5        Mr. Curren?
6  A.   From the notes on the assay ticket.
7  Q.   What specific note would lead you to
8        believe that there was some
9        concentration of deleterious metals in a
10       particular lot?
11 A.   This lot looks like it has 10 percent
12       chromium.
13 Q.   Who would write that, Miss Michalik?
14 A.   Sometimes, sometimes the plant manager.
15       This lot only melted, it turned purple
16       and smoked.  I think it has aluminum,
17       another i-u-m, in it.  These guys --
18       it's a religious experience for them
19       because --
20 Q.   What guys?
21 A.   The guys in the plant writing things
22       down, information.  It's a religious
23       experience because after you get burnt
24       -- when I say burnt, I mean financially

177

1   burnt -- you pay somebody for aluminum,
2   for gold when it's aluminum, you try not
3   to do that too often.
4   Q.  How do you figure that out when it's all
5   bundled together in one massive lot that
6   is sent out to a refiner?  How do you
7   know that you got burnt on a particular
8   job?
9   A.  Because aluminum has certain
10  characteristics when you melt it.  It
11  sparkles, so if somebody is looking at
12  it when it's melted and they see it
13  sparkle, then they tell us.
14  Q.  When you send it to a refiner, they will
15  tell you?
16  A.  No, no, no, when melting.
17  Q.  You melt it on site?
18  A.  Yeah.
19  Q.  So after you pay the customer, you melt
20  that particular lot.  If it sparkles --
21  A.  No, no, before we pay the customer.
22  Q.  That's part of the assay process; is
23  that right?
24  A.  I think -- you have to -- for the

179

1   done the assay, the sampling process may
2   tell us what we need to know in order to
3   effectuate -- excuse me -- in order to
4   accurately settle with the customer.
5   The knowledge that we get may not come
6   out of the assay lab; it may come, and
7   very often does, come out of the
8   sampling process because the certain
9   visual things and certain
10  characteristics that certain metals have
11  that are very visible during the
12  sampling process.  You need to know
13  that.
14  Q.  I don't know if you defined this before,
15  but what is the sampling process that
16  you're referring to now?
17  A.  Well, for dental scrap it's primarily
18  incineration and melting.
19  Q.  And that is done after the assaying?
20  A.  No, it's done before the assaying.
21  Q.  It's done before the assaying?
22  A.  Yeah.
23  Q.  That way you made it homogeneous at that
24  point; is that right?

178

1   purposes of a refinery, you have to
2   consider the sampling process and the
3   assaying process as one continuous
4   process.  You seem to want to separate
5   them, and that's natural, you don't work
6   in a refinery.  But you try to separate
7   them too much --
8   Q.  Right.
9   A.  -- whereas I'm -- it's not like I baked
10  a cake and then I put the frosting on
11  it.
12  Q.  Describe for me the process so that I
13  understand it, then.
14  A.  Sampling process?
15  Q.  Yeah.  Well, you were just saying that I
16  want to combine these two things, the
17  assaying and the sampling process.
18  A.  In your mind, the sampling process and
19  the assaying process are all tied
20  together as one process in order to come
21  up with the settlement, so you're asking
22  me about the settlement, and then you're
23  segregating, "How about the assay.  How
24  about the sampling?"  Even though we've

180

1   A.  At that point we attempted to make it
2   homogeneous, and it's homogeneous as we
3   can within our capabilities.
4   Q.  Mr. Curren, let me turn your attention
5   to Exhibit No. 3, sir.
6   A.  Okay.
7   Q.  Have you ever seen this document prior
8   to today?
9   A.  Yes.
10  Q.  Did you, in fact, create this document
11  as part of your marketing
12  responsibilities?
13  A.  No.
14  Q.  Do you know who did?
15  A.  Yup.
16  Q.  Who's that?
17  A.  Bruce Gladstone.
18  Q.  Did you have any input in the language
19  that went into this document, Exhibit
20  No. 3?
21  A.  I did not.
22  Q.  Let's turn to page 2, paragraph 6.  Do
23  you know what Mr. Gladstone was
24  referring to when he wrote "commercial

181

1    tolerances and custom and usage"?
2  A.  Yes.
3          MR. ARONSON:  Let me object and
4    instruct the witness not to answer to
5    the extent that you have to rely upon
6    communications with counsel, including
7    Mr. Gladstone, to answer that question.
8  Q.  Let me rephrase that for you, Mr.
9    Curren.  Do you know what that is in
10   reference to?
11 A.  Commercial --
12         MR. ARONSON:  Same instruction.
13         MR. ACETO:  If he told him what
14   that means, it's not attorney-client
15   privilege.
16 A.  Commercial tolerance?
17 Q.  Yes.
18 A.  That's what you're interested in hearing
19   about?
20 Q.  Yes.  What's the meaning of commercial
21   tolerance and custom and usage based on
22   your understanding of those terms in
23   your industry?
24 A.  Okay.  In my industry what we do is we

182

1    do what is called commercial assay, and
2    what we also perform is what we call a
3    commercial sampling procedure.  Not
4    perfect.  It's a good indication.  It's
5    better than an estimate.  It's better
6    than a buyer.  So a commercial sampling
7    -- I'm going to give you an example.
8    For our dental sweeps, which are an
9    important part of our business and an
10   important part of Trish's business, we
11   have 40-mesh screens in our sifters.  So
12   picture big incinerators -- maybe you
13   could fit four or five of them in this
14   room -- and you would take the dental
15   scrap, and you would shovel the dental
16   scrap into the incinerator, you would
17   incinerate it, you would pull it out,
18   and you would wait for it to cool off.
19   Then you would take the material and you
20   would put it in a ball mill.  Are you
21   familiar with what a ball mill is?
22 Q.  Yes.
23 A.  It's a pulverizer.  And you would
24   pulverize this material until you get it

183

1    to the point where it would fit through
2    a 40-mesh screen.  And then you would
3    have the undersize and the oversize --
4    that's a commercial sampling.  It's
5    very good for our purposes.
6          Now, if we're a pharmaceutical
7    company or Rand Refinery, and there was
8    billions and billions of dollars at
9    stake or maybe even several million
10   dollars, they would say, "That's not
11   good enough for us.  We're not using
12   this 40-mesh screen.  We're using
13   220-mesh screen."  Now if you take the
14   40-mesh -- what went through the 40-mesh
15   screen, what you have is it looks like
16   dirt, and it looks like it's perfectly
17   sifted until you take it and you put it
18   under a microscope and you start
19   measuring the microns, and you find out
20   quite often what you have is the
21   equivalent of basketballs and marbles.
22   Now you can take basketballs and
23   marbles, and you can mix them in a mixer
24   till the cows come home, and you're

184

1    never going to get a homogeneous sample.
2    So somebody who's doing a non-commercial
3    sampling would take the material -- they
4    wouldn't use a ball mill, they would use
5    a much different pulverizer and they
6    would also do it at different
7    temperatures, and they would probably
8    first do -- get it through a 120-mesh
9    screen, and then they would go through
10   the whole process again, and depending
11   upon the tensile strength of the
12   material, and then they would get it
13   down to a 2000 -- 220-mesh screen, and
14   then they would submit it for assay if
15   that was a pharmaceutical company or a
16   large mining company.  Same thing goes
17   for the assay part.  When you say
18   commercial tolerances, you would talk
19   about a commercial assay.  If you're
20   Rand Refinery or Pfizer, you can't have
21   any discrepancies.  You have to be able
22   to replicate -- what we talked about,
23   replicate with the chemistry, so you
24   have to physically recover every metal

185

1 in the material, quite often by
2 dissolving it and redissolving it and
3 precipitating and getting actually
4 recoverable amounts that you can dry and
5 quantify. So you have to have a
6 quantitive analysis performed on there,
7 so it would not be called a commercial
8 assay at that point. It would be much
9 more sophisticated.
10 Q. Is it your understanding of the use of
11 the term commercial tolerances in this
12 Exhibit 3 is a reference to the degree
13 of accuracy that you're providing to
14 your customers when you assess the
15 amount of precious metals?
16 A. Yes.
17 Q. Do you use this document, Exhibit No. 3,
18 when new customers come in?
19 A. Every time somebody ships -- not every
20 time. Any substantial new customer,
21 substantial new customer who ships
22 something in gets one of these. Now
23 they don't all sign them and send them
24 back, they just put them in their file,

186

1 but I want them to know about it.
2 Q. Was this document in effect at the time
3 that Miss Bergevine worked at Pease &
4 Curren?
5 A. Some of the document was in effect.
6 Q. I notice on page 2 it's dated 2004,
7 Mr. Curren, so do you know whether
8 Mr. Gladstone created it after she
9 left, or was it a document that was
10 used when she was there?
11 A. This was afterwards, this document.
12 Q. Okay. We can turn to Exhibit No. 4.
13 Take a look at Exhibit No. 4. Are you
14 familiar with Miss Thomasen?
15 A. No.
16 Q. Are you familiar with the fact that
17 Mr. Pease had to send this letter out to
18 Miss Thomasen?
19 A. No.
20 Q. If you look at Exhibit No. 5, you see
21 the body of the letter is pretty much
22 identical to Exhibit No. 4; is that
23 right?
24 A. Yeah.

187

1 Q. Was there a form letter in 2002 that you
2 sent out to customers -- by you, I mean
3 Pease & Curren -- sent out to customers
4 in response to an inquiry as to the
5 accuracy as to assay report -- not,
6 assay, accuracy of a particular
7 settlement report?
8 A. No.
9 Q. There wasn't a form letter?
10 A. No, no. Jay -- I have to assume Jay
11 spoke to both of these customers, and
12 then after he spoke with them, he sent
13 them a letter confirming that their
14 assays were -- excuse me -- the
15 recoverable amount of gold that they got
16 was accurate, and that they could put it
17 in their file and show it to their boss
18 or their wife, depends how big the
19 company was.
20 Q. But you didn't have a form letter at
21 Pease & Curren that was used to send to
22 clients?
23 A. No.
24 Q. Do you have one today that you use?

188

1 A. We don't have any letter now.
2 Q. Is it your responsibility to send out
3 something in sum or substance similar to
4 Exhibit No. 5 now that you have taken
5 over the settlement function?
6 A. Customer inquiries come to me.
7 Q. So it's your responsibility now as
8 opposed to Jay Pease back when he was
9 with the company?
10 A. Correct.
11 Q. Exhibit No. 6. No. 6 was a document
12 that was produced by you or by your
13 office. I'm assuming this is a Web site
14 that Pease & Curren has implemented?
15 A. This is a Web site, yeah.
16 Q. When did you put up this particular
17 material on the Web site; do you know?
18 A. No.
19 Q. Is that part of your responsibilities of
20 marketing that you do the Web site, or
21 did you hire an outside source to do
22 that?
23 A. I hired an outside source.
24 Q. Did you provide the literature that went

189

1    into the Web site?
2    A.   Nope.
3    Q.   Look on page 2, then, of Exhibit 6, did
4        you provide that particular language
5        that went into the Web site?  And I am
6        referring to the words at the top.
7    A.   Dental?
8    Q.   Dental Refining Services for Gold, that
9        whole section.  Did you provide all that
10       material?
11           MR. ARONSON:  Outlined in the
12       paragraphs below it?
13           MR. ACETO:  Yeah, all the
14       written material.
15   A.   "Did you know that 10 to 15 percent,"
16       that line?
17   Q.   Yes, that all the way down to "partner
18       links," all the written material on
19       page 2.  Did you provide that material
20       to the Web site designer, or did
21       somebody else at Pease & Curren?
22   A.   Somebody else at Pease & Curren.
23   Q.   Do you -- specifically, paragraph 2,
24       "For 85 years Pease & Curren, a

190

1        family-owned," that whole paragraph, can
2        you read that.  Are you familiar with
3        that paragraph?
4    A.   Let me read it.
5    Q.   Sure.
6            (Witness reading over document.)
7    A.   Yup.
8    Q.   Do you agree with all the statements
9        that are in that paragraph today?
10   A.   I do.
11   Q.   And that is an accurate statement, or
12       the two sentences are accurate
13       statements?
14   A.   Yes.
15   Q.   If I could turn your attention,
16       Mr. Curren, to Exhibit No. 9.  Have
17       you ever seen that document prior to
18       today?
19   A.   No.
20   Q.   Do you know why that document was
21       produced in your document production?
22   A.   I do not.
23   Q.   Do you know whose handwriting that is at
24       the top?

191

1    A.   I do not.
2    Q.   Do you know who Innodent is from
3        Yarmouthport?
4    A.   I know they're a dental lab.  I know
5        they're in Yarmouthport.  I know my
6        sister went and visited them, and I know
7        the guy ships to us still.
8    Q.   But you have no idea -- by the way, is
9        this an assay ticket?
10   A.   It's not an assay ticket.
11   Q.   It's what, then, a tracking system
12       printout?
13   A.   Apparently.  I mean, I can't guarantee
14       anything with this thing.
15   Q.   Let's turn to page 10 -- excuse me,
16       Exhibit 10, have you seen this document
17       prior to today?
18   A.   No.
19   Q.   Do you know what this is, this multiple
20       page Exhibit 10?
21   A.   I assume it's -- without reading it, but
22       looking at it, I assume it's sales
23       comments that came out of the computer
24       system for salesmen.

192

1    Q.   Does this relate to one particular
2        customer of yours?  Not that the
3        customer at the top, sir, at the top of
4        page 1 of Exhibit 10, Precious Metal
5        Refining Services, wouldn't that be --
6        isn't that the customer?
7    A.   I think so.
8    Q.   So all these entries relate to that one
9        particular customer of Pease & Curren;
10       is that right?
11   A.   Greg, do you want me to read all this to
12       guarantee that?
13   Q.   Not really, no.
14   A.   Or do you want me to just take your word
15       for it?
16   Q.   If you're going to say something about
17       it, you're going to have to peruse the
18       document.
19   A.   I am willing to help you out, man, I
20       really am.
21   Q.   Take a second.
22   A.   I'm not -- I can't make things up unless
23       you promise me they're okay.
24   Q.   Take a look at everything, and then try

SHEA COURT REPORTING SERVICES
BOSTON MA - (617) 227-3097

193

1     to respond.
2            (Witness reading over document.)
3     Q.  So, Mr. Curren, all those documents that
4         are part of Exhibit No. 10, are those
5         entries relating to one specific
6         customer?
7     A.  Yes.
8     Q.  Is that part of your responsibilities to
9         oversee that particular database
10        regarding communications with clients?
11    A.  No.
12    Q.  Who makes these entries in this
13        database reflected in Exhibit 10?
14    A.  Well, if you look at the top in the
15        middle you'll see initials.  On this
16        page it's MH, Mary Hone.  She made the
17        entries.
18    Q.  Is there a procedure as to why someone
19        would make entries regarding a specific
20        client?
21    A.  Incoming calls quite often go to
22        customer service.  Outgoing calls quite
23        often are the result of inside sales.
24    Q.  So incoming calls get recorded in this

194

1     particular system?
2     A.  No, everything gets recorded in the
3         system.  Each customer has a file in the
4         computer.
5     Q.  And every time anyone talks to them, you
6         make an entry in the system?
7     A.  Yeah.
8     Q.  Including yourself?
9     A.  Yeah.  I don't make the entry because I
10        don't use the computer, but I inform
11        somebody, "Can you please make an entry
12        that I spoke with such and such about
13        such and such?"
14    Q.  Do you orally give them that or do you
15        write it out?
16    A.  Yeah, orally.
17    Q.  And your administrative assistants would
18        write it in under your initials or under
19        their initials?
20    A.  Under their initials.
21    Q.  So they say --
22    A.  "Kip said he talked to Shelly and Shelly
23        wants 50 kegs sent to his warehouse."
24    Q.  "Shelly," who's that in reference to --

195

1     I see a reference to Sheldon something.
2     A.  Sheldon something, yeah.
3     Q.  And is he still a customer of yours?
4     A.  I don't know, but -- I'm not sure.
5     Q.  What number or estimate do you have of
6         the customers that you have that are
7         current customers?  You said 3000
8         before; is that right?
9     A.  Yes.
10    Q.  That's an estimate of roughly 3000
11        active clients?
12    A.  Yeah, yeah.  Guys like this.  This guy
13        is buying stuff from people, not just --
14        he's buying stuff, he's got rubber dust.
15        He want 25 jars to pass out to stores in
16        his neighborhood.
17    Q.  25 jars, what do you mean by that, 25
18        jars of what?
19    A.  Empty jars.  He wants me to put -- he's
20        kind of -- he's a middleman.
21    Q.  Why is it that Pease & Curren produced
22        this particular file of precious metal
23        as opposed to another customer; do you
24        know?

196

1     A.  No, I don't know.  I would say that it's
2         an example of a buyer who's a middleman
3         who's done a lot of business with us,
4         and there's some complaints in it, and
5         there's some happy news in it, and
6         sometimes he calls at night, sometimes
7         he calls in the day.  He's fairly
8         demanding.  I would say it's an example
9         of what our guys are doing and how
10        they're handling it.
11    Q.  Whose DD?
12    A.  Deb Dubois.
13    Q.  Exhibit No. 11, Mr. Curren, have you
14        ever seen these documents prior to
15        today?
16    A.  No.
17    Q.  Do you know why those particular --
18        strike that.  What are these, to your
19        knowledge?  You don't even know what it
20        is?
21    A.  No.  I know that there's some dates,
22        some bullions, some sweeps, some
23        amounts --
24    Q.  But do you know what database this is

197

1    being printed from?
2  A.  No.
3  Q.  You don't know.  Did you recognize
4    these clients that are at the top of
5    Exhibit 11?
6  A.  No.
7  Q.  Creative Dental, never heard of them?
8  A.  No.
9  Q.  Precision Dental?
10  A.  No.
11  Q.  Quality Plus Dental.
12  A.  No.
13  Q.  Shaw Laboratories?
14  A.  Don't know.
15  Q.  Wolfe Dental?  You never heard of any of
16    these?
17  A.  No.  I mean, there's thousands of them.
18    They're all Dental something.
19  Q.  But earlier you were saying that you
20    don't keep the information back more
21    than three years.  Some of this
22    information is from 2002.  So do you
23    have a lot of information relating to
24    the amount of precious metals in

198

1    particular lots in your database?
2  A.  Not that I know of.
3  Q.  Do you know who accessed these documents
4    to provide them to me?
5  A.  I don't.  I had nothing to do with
6    discovery over here.
7  Q.  Exhibit No. 12, Mr. Curren, can you
8    describe for me what that is, sir?
9  A.  That's a tracking system.
10  Q.  Those are typical tracking system
11    entries?
12  A.  Yup.  They got BX and XX numbers.
13    Numbers with X's mean Pease & Curren
14    only.
15  Q.  Let's look at Exhibit 14A and 14B,
16    Mr. Curren.  Do you recognize at least
17    the format, if nothing else, of 14A and
18    14B?
19  A.  Yup.
20  Q.  14A is a typical settlement report; is
21    that right?
22  A.  Yeah.
23  Q.  And 14B is a typical tracking system
24    entry; correct?

199

1  A.  Yes.
2  Q.  For this particular line of questioning,
3    I'm going to focus on lot B0470, which I
4    guess is the bottom half of 14B; is that
5    right?  Correct?
6  A.  It says lot number.
7  Q.  It says lot number right there, so that
8    would be the bottom half of the tracking
9    system; is that right?
10  A.  Yes.
11  Q.  So according to 14B, the amount of gold
12    that was estimated -- to use your words
13    -- estimated in that lot was 8.656
14    ounces; is that right, according to the
15    entry there in the tracking assay?
16  A.  8.65.
17  Q.  In the settlement record it's written
18    down as 6.989 ounces; correct, which was
19    sent to the client?
20  A.  Yeah.
21  Q.  Can you account for the difference of
22    roughly 1.7 ounces of gold?
23  A.  Well, I can if I have -- well, first of
24    all, I didn't settle this; however, if I

200

1    did settle it, and I wanted to tell you
2    the difference, I would have to have the
3    assay ticket.
4  Q.  And you don't have the assay tickets for
5    2002; correct?
6  A.  I don't have the tickets.
7  Q.  And what about the silver, if we look to
8    the silver, 14B estimates the presence
9    of silver in that lot at 5.33 ounces; is
10    that accurate?  Am I reading that
11    accurate?  Let me rephrase that so we
12    don't get into this area.
13    The statement -- the tracking
14    system indicates that there's an
15    estimated amount of 5.33 ounces of
16    silver present in Lot B0470; correct?
17  A.  It does, yes.
18  Q.  And then if you go to 14A, it indicates
19    that that lot, the notification of the
20    client indicated that the lot had 2.21
21    ounces; is that right?
22  A.  That's right.
23  Q.  So there's a discrepancy, a difference,
24    if you will, of about 3.1 ounces of

201

```
 1      silver?
 2   A.  Yes, that's true.
 3   Q.  And do you have an explanation -- and I
 4      know you didn't settle this -- but do
 5      you have an explanation as to what
 6      accounts for the significant difference
 7      between the amounts of silver in this
 8      lot from the tracking system to the
 9      statement report, settlement report?
10          MR. ARONSON: Objection. You
11      may answer.
12   A.  I don't find them a significant
13      difference. I find lead retention.
14      Once again, I find the presence of
15      palladium, and the silver probably was
16      reached by subtraction of the silver and
17      some as lead.
18   Q.  What about the platinum, there's a
19      difference between 14B and 14A in the
20      same lot, a difference of .15 ounces of
21      platinum. Did I read that right?
22   A.  Yeah. That's not a big difference.
23   Q.  Would you have an understanding of --
24   A.  You're talking about one-tenth of one
```

202

```
 1      percent. I mean, it's not a big
 2      difference.
 3   Q.  Understanding that you didn't do the
 4      settlement report, could you offer an
 5      explanation as to why the amount of
 6      platinum in the settlement report was
 7      reduced when sent to the client?
 8   A.  I can't really speculate on it. I can't
 9      really speculate, Greg; however, if you
10      have all the information, as I talked
11      about, in front of you, then you can
12      make a determination. I can tell you a
13      couple of things about dental alloys,
14      though, that --
15   Q.  Haven't we already talked about that,
16      though?
17   A.  Well --
18   Q.  If it's something you haven't talked
19      about, feel free.
20   A.  Okay. Just for silver sake.
21   Q.  Right.
22   A.  The dental alloys are loaded with
23      silver. In other words, they don't use
24      them. So you can't expect to find it in
```

203

```
 1      a scrap.
 2   Q.  So you're saying if there's any reading
 3      of silver, it's probably inaccurate?
 4   A.  Not always. They don't use 90 percent,
 5      they don't have dental alloys with
 6      90 percent silver. There's variations
 7      of the alloy, and if you look at it
 8      here, the gold is usually the highest,
 9      then you see the silver. The silver is
10      really the second highest because they
11      don't use that much silver, and they use
12      a tiny amount of platinum, and then
13      palladium is the secondary metal in
14      dental alloys, just so you know. I
15      didn't mean to digress.
16   Q.  Thank you. And the palladium, there's a
17      difference between 14B to 14A of about
18      .83 ounces. Can you -- understanding,
19      again, that you didn't do this
20      settlement report --
21   A.  You know, 10 percent of it is our
22      charge.
23   Q.  10 percent for palladium?
24   A.  Yeah.
```

204

```
 1   Q.  10 percent or 7 percent?
 2   A.  10 percent.
 3   Q.  Was it at some point 7 percent when
 4      Bergevine worked there?
 5   A.  Yeah, when she started there I think it
 6      was 7.
 7   Q.  Now it's 10 percent today. What about
 8      2002?
 9   A.  I think it was 10 percent.
10   Q.  Can you explain something to me about
11      the assay, what are those percentages
12      actually a percentage of in 14B where it
13      says Assay Percentage?
14   A.  Aftermelt.
15   Q.  That's a percentage of the entire lot?
16   A.  No.
17   Q.  So can you explain to me what that means
18      when it says Percentage?
19   A.  Okay. Do you have a calculator?
20   Q.  No, not in here, no. Do you really need
21      one?
22   A.  Let me see if I can do it for you.
23   Q.  I am more asking you what those
24      percentages reflect. Is it a percentage
```

SHEA COURT REPORTING SERVICES
BOSTON MA - (617) 227-3097

205

```
1      of all the material in the lot, or is it
2      a percentage of the amount of precious
3      metals?
4   A. I was looking at this when you asked
5      that question, so let me just look at
6      you, and you can ask that question
7      again.
8   Q. I'm looking at 14B.
9   A. I understand that.
10  Q. I'm asking you what those percentages
11     actually represent.  It's a percentage
12     of what, the overall weight of that lot,
13     including all of the junk and garbage?
14  A. No, no, no, no, no, no, no.  No, no.
15     No, no.  No, no.  No, no.  It would be
16     the aftermelt, aftermelt, but there
17     would be -- you can't expect it to add
18     up to 100 percent.
19  Q. That's my question, it didn't add up to
20     100 percent?
21  A. You didn't ask that question, but now
22     that you asked that question, let me
23     answer it.  You got base metals and
24     other contaminants in there.  Well, you
```

207

```
1   A. It's like burning this.  Maybe the
2      rubber will burn off, maybe the cork
3      will burn off.  That won't.
4   Q. That's what left, the 100 percent,
5      that's what is left over here?
6   A. Yeah, that's what you got.
7   Q. Let's turn to 15A and 15B for a second.
8   A. Okay.
9   Q. Are you familiar with this Shaw
10     Laboratories?
11  A. I said I didn't know really -- I don't
12     know him.
13  Q. Focusing on lot --
14  A. Wyoming, Pennsylvania.
15  Q. Lot B0410, which is the subject of 15A
16     and 15B.
17  A. Okay.
18  Q. According to the settlement report,
19     there was 37.8 ounces of gold in this
20     particular lot, and according to the
21     tracking system entry it was 46 ounces
22     of gold.  So understanding again that
23     you didn't do this settlement report,
24     can you account for the discrepancy of a
```

206

```
1      can't -- when we do a sample, we -- as I
2      said, remember we talked about a
3      commercial sampling?  There's base
4      metals and sometimes silk or ceramic or
5      something.  Also, in the weight --
6      that's one of the problems why -- as far
7      as getting it homogeneous, that I was
8      alluding to earlier.
9   Q. If you added all these percentages up,
10     it adds up to roughly 74 percent?
11  A. What's the rest?
12  Q. Exactly, what's the other 26 percent?
13  A. It could be chromium, could be lead.
14  Q. Could it also be dirt and garbage?
15  A. No, no, no, no, no, no, no.  We
16     don't -- anything that will incinerate,
17     it has to be able to withstand a certain
18     amount of heat to still exist there, so
19     if it was like this plastic.
20  Q. It's gone?
21  A. Poof.
22  Q. I see.  So it's other kind of metals
23     that aren't precious metal that account
24     for the other 24 percent?
```

208

```
1      little over eight ounces of gold?
2   A. I'm not sure it's a discrepancy, but
3      there is a difference.
4   Q. There is a difference?
5   A. There is a difference, Greg.
6   Q. What's accounts for that difference?
7   A. Look at the percentages once again.
8      Very high gold percentage.  Is that
9      realistic?  I mean, I can't account for
10     it.
11  Q. And there's about 25 percent missing.
12     Does that indicate something to you?
13  A. No, no, no, no.  No, no, no, no.  Look
14     at the platinum/palladium ratios.
15  Q. What does that mean to you?
16  A. That means to me that this was probably
17     not even dental scrap.  That's some
18     jewelry scrap put in there and doesn't
19     fall into the jewelry scrap guideline.
20     But as far as the difference in figures,
21     as far as the 55 percent being real, is
22     that a real number?  Is that a good
23     number that we're going to pay on?  I'd
24     have to see this -- it's 95-ounce bar of
```

209

```
1    flash crowns and grinds. Let me tell
2    you something, Greg. I know what a
3    flash looks like; I know what crowns
4    look like; I know what grinds look like.
5    We might have paid this guy 30 ounces
6    too much because I get really scared
7    when I see flash and grinds because I
8    paid a lot of flash and grinds that
9    don't look like this, so -- it isn't
10   dental scrap, that's for sure.
11 Q.  What about palladium then, palladium,
12   there's a difference of about two ounces
13   of palladium at $3.46 an ounce. With
14   your understanding of what is entailed
15   in the settlement report, can you
16   account for that difference?
17 A.  I can't. I can't. I would like to
18   know. I would like to know whether this
19   weight is correct.
20 Q.  The overall weight?
21 A.  Yeah. You know what I am saying? Like
22   if I was paying this job, Greg, you
23   would see Kip Curren going into the back
24   and going, "Boys, get this job out here.
```

211

```
1  A.  A few.
2  Q.  More than two?
3  A.  Yes.
4  Q.  More than five?
5  A.  Yes.
6  Q.  More than ten?
7  A.  Yes.
8  Q.  More than 20?
9  A.  Yes, but she was there a long time.
10 Q.  She was there about six years.
11 A.  Yeah. So it wasn't -- it wasn't -- I
12   wouldn't characterize her as anything
13   but a good salesperson, but she was
14   aggressive. Some people, they don't
15   like the aggressive nature, aggressive
16   women nature. And then, of course,
17   other people loved her, so it was --
18 Q.  So the complaints were of what nature,
19   that she was too aggressive with them?
20 A.  One guy told me that she belonged on the
21   back of a Harley. Yeah. It had to do
22   with she's out to get the business,
23   she's not going to take no for an
24   answer.
```

210

```
1    It's flash, it's crowns, it's grinds.
2    Those usually lose 50 percent of their
3    weight. If you wrote down 82 and it was
4    used -- supposed to be 32, I am going to
5    pay this guy 20 ounces too much, so find
6    it and weigh it in front of me."
7  Q.  So you find it and weigh it again?
8  A.  Yeah. I am looking at this, and if I
9    had to bet on this thing, this is a
10   goof-up and we overpaid.
11 Q.  You paid him too much money?
12 A.  Yeah. Quite a goof-up to me.
13 Q.  Let's go back to Miss Bergevine for a
14   couple of minutes. Miss Bergevine, when
15   she left, she resigned; is that right?
16 A.  She did, yeah.
17 Q.  Did you have any negative evaluations in
18   her personnel file when she left there?
19 A.  No.
20 Q.  Did you have any complaints from
21   customers regarding her performance for
22   the time she worked there?
23 A.  Yes.
24 Q.  How many complaints?
```

212

```
1  Q.  Was she doing anything that she was
2    turning away customers?
3  A.  I would say there was some customers
4    that I said, "Trish, don't call them
5    anymore. We'll have somebody else call
6    that person."
7  Q.  This is in the dental field?
8  A.  Yeah.
9  Q.  But you kept her around and increased
10   her compensation structure over time;
11   correct?
12 A.  I did, yeah.
13 Q.  In fact, you wanted to make her an
14   employee and integrate her into the
15   sales force?
16 A.  I did. I wanted her to make some real
17   dough. I figured she'd paid her dues,
18   it was time to come into the sales
19   force. I thought she could do it. I
20   thought she could be part of my company,
21   and she had a partner, and they would
22   have some teamwork, and they would make
23   me money, and they would bring me in
24   customers, and the type of customers I
```

213

1   wanted.
2   Q.  And did they, during the time they were
3       together, Miss Bergevine and Miss
4       Granger?
5   A.  No.
6   Q.  They didn't?
7   A.  No.
8   Q.  It was a disaster?
9   A.  No.  They quit in, I think, June or
10      July, but they really quit in February.
11  Q.  Why do you say that?
12  A.  They just stopped working.
13  Q.  Do you have an understanding that they
14      went to work for a competitor?
15  A.  After they left us, yeah.
16  Q.  But not immediately after they left you?
17  A.  Fairly immediately.  Within a month or
18      two.
19  Q.  Do you have an understanding how long
20      they worked at that company?
21  A.  Several years.
22  Q.  Several years.  What do you base that
23      understanding on?
24  A.  Just what I hear from people around my

214

1       company who are in touch with the other
2       company.  I base some of it on her
3       deposition, which I was present at.
4   Q.  Right.  Did any of your customers, to
5       your knowledge, your Pease & Curren
6       customers, go to -- we're talking about
7       Advanced Chemical.  Did any of your
8       clients, that you know of, switch at
9       that time in 2002 from you to Advanced
10      Chemical?
11  A.  Yes.
12  Q.  How many customers?
13  A.  I don't know.
14  Q.  More than a couple?
15  A.  Yeah.
16  Q.  Do you have an understanding that
17      Miss Bergevine was soliciting them?
18  A.  I know positively she was soliciting
19      them.
20  Q.  Which ones do you know of that she was
21      soliciting?
22  A.  I don't know off the top of my head
23      which ones she was soliciting, but I
24      know she was soliciting in her

215

1       territory, and Bethany was soliciting in
2       hers, and I hired two more people to
3       retain our customers, and they basically
4       would be coming back saying, "Gee, I
5       talked to some dental lab, and Trish
6       talked to them yesterday.  I am talking
7       to them tomorrow," that type of stuff,
8       you know?
9   Q.  You're not aware of any non-compete that
10      Miss Bergevine signed with the company?
11  A.  No.
12          MR. ACETO:  Why don't we take a
13      break for two minutes.  I am very close
14      to being done.  If we can take a three-
15      minute break.
16          (Whereupon there is a brief
17      recess.)
18  Q.  You said, Mr. Curren, that each client
19      has a file in the computer system.
20      Besides the sales calls, is there
21      anything else in a particular client's
22      file?
23  A.  No.
24  Q.  So that what you're saying is there was

216

1       a file, the file is solely for the sales
2       call-in log or whatever you called it
3       before?
4   A.  As you saw with the client Shelly, no
5       matter who talks to Shelly, it gets
6       recorded, so Shelly is all in one place,
7       so we can kind of go over things.
8   Q.  But it's not for the purpose of solenoid
9       boards or the tracking system?
10  A.  No.
11  Q.  The file is just for sales amounts.  It
12      has the call-ins and call-outs, like an
13      insurance company recording everything
14      that is discussed with a customer in the
15      computer system?
16  A.  Or a hospital.
17  Q.  Or a hospital?
18  A.  Yeah.
19  Q.  If we could turn back to Exhibit 1, that
20      information under Refining Terms in
21      Exhibit No. 1, although you say it never
22      went out to any of the clients, is that
23      accurate information as to the charges?
24      I'm asking you just to focus on the

SHEA COURT REPORTING SERVICES
BOSTON MA - (617) 227-3097

217

1    Refining Terms.
2         MR. ARONSON:  At what time are
3    you talking about?
4         MR. ACETO:  Of when this was
5    created.
6    A.   Well, see the bottom, combined high
7         grade low grade received at the same
8         time, 150?
9    Q.   Yes.
10   A.   That's a bunch of hogwash.
11   Q.   Why is that?
12   A.   Well, why would I do two lots for the
13        price of one?
14   Q.   So that is not accurate how you do your
15        charging, No. 3?
16   A.   No, no.
17   Q.   What about 1 and 2, are those accurate
18        statements as to the charging for dental
19        industry lots at Pease & Curren?
20   A.   No.
21   Q.   Why don't we do No. 1 first.  Is No. 1
22        accurate?
23   A.   Yup.
24   Q.   Number 1 is accurate in its entirety?

219

1    incentive not to just fill their drums
2    up with non-precious metal bearing
3    scrap.  To do that we charge them
4    seventy-five cents a pound weight
5    received as opposed to $2.00 a pound
6    afterburn in addition.
7    Q.   So it's just seventy-five cents per lot
8         per pound prior to burn?
9    A.   Oh, yeah.
10   Q.   But it's not --
11   A.   It's both.
12   Q.   It's seventy-five for the weight
13        initially?
14   A.   Incoming.
15   Q.   And then $2.00 per pound --
16   A.   -- afterburn.  Remember we talked about
17        the sludge?  It was 2000 pounds and it
18        didn't burn down and all that.
19   Q.   So where do you account for that in one
20        of these typical settlement reports that
21        you send out?  Where do you account for
22        those charges for the weight?  In, like,
23        16A, where do you account for the
24        charges for the afterburn rate and the

218

1    A.   Yup.
2    Q.   Is No. 2 accurate in its entirety?
3    A.   No.
4    Q.   What is not accurate as to your charges
5         for dental industry lots?
6    A.   No, incoming weight on the seventy-five
7         cents incoming; in other words, we have
8         the afterburn.
9    Q.   Where are you reading that from?
10   A.   B.
11   Q.   B, charges 125 minimum?
12   A.   No, below that.
13   Q.   Refining at $2.00 per pound?
14   A.   Afterburn.
15   Q.   Afterburn weight.  That's not accurate.
16        No. 1, refining at $2.00 per pound?
17   A.   Oh, no.  It's seventy-five cents
18        incoming is omitted.
19   Q.   Can you just explain to me what you mean
20        by that?
21   A.   Well, we talked before about how we're
22        trying to get the guys not to just send
23        everything in to us.  In order to do
24        that, we have a charge, so they have an

220

1    preburn rate?  Where is that reflected
2    on?
3    A.   It's a bullion meltdown.
4         THE STENOGRAPHER:  I'm sorry,
5    what did you say?
6         THE WITNESS:  A bullion,
7    b-u-l-l-i-o-n.
8    Q.   This particular one?
9    A.   That's a bullion.
10   Q.   What about --
11   A.   Find me a sweep.
12   Q.   How about 15A?
13   A.   Bullion.
14   Q.   14A?
15   A.   It's a bullion.
16   Q.   What do you mean by that, it's a
17        bullion?
18   A.   See the B number?
19   Q.   You mean the lot number?
20   A.   The B is for bullion, the S is for
21        sweep.
22   Q.   What's the difference between bullion as
23        opposed to a sweep, then?
24   A.   See, essentially the opposite.  A

221

```
 1      bullion is meltable, and a sweep has to
 2      be incinerated, ball mill and screened.
 3   Q. Is there a weight charge on a bullion
 4      delivery, then?
 5   A. Yes, there is.
 6   Q. Let's take 14A, where is that weight
 7      charge on this for bullions?
 8   A. $50.
 9   Q. That's the per pound --
10   A. -- ounce.
11   Q. Excuse me, per ounce?
12   A. 48 ounces.  If it was 51 ounces, it
13      would be $51.
14   Q. What about 18A, that indicates it's a
15      sweep.
16   A. All right, we got a sweep boys, 14-pound
17      sweep.  Charge is 100 bucks.  If it was
18      1400 pounds, I would multiply 14 pounds
19      incoming times .75, and that charge
20      would be reflected right here.
21          MR. ACETO:  I have no further
22      questions.  Thank you, Mr. Curren.
23          THE WITNESS:  Thank you.
24          (Whereupon the deposition was
        concluded at 4:05 p.m.)
```

223

```
 1   COMMONWEALTH OF MASSACHUSETTS)
     COUNTY OF ESSEX)
 2
 3       I, Joan Applegate, C.S.R., a
     notary public in and for the
 4   Commonwealth of Massachusetts, do hereby
     certify that Francis H. Curren, III was
 5   by me first duly sworn, to testify to
     the truth, the whole truth, and nothing
 6   but the truth, and that the above
     deposition, pages 9 through 221
 7   inclusive, was recorded stenographically
     by me and reduced to typewriting by me.
 8       I FURTHER CERTIFY that the
     foregoing transcript of the said
 9   deposition is a true and correct
     transcript of the testimony given by the
10   said witness at the time and place
     specified hereinbefore.
11
12       I FURTHER CERTIFY that I am not a
     relative or employee or attorney or
13   counsel of any of the parties, nor a
     relative or employee of such attorney or
14   counsel, or financially interested
     directly or indirectly in this action.
15       IN WITNESS WHEREOF, I have
16   hereunto set my hand and seal of office
     at Saugus, Massachusetts, this 14th day
17   of August, 2006.
18
19       Joan Applegate
         Certified Shorthand Reporter
20       Notary Public
21
22   My notary commission expires:
     March 29, 2007.
23
24
```

222

```
 1      SIGNATURE PAGE/ERRATA SHEET
 2   RE: BERGEVINE VS. PEASE & CURREN
 3   DATE: 7/25/06
 4   DEPOSITION OF: FRANCIS H. CURREN, III
 5
        I, Francis H. Curren, III, do
 6   hereby certify that I have read the
     foregoing transcript of my testimony and
 7   it is a true and correct record of my
     testimony (with the exception of the
 8   corrections, if any, listed below.)
 9   PAGE  LINE  CORRECTION
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20      Signed under the pains and
21   penalties of perjury this _____ day of
22   _____, 2006.
23   _____
24      FRANCIS H. CURREN, III
```